## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ROADSYNC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | Civil Action File No.: |
| RELAY PAYMENTS, INC., | ) | |
| SPENCER BARKOFF, | ) | |
| JAMES RYAN DROEGE, | ) | |
| and DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff RoadSync, Inc. ("RoadSync") files this Complaint against Defendant Relay Payments, Inc. ("Relay Payments"), Spencer Barkoff ("Barkoff"), James Ryan Droege ("Droege"), and Does 1-10 (collectively, "Defendants"), showing as follows:

## PRELIMINARY STATEMENT

1.     RoadSync is an innovative technology company that provides automated solutions to the logistics industry.  RoadSync's proprietary Checkout™ software delivers a streamlined, time-saving solution for invoicing and fee collection for warehouse, shipping, towing, and trucking companies.  RoadSync has enjoyed rapid growth and acclaim for its products and services.

2.      Unfortunately, RoadSync has been raided by two former executives, Barkoff and Droege, who stole RoadSync's trade secrets and other proprietary information and used them to launch a competing company and software platform.

3.      Several days before their departure from RoadSync, Barkoff and Droege engaged in a coordinated download of RoadSync's confidential customer and financial information and other trade secrets.  They then attempted to permanently delete all record of those unauthorized downloads.

4.      After leaving RoadSync, Barkoff and Droege launched Relay Payments.  Relay Payments, Barkoff, and Droege are now aggressively pursuing RoadSync's customers and privately promoting — but not disclosing on their website — software that mimics key features of RoadSync's Checkout™.

5.      As a result, RoadSync has been forced to bring this action to recover for the theft of its trade secrets and confidential information, to enjoin Defendants from continuing to illegally free ride on RoadSync's intellectual property, and to recover damages for Defendants' willful and malicious misconduct.

## NATURE OF THE ACTION

6.      This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1) *et seq.* and the Georgia Trade Secrets Act, O.C.G.A. 10-7-761 *et seq.*, breach of contract,

violation of the Georgia Computer Systems Protection Act, O.C.G.A. § 16-9-93

*et seq.*, and breach of fiduciary duties.

## PARTIES

7.    RoadSync is a corporation organized and existing under the laws of

Delaware with its principal place of business at 730 Peachtree Street NE,

Suite 830, Atlanta, Georgia.

8.    Relay Payments is a corporation organized and existing under the

laws of Delaware with its principal place of business at 800 Battery Avenue SE,

Suite 3017, Atlanta, Georgia.

9.    Barkoff is a person residing in Atlanta, Georgia.  Barkoff was a

co-founder of RoadSync and served as RoadSync's Chief Revenue Officer through

August 30, 2018.

10.    Droege is a person residing in Kennesaw, Georgia.  Droege was a

co-founder of RoadSync and served as RoadSync's Chief Operating Officer

through August 30, 2018.

11.    Does 1-10 are officers, employees, agents, or representatives of Relay

Payments or the named individual defendants who participated in the theft and

misuse of RoadSync's trade secrets and other confidential information.  The

identities of Does 1-10, and their roles in the misappropriation of RoadSync's trade

secrets, are not currently known.  RoadSync will amend this Complaint to include

the name or names of said persons or entities, and their roles in the

misappropriation of RoadSync's trade secrets, when that information becomes

available.

12.     On information and belief, each of the Defendants was the agent of

each of the other Defendants, and committed the acts or omissions alleged herein

on behalf of each of the other Defendants.  Defendants authorized, approved,

ratified or directed the acts or omissions of each of the other Defendants that are

alleged here.

## JURISDICTION AND VENUE

13.     The Court has original jurisdiction of RoadSync's DTSA claim under

18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental

jurisdiction over RoadSync's state law claims pursuant to 28 U.S.C. § 1367

because they are part of the same case or controversy.

14.     The Court has personal jurisdiction over Relay Payments because

Relay Payments maintains its principal place of business in the State of Georgia, is

licensed to do business in the State of Georgia, and regularly, systematically, and

continuously transacts business in the State of Georgia.  Relay Payments also

committed the wrongful acts giving rise to the claims against it in this action in the

State of Georgia, including misappropriating RoadSync's trade secrets in the State

of Georgia.

15.     The Court has personal jurisdiction over Barkoff and Droege because they reside in the State of Georgia.  Barkoff and Droege also committed the wrongful acts giving rise to the claims against them in this action in the State of Georgia, including breaching contracts with RoadSync in the State of Georgia, and misappropriating RoadSync's trade secrets in the State of Georgia.

16.     The Court has personal jurisdiction over Does 1-10 because they reside in, or will be present in, the State of Georgia.  Does 1-10 also committed the wrongful acts giving rise to the claims against them in this action in the State of Georgia, including misappropriating RoadSync's trade secrets in the State of Georgia.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district, and because a substantial part of the events giving rise to RoadSync's claims occurred in this judicial district.

## **BACKGROUND FACTS**

### A.     **RoadSync Is an Innovator in Logistics Payment Software**

18.     RoadSync, formerly known as MyLumper Corp., was founded in 2015.  RoadSync is a pioneer in the market for logistics payments for commercial "lumping," *i.e.*, loading and unloading commercial freight and associated services.

19.     The United States trucking industry is among the largest generators of revenue in the country.  Almost three quarters of all goods sold in the United States

are transported by truck.  The industry's total revenue is approaching $1 trillion annually.

20.    Despite the size of the market, logistics companies such as freight brokers, truckers, lumpers, and warehouses often continue to rely on archaic manual invoicing and payment of lumping and related fees.  These manual transactions are time-consuming and fraught with error.

21.    RoadSync set out to disrupt the industry with a secure software solution that modernizes logistics payment transactions.

22.    On March 27, 2017, RoadSync launched its proprietary Checkout™ software platform — the first automated solution directed to logistics payment transactions.  Checkout™ facilitates payments between a shipper, freight broker, carrier, or driver, on the one hand, and a lumper, receiver, or other freight handler, on the other hand.  RoadSync's Checkout™ accepts and processes various means of payment, including fleet checks, fuel cards (or fleet cards), and credit cards.

23.    RoadSync invested years of effort and thousands of employee hours, and made a significant monetary investment, to create competitive market intelligence to identify players in the relevant fragmented markets, identify revenue opportunities, analyze financial metrics, and establish relationships with customers and prospective customers.  RoadSync also invested great time and expense to

develop Checkout™ and to successfully integrate it into customers' existing IT and logistics infrastructures.

24.    RoadSync's intellectual property, including its confidential customer information, competitive market intelligence, and the Checkout™ source code, is critical to providing RoadSync with a competitive advantage.  Accordingly, RoadSync has diligently protected its intellectual property against unauthorized disclosure and misuse.

25.    RoadSync's trade secret information includes its customer lists (including names, addresses, key contacts, and decision-makers at warehouses, freight handlers, and carriers); customer data compilations (including locations, volumes, proposed and acceptable prices, and payment and purchase histories for warehouses, freight handlers, and carriers); prospective customer lists (including names, addresses, key contacts, decision-makers, contact history, and potential revenue for warehouses, freight handlers, and carriers); financial analyses (including pricing, costs, economic models, and forecasts); product road maps, workflows, and confidential user guides; and source code for RoadSync's Checkout™ (including its Remote Checkout™ and robodialer functionality) and related software (including the "paycodes" functionality used for Remote Checkout™) (collectively, "RoadSync's Trade Secrets").

26.     RoadSync has invested millions of dollars over several years to develop RoadSync's Trade Secrets.  More than a dozen RoadSync employees worked tirelessly and devoted thousands of hours during their employment at RoadSync to develop RoadSync's Trade Secrets.

27.     RoadSync's Trade Secrets are extremely valuable to RoadSync and would be valuable to any actual or potential competitor.  The significant investment needed to develop a competitive platform such as Checkout™ is just the beginning of RoadSync's competitive advantage.  RoadSync, like potential competitors, needed to analyze a fragmented industry that includes many obscure small- and mid-sized players to identify revenue-generating opportunities and prospective customers.  The substantial investments required to enter and grow in this industry has resulted in relatively few competitors.

28.     RoadSync's Trade Secrets have not been and are not reasonably ascertainable to competitors, potential competitors, or other third parties.  And RoadSync takes numerous steps to vigorously protect RoadSync's Trade Secrets from unauthorized disclosure and misuse.

29.     For example, RoadSync's Trade Secrets are disclosed only to authorized employees on a need-to-know basis and are not disclosed to third parties.  RoadSync's Trade Secrets are stored electronically on RoadSync's password-protected computers and computer servers, which can be accessed only

by authorized users using their assigned credentials and passwords compliant with password-integrity protocols. RoadSync's electronic systems track and log user activity to allow RoadSync to audit access.

30.    RoadSync's Trade Secrets are maintained, to the extent memorialized in hardcopy, in RoadSync's locked offices accessible only to authorized employees through personally-identifiable electronic badge access control systems.

31.    RoadSync employees are required to sign confidentiality agreements requiring that they maintain RoadSync's Trade Secrets in confidence, not disclose RoadSync's Trade Secrets to third parties, and not use RoadSync's Trade Secrets for any purpose other than furthering RoadSync's best business interests within the scope of their authority as RoadSync employees.

32.    RoadSync's employees are also required to review and agree to the terms of an Employment Handbook that requires that they maintain RoadSync's Trade Secrets in confidence, not disclose Roadsync's Trade Secrets to third parties, and not use Roadsync's Trade Secrets for any purpose other than furthering RoadSync's best business interests within the scope of their authority as RoadSync employees.

**B.    Barkoff and Droege Agreed to Keep Confidential and Not Misuse RoadSync's Proprietary and Trade Secret Information**

33.    Barkoff and Droege, as RoadSync employees, signed confidentiality agreements requiring that they not disclose to third parties and not misuse RoadSync's Trade Secrets and other confidential and proprietary information.

34.    On October 29, 2015, Barkoff signed a Confidential Information and Invention Assignment Agreement (the "Barkoff Confidentiality Agreement").  On April 17, 2016, Droege signed a Confidential Information and Invention Assignment Agreement (the "Droege Confidentiality Agreement"; together with the Barkoff Confidentiality Agreement, the "Confidentiality Agreements"). Copies of the Barkoff and Droege Confidentiality Agreements are attached hereto as **Exhibits 1 and 2**, respectively.

35.    Section 2 of the Confidentiality Agreements requires that Barkoff and Droege devote their best business efforts to the interests of RoadSync and not to engage in any activity detrimental to the company:

> I will perform for the Company such duties as may be designated by the Company from time to time or that are otherwise within the scope of the Relationship and not contrary to instructions from the Company.  During the Relationship, I will devote my entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

(Exhibits 1 & 2 at 1.)

10

36.     Section 3(b) of the Confidentiality Agreements defines Confidential

Information:

> "Confidential Information" means information and physical
> material not generally known or available outside the
> Company and information and physical material entrusted to
> the Company in confidence by third parties. Confidential
> Information includes, without limitation: (i) Company
> Inventions (as defined below); and (ii) technical data, trade
> secrets, know-how, research, product or service ideas or
> plans, software codes and designs, algorithms,
> developments, inventions, patent applications, laboratory
> notebooks, processes, formulas, techniques, biological
> materials, mask works, engineering designs and drawings,
> hardware configuration information, agreements with third
> parties, lists of, or information relating to, employees and
> consultants of the Company (including, but not limited to,
> the names, contact information, jobs, compensation, and
> expertise of such employees and consultants), lists of, or
> information relating to, suppliers and customers (including,
> but not limited to, customers of the Company on whom I
> called or with whom I became acquainted during the
> Relationship), price lists, pricing methodologies, cost data,
> market share data, marketing plans, licenses, contract
> information, business plans, financial forecasts, historical
> financial data, budgets or other business information
> disclosed to me by the Company either directly or indirectly,
> whether in writing, electronically, orally, or by observation.

(Exhibits 1 & 2 at 2.)

37.     Section 3(a) of the Confidentiality Agreements requires that Barkoff

and Droege not misuse, disclose, or make unauthorized copies of RoadSync's

Trade Secrets and other confidential information:

> I agree, at all times during the term of the Relationship
> and thereafter, to hold in strictest confidence, and not to

11

use, except for the benefit of the Company to the extent
necessary to perform my obligations to the Company
under the Relationship, and not to disclose to any person,
firm, corporation or other entity, without written
authorization from the Company in each instance, any
Confidential Information that I obtain, access or create
during the term of the Relationship . . . .  I further agree
not to make copies of such Confidential Information
except as authorized by the Company.

(Exhibits 1 & 2 at 1-2.)

38.    Section 5 of the Confidentiality Agreements requires that Barkoff and

Droege deliver all Confidential Information to RoadSync on termination of their

employment:

I agree that, at the time of termination of the Relationship, I
will deliver to the Company (and will not keep in my
possession, recreate or deliver to anyone else) any and all
devices, records, data, notes, reports, proposals, lists,
correspondence, specifications, drawings, blueprints,
sketches, laboratory notebooks, materials, flow charts,
equipment, other documents or property, or reproductions of
any of the aforementioned items developed by me pursuant
to the Relationship or otherwise belonging to the Company,
its successors or assigns.

(Exhibits 1 & 2 at 5.)

39.    Section 8 of the Confidentiality Agreements reiterates that Barkoff

and Droege shall not misuse or disclose RoadSync's confidential information:

I acknowledge and agree that the Company's Confidential
Information includes information relating to the Company's
employees, consultants, customers and others, and that I will
not use or disclose such Confidential Information except as
authorized by the Company.

(Exhibits 1 & 2 at 6.)

40.     Section 8(a) further requires that Barkoff and Droege not solicit, induce, recruit, or encourage any RoadSync employees to leave RoadSync:

> I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

(Exhibits 1 & 2 at 6.)

41.     The Confidentiality Agreements also made clear that any violation of the agreements could irreparably harm RoadSync and that RoadSync would be entitled to seek injunctive relief:

> I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(Exhibits 1 & 2 at 9 (Section 12(f)).)

42.     Droege also signed a Confidentiality and Intellectual Property Assignment Agreement in January 2018 (the "2018 Confidentiality Agreement"). A copy of the 2018 Confidentiality Agreement is attached as **Exhibit 3**.  The 2018 Confidentiality Agreement reiterated Droege's contractual obligations not to disclose, misuse, or make unauthorized copies of RoadSync's confidential information:

> I will not, at any time, without the Company's prior written permission, either during or after my Services, disclose any Confidential Information to anyone outside of the Company, or use or permit to be used any Confidential Information for any purpose other than the performance of my duties as a service provider of the Company. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Confidential Information. I will deliver to the Company all copies of Confidential Information in my possession or control upon the earlier of a request by the Company or termination of my Services.

(Exhibit 3 at 1 (Section 1.2).)

43.     Barkoff and Droege also agreed to the terms of the RoadSync Corporation Employee Handbook, as of January 2018 (the "Employee Handbook").  The Employee Handbook requires that Barkoff and Droege, and other employees, not disclose or misuse RoadSync's confidential information:

> <u>Confidentiality and Non-Disclosure</u>.  It is inevitable that Company employees will have access to confidential or proprietary information regarding the Company, its customers/clients, vendors and suppliers.  Examples of such confidential information include, but are not limited to, information of a business nature such as marketing

information, future plans, strategies and financial data, employee and customer data and lists, computer programs, data files, reports, business tools and business methods.

It is integral to our success that our customers and others with whom we do business have complete confidence in the Company's ability to maintain the confidentiality of any information provided to us. All such information, whether of a personal or business nature, must be kept strictly confidential. All employees are expected to maintain the highest standards of confidentiality regarding information which they have obtained during the course of their employment. Unauthorized disclosure or use of confidential information may result in discipline, up to and including immediate dismissal.

**C.    Barkoff and Droege Stole RoadSync's Confidential, Proprietary, and Trade Secret Information**

44.    In 2018, Barkoff and Droege expressed dissatisfaction with RoadSync's business strategy and their personal remuneration. Barkoff and Droege became disruptive to RoadSync's otherwise collaborative and collegial culture. Barkoff and Droege were no longer devoting, and were not interested in devoting, their best business efforts to the interests of RoadSync.

45.    Motivated by a desire to control the company, Barkoff and Droege threatened to leave RoadSync unless RoadSync's Board of Directors removed RoadSync's Chief Executive Officer. By August 23, 2018, Barkoff and Droege understood that the Board of Directors was not going agree to Barkoff and Droege's ultimatum and that, instead, Barkoff and Droege were at imminent risk of termination.

46.     Barkoff and Droege then engaged in a coordinated theft of RoadSync's Trade Secrets and other confidential and proprietary information, intending to use that intellectual property for their own personal and financial gain and to launch and benefit a competitor (Relay Payments), to RoadSync's detriment, after their departures.

47.     On August 23, 2018, at 10:20 a.m., while in RoadSync's offices and still employed as its Chief Operating Officer, Droege archived and downloaded the entire RoadSync Google drive to which he had access, RoadSync contacts, and his RoadSync email.  Droege then attempted to conceal his misconduct by deleting the email receipt that confirmed his unauthorized reproduction of RoadSync's Google drive.  Droege then deleted most of the other emails in his RoadSync email inbox, including business-related emails that contained RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information relevant to the company's ongoing business endeavors.

48.     Eight minutes later, at 10:28 a.m. on August 23, 2018, while in RoadSync's offices and still employed as its Chief Revenue Officer, Barkoff archived and downloaded the entire RoadSync Google drive to which he had access, RoadSync contacts, and his RoadSync calendar.  Barkoff attempted to conceal his misconduct by deleting the email receipt confirming his unauthorized reproduction of RoadSync's Google drive.  Barkoff also deleted other emails from

his work email, including emails containing RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information relevant to the company's ongoing business endeavors.

49.     The information that Barkoff and Droege downloaded and stole on August 23 included RoadSync's Trade Secrets and other confidential and proprietary information.  This information included information from customer lists (including names, addresses, key contacts, and decision-makers at warehouses, freight handlers, and carriers); customer data compilations (including locations, volumes, proposed and acceptable prices, and payment and purchase histories for warehouses, freight handlers, and carriers); prospective customer lists (including names, addresses, key contacts, decision-makers, contact history, and potential revenue for warehouses, freight handlers, and carriers); financial analyses (including pricing, costs, economic models, and forecasts); and product road maps, workflows, and confidential user guides.

50.     On August 24, 2018, RoadSync's Chief Executive Officer and RoadSync's Chief Product Officer, neither of whom knew that Barkoff and Droege had just downloaded RoadSync's Trade Secrets, held meetings with Barkoff and Droege.  RoadSync advised Barkoff and Droege that they had reached an impasse concerning RoadSync management's visions for the company, and that Barkoff and Droege were being terminated effective immediately.

51.    But, as noted above and unbeknownst to RoadSync, Barkoff and Droege had already made unauthorized copies of RoadSync's Trade Secrets and other confidential and proprietary information.  Droege also maintained a copy of RoadSync's source code, including Checkout™, on his company-issued laptop owned by RoadSync (the "RoadSync Laptop").  Droege did not delete or return the source code.  To the contrary, Droege took the RoadSync Laptop — including Roadsync source code and other of RoadSync's Trade Secrets — with him after his termination.

52.    In November 2018, RoadSync's attorney sent letters to Barkoff and Droege reiterating their contractual obligations to return and not to disclose or otherwise misuse RoadSync's Trade Secrets and other confidential and proprietary information.  RoadSync's attorney letters stated, in part:

> Given the existence of these legal obligations, it is imperative that you take all necessary steps to ensure you do not disclose any RoadSync proprietary, confidential, or trade secret information to anyone outside of RoadSync, and that you do not use any such RoadSync information in the course of your employment with any current or future employer or in your own endeavors.  Those steps must include, in accordance with the Confidential Information Agreement [and also, in Droege's letter, the 2018 Confidentiality Agreement], returning to RoadSync all RoadSync property, equipment, and non-public documents and information, whether in tangible or electronic form, if you have not already done so.  RoadSync further asserts that you cannot lawfully perform and should immediately cease any tasks on behalf of any employer or yourself that would cause you to rely upon proprietary or confidential information or trade

secrets belonging to RoadSync – or that would violate your other continuing obligations to RoadSync, including your obligations pertaining to non-solicitation.

53.     RoadSync's attorney enclosed copies of the Confidentiality Agreements with both letters, and also included a copy of the 2018 Confidentiality Agreement with the letter to Droege.  Barkoff and Droege did not return any source core or other of RoadSync's Trade Secrets, and Droege also did not return the RoadSync Laptop.

**D.     Defendants Misused RoadSync's Confidential, Proprietary, and Trade Secret Information to Compete Against RoadSync**

54.     In 2019, Barkoff and Droege launched Relay Payments as a direct competitor of RoadSync.  Barkoff and Droege then sought to hire, and succeeded in hiring, several former RoadSync employees, including a chief engineer of RoadSync's Checkout™.  In late 2020, RoadSync discovered that one of its customers had partnered with Relay Payments to provide the same type of payment platform that it had been collaborating on with RoadSync earlier that year.  In early 2021, Defendants launched a competing payment platform called "Relay," which it used to target other existing and prospective customers of RoadSync.

55.     Upon learning of Defendants' targeting RoadSync's employees, customers, and prospective customers, as well as their launch of Relay, RoadSync conducted an internal forensic investigation of its computer systems.  RoadSync's internal forensic investigation revealed that Barkoff and Droege had downloaded

without authorization the contents of RoadSync's computer drive, contacts, and email, including RoadSync's Trade Secrets, and deleted the email records of their unauthorized downloads.

56.    RoadSync also enlisted the assistance of a third-party shopper to obtain from Defendants a one-on-one demonstration of the features of Relay that are not readily apparent from Relay Payments' website.

57.    Relay Payments' demonstration of Relay to this third-party shopper revealed striking similarities between features of Relay's "payee-side" application and Checkout™ that are not publicly known.  Incredibly, Defendants are now offering for free, or at a deeply discounted price, this payee-side application with key aspects that mimic RoadSync's Checkout™.  Defendants are offering this product in an effort to undercut RoadSync's market share and to trade off of technology and features developed by RoadSync.

58.    Defendants' payee-side Relay application is strikingly similar to RoadSync's Checkout™ and certain of its functionality is virtually identical.  For example, Relay Payments copied RoadSync's "Remote Checkout™" feature, which allows payors to remotely authorize and pay the required lumping fee using a variety of payment options including fuel cards, fleet checks, or other payment means via a text message to the payor's phone.

59.     Relay Payments also copied and implemented RoadSync's "robodialer" functionality to process fleet checks.  When a driver pays a lumper by check, the driver must obtain a check number and then contact the check provider (*e.g.*, Comcheck, EFS, Tcheck) to draft funds onto that check.  The driver receives an "express code" or "money code" that authorizes the particular check number for a specific amount.  The recipient of the payment must obtain an authorization code for the express or money code to cash the check.  Traditionally, this was done by a phone call to the check provider.  RoadSync automated this process by using computer software that enters the codes needed by the check provider to return the authorization code.  Features of Defendants' Relay application copy these technical advances.

60.     Relay Payments also copied RoadSync's original "paycodes" feature and renamed it "Relay Codes."  RoadSync developed paycodes in 2017 as part of a pilot of its payor-side application.  Paycodes facilitates instant lumper payments to known recipients, such as a freight handler, using 5-6 character alphanumeric codes.  Defendants' Relay application performs the same function as paycodes using codes that appear identical to the ones developed by RoadSync.

61.     The strikingly similar features in Defendants' Relay application could not have been developed independently given Relay Payments' short time between formation and launch, even if Relay Payments had not been infected with

RoadSync's Trade Secrets — including the information that Barkoff and Droege wrongfully took with them when they left RoadSync.

62.    Defendants also could not have so quickly developed the Relay platform, including the payee-side application, without the support of RoadSync's former Chief Architect and former Senior Software Engineer — who were integral to developing RoadSync's Checkout™ and who were induced to leave RoadSync and to join Relay Payments by Barkoff and Droege.

63.    Defendants misused RoadSync's Trade Secrets and other confidential and proprietary information to make quick inroads into the market that RoadSync spent years developing.  For example, Defendants used RoadSync's Trade Secrets and other confidential information to identify key prospects in the fragmented logistics market, to identify and develop customer opportunities, and to otherwise target RoadSync's established and prospective customers.

64.    By illegally free riding on RoadSync's confidential customer information, competitive market intelligence, and proprietary software platform, Defendants are eroding RoadSync's head-start advantage, unfairly competing with RoadSync, and misusing RoadSync's Trade Secrets and other confidential and proprietary information.

65.    Barkoff and Droege still hold equity in RoadSync.  Recently, Barkoff and Droege have been actively trying to sell their equity interests in RoadSync

without disclosing to potential buyers (or RoadSync) that they are continuing to using RoadSync's Trade Secrets to build a new company to compete directly against RoadSync.

## CLAIMS FOR RELIEF

### COUNT I
### (Violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, Against All Defendants)

66.    RoadSync incorporates by reference the allegations in Paragraphs 1-65 above.

67.    RoadSync's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  RoadSync's Trade Secrets provide it with a substantial competitive advantage over potential and actual competitors.

68.    RoadSync has taken reasonable measures to keep RoadSync's Trade Secrets secret and to maintain their confidentiality.  Those measures, as further described above, include using personally-identifiable electronic badge access control systems; computer credentials and passwords; and confidentiality agreements.

69.    As described above, Barkoff and Droege misappropriated RoadSync's Trade Secrets by (1) acquiring RoadSync's Trade Secrets by improper means;

(2) disclosing RoadSync's Trade Secrets to Relay Payments without RoadSync's consent after acquiring them by improper means; (3) misusing RoadSync's Trade Secrets without RoadSync's consent after acquiring them by improper means; (4) disclosing RoadSync's Trade Secrets to Relay Payments without RoadSync's consent knowing that they had an obligation to maintain the secrecy of RoadSync's Trade Secrets and not to disclose RoadSync's Trade Secrets to others; and (5) misusing RoadSync's Trade Secrets without RoadSync's consent knowing that they had an obligation not to misuse or disclose RoadSync's Trade Secrets to others.

70.    Barkoff and Droege acquired RoadSync's Trade Secrets by improper means by making unauthorized copies of RoadSync's Trade Secrets through their unauthorized downloading and copying of their RoadSync Google drives, RoadSync contacts, RoadSync calendar, and RoadSync emails just before their termination and when they knew termination was imminent.  Barkoff's and Droege's unauthorized downloading and copying of RoadSync's Trade Secrets constituted a theft of those trade secrets and was in breach of their contractual obligations and their fiduciary obligations.  Barkoff and Droege also acquired RoadSync's Trade Secrets by improper means by stealing and refusing to return the RoadSync Laptop, as required by the Confidentiality Agreements and in breach

of their fiduciary obligations.  The RoadSync Laptop include RoadSync's source code and other of RoadSync's Trade Secrets.

71.    Barkoff and Droege disclosed RoadSync's Trade Secrets to Relay Payments, and misused RoadSync's Trade Secrets, without RoadSync's consent after using improper means to acquire those trade secrets, and with the knowledge they had continuing duties to RoadSync to safeguard, return, and not to use the RoadSync Trade Secrets.  For example, Barkoff and Droege misused RoadSync's Trade Secrets to compete directly with RoadSync.  Barkoff and Droege misused RoadSync's Trade Secrets to establish Relay Payments as a direct competitor to RoadSync, to develop and market Relay in direct competition with RoadSync's Checkout™, and to wrongfully secure contractual and other relationships with RoadSync's actual and prospective customers.

72.    Relay Payments misappropriated RoadSync's Trade Secrets by (1) acquiring RoadSync's Trade Secrets knowing and having reason to know that they were acquired by improper means; (2) misusing RoadSync's Trade Secrets without RoadSync's consent knowing and having reason to know that the trade secrets were acquired by improper means; and (3) misusing RoadSync's Trade Secrets without RoadSync's consent knowing and having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain

the secrecy of RoadSync's Trade Secrets and to not misuse or disclose RoadSync's Trade Secrets to others.

73.    Relay Payments acquired RoadSync's Trade Secrets knowing and having reason to know that they were acquired by improper means.  Barkoff, as President of Relay Payments, and Droege, as CEO of Relay Payments, both knew from the moment that they first used RoadSync's Trade Secrets during the course of their employment at Relay Payments that they had acquired RoadSync's Trade Secrets by improper means.

74.    Relay Payments also misused RoadSync's Trade Secrets without RoadSync's consent knowing and having reason to know that the trade secrets were acquired by improper means.  Relay Payments, by and through Barkoff, Droege, and other employees (including Does 1-10), misused RoadSync's Trade Secrets to directly compete with RoadSync.  For example, Relay Payments misused RoadSync's Trade Secrets to develop and market products in direct competition with RoadSync, and to wrongfully secure contractual and other relationships with RoadSync's actual and prospective customers.  Relay Payments, by and through Barkoff and Droege, knew and had reason to know at the time that they misused RoadSync's Trade Secrets that those trade secrets were acquired by improper means.

75.     Relay Payments also misused RoadSync's Trade Secrets without RoadSync's consent knowing and having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of RoadSync's Trade Secrets and to not misuse or disclose RoadSync's Trade Secrets to others.

76.     Does 1-10 misappropriated RoadSync's Trade Secrets by misusing and/or disclosing RoadSync's Trade Secrets without RoadSync's consent, knowing that they had been acquired by improper means, and knowing that they had a continuing obligation to maintain the confidentiality of and to not disclose RoadSync's Trade Secrets.

77.     Defendants' past, continuing, and threatened misappropriation of RoadSync's Trade Secrets violate the DTSA.

78.     As a direct and proximate result of Defendants' violation of the DTSA, RoadSync has suffered, and continues to suffer, substantial damages in an amount to be proven at trial.

79.     As a direct and proximate result of Defendants' violation of the DTSA, Defendants also have been, and continue to be, unjustly enriched in an amount to be proven at trial.

80.     Defendants' violations of the DTSA were, and continue to be, willful and malicious and justify an award of exemplary damages and RoadSync's attorney's fees.

81.     Defendants' acts of misconduct also constitute transgressions of a continuing nature for which RoadSync has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use RoadSync's Trade Secrets to enrich themselves and to continue to divert business from RoadSync.  RoadSync is entitled to an injunction against Defendants' continuing and threatened violations of the DTSA, 18 U.S.C. § 1836 *et seq.*

### COUNT II
### (Georgia Trade Secrets Act, O.C.G.A. 10-7-761 *et seq.*, Against All Defendants)

82.     RoadSync incorporates by reference the allegations in Paragraphs 1-81 above.

83.     RoadSync's Trade Secrets derive independent value from not being generally known to, and not being readily ascertainable by proper means by, another person who can obtain economic value from their disclosure or use of the information.

84.     RoadSync has made efforts that are reasonable under the circumstances to maintain the secrecy of RoadSync's Trade Secrets.

85.    Defendants have misappropriated RoadSync's Trade Secrets by, for example, acquiring RoadSync's Trade Secrets by improper means, disclosing and misusing RoadSync's Trade Secrets without RoadSync's consent knowing that they had been acquired by improper means, and disclosing and misusing RoadSync's Trade Secrets without RoadSync's consent knowing that they had ongoing obligations to maintain the confidentiality of and to not disclose RoadSync's Trade Secrets.

86.    Defendants' past, continuing, and threatened misappropriation of RoadSync's Trade Secrets constitutes misappropriation of trade secrets in violation of O.C.G.A. 10-7-761 *et seq.*

87.    As a direct and proximate result of Defendants' misappropriation of RoadSync's Trade Secrets, RoadSync has suffered, and continues to suffer, substantial damages in an amount to be proven at trial.

88.    As a direct and proximate result of Defendants' misappropriation of RoadSync's Trade Secrets, Defendants have been, and continue to be, unjustly enriched in an amount to be proven at trial.

89.    Defendants' misappropriation of RoadSync's Trade Secrets was, and continues to be, willful and malicious and justifies an award of exemplary damages and RoadSync's attorneys' fees.

90.    Defendants' acts of misconduct also constitute transgressions of a continuing nature for which RoadSync has no adequate remedy at law.  Unless enjoined by order of this Court, Defendants will continue to retain and use RoadSync's Trade Secrets to enrich themselves and to continue to divert business from RoadSync.  RoadSync is entitled to an injunction against Defendants' continuing and threatened violations of O.C.G.A. 10-7-761 *et seq.*

### COUNT III
### (Breach of Contract
### Against Defendants Barkoff and Droege)

91.    RoadSync incorporates by reference the allegations in Paragraphs 1-65 above.

92.    The Confidentiality Agreements are valid and enforceable contracts. The Barkoff Confidentiality Agreement is a valid and enforceable contract by and between RoadSync and Barkoff.  The Droege Confidentiality Agreement is a valid and enforceable contract by and between RoadSync and Droege.  The provisions in the Confidentiality Agreements are reasonably necessary to protect legitimate protectable interests in RoadSync's confidential, proprietary, trade secret, and other information.

93.    RoadSync has fully performed all of its obligations under the Confidentiality Agreements.

94.     Barkoff and Droege have breached, and are continuing to breach, their respective Confidentiality Agreements including, without limitation, Sections 3(a), 5, and 8.

95.     Barkoff and Droege have breached and are continuing to breach Section 3(a) of their respective Confidentiality Agreements by misusing RoadSync's confidential information to compete directly against RoadSync.  For example, Barkoff and Droege misused RoadSync's confidential information to establish Relay Payments as a direct competitor to RoadSync, to develop and market Relay Payments' products in direct competition with RoadSync, and to wrongfully secure contractual and other relationships with RoadSync's actual and prospective customers.

96.     Barkoff and Droege also breached Section 3(a) of their respective Confidentiality Agreements by making unauthorized copies of RoadSync's confidential information through their unauthorized download and copying of their RoadSync Google drives, RoadSync contacts, RoadSync calendar, and RoadSync emails just before their termination and when they knew that such termination was likely and imminent.  Barkoff and Droege downloaded and copied that information with the intent to misuse it to compete with RoadSync.

97.     Barkoff and Droege breached Section 5 of their respective Confidentiality Agreements by failing and refusing, on termination from

RoadSync, to deliver to RoadSync and not keep in their possession confidential, proprietary, trade secret, and other information developed by them pursuant to their relationship with RoadSync or otherwise belonging to RoadSync.  Instead, Barkoff and Droege made unauthorized copies of that information and took it with them to compete directly against RoadSync.  Barkoff and Droege, on their termination from RoadSync, also wrongfully deleted confidential, proprietary, trade secret, and other information developed during their relationship with RoadSync and belonging to RoadSync, including information contained in their RoadSync email. Droege additionally breached Section 5 of the Droege Confidentiality Agreement by stealing and refusing to return the RoadSync Laptop, which contained RoadSync's confidential, proprietary, trade secret, and other information.

98.     Barkoff and Droege have breached and are continuing to breach Section 8 of their respective Confidentiality Agreements by misusing RoadSync's confidential information to directly compete against RoadSync.  For example, Barkoff and Droege misused RoadSync's confidential information to establish Relay Payments as a direct competitor to RoadSync, to develop and market Relay Payments' products in direct competition against RoadSync, and to wrongfully secure contractual and other relationships with RoadSync's actual and prospective customers.

99.     Barkoff and Droege breached Section 8(a) of the Barkoff Confidentiality Agreement by, before their termination or within 12 months of such termination, soliciting, inducing, recruiting, and/or encouraging RoadSync employees to terminate their relationship with RoadSync and to join them to compete directly against RoadSync at competitor Relay Payments.  Those RoadSync employees, now with Relay Payments, include RoadSync's former Chief Architect who is now Chief Technology Officer at Relay Payments, as well as RoadSync's former Senior Software Engineer who is now a Software Engineer at Relay Payments.

100.   As a direct and proximate result of Barkoff's and Droege's past and continuing breaches of their Confidentiality Agreements, RoadSync has suffered, and continues to suffer, substantial damages in an amount to be proven at trial.

101.   As a direct and proximate result of Barkoff's and Droege's past and continuing breaches of their Confidentiality Agreements, RoadSync has suffered, and continues to suffer, irreparable harm that cannot be fully redressed by an award of monetary damages.  RoadSync is threatened with losing its competitive advantage, trade secrets, customers, and goodwill in amounts which would be impossible to fully compensate RoadSync unless Barkoff and Droege are enjoined by order of this Court.

## COUNT IV
### (Breach of 2018 Confidentiality Agreement
### Against Defendant Droege)

102.    RoadSync incorporates by reference the allegations in Paragraphs 1-65 above.

103.    The 2018 Confidentiality Agreement is a valid and enforceable contract by and between RoadSync and Droege.  The provisions in the 2018 Confidentiality Agreement are reasonably necessary to protect legitimate protectable interests in RoadSync's confidential, proprietary, trade secret, and other information.

104.    RoadSync has fully performed all of its obligations under the 2018 Confidentiality Agreement.

105.    Droege breached, and is continuing to breach, the 2018 Confidentiality Agreement including, without limitation, Section 1.2.

106.    Droege breached, and is continuing to breach, Section 1.2 of the 2018 Confidentiality Agreement by misusing RoadSync's confidential information to compete directly against RoadSync.  For example, Droege misused RoadSync's confidential information to establish Relay Payments as a direct competitor to RoadSync, to develop and market the Relay platform in direct competition against RoadSync, and to wrongfully secure contractual and other relationships with RoadSync's actual and prospective customers.

107.    Droege also breached Section 1.2 of the 2018 Confidentiality Agreement by making unauthorized copies of RoadSync's confidential information in connection with his unauthorized download and copying of his RoadSync Google drive, RoadSync calendar, and RoadSync email just before his termination and when Droege knew that his termination was likely and imminent.  Droege downloaded and copied that information with the intent to misuse that information to compete against RoadSync.

108.    Droege also breached Section 1.2 of the 2018 Confidentiality Agreement by stealing and refusing to return the RoadSync Laptop, which contained RoadSync's confidential, proprietary, and trade secret information. Mr. Droege then used that confidential, proprietary, and trade secret information to compete directly against RoadSync.

109.    Droege also breached Section 1.2 the 2018 Confidentiality Agreement by failing, on his termination from RoadSync, to deliver to RoadSync and not keep in his possession all confidential information in his possession.  Instead, Droege made unauthorized copies of that information and took it with him to compete directly against RoadSync.  Droege, on his termination from RoadSync, also wrongfully deleted confidential information in his RoadSync email and stole and did not return the RoadSync Laptop containing confidential information.

110.   As a direct and proximate result of Droege's past and continuing breaches of the 2018 Confidentiality Agreement, RoadSync has suffered, and continues to suffer, substantial damages in an amount to be proven at trial.

111.   As a direct and proximate result of Droege's past and continuing breaches of the 2018 Confidentiality Agreement, RoadSync has suffered, and continues to suffer, irreparable harm that cannot be fully redressed by an award of monetary damages.  RoadSync is threatened with losing its competitive advantage, trade secrets, customers, and goodwill in amounts which would be impossible to fully compensate RoadSync unless Droege is enjoined by order of this Court.

### COUNT V
### (Violation of the Georgia Computer Systems Protection Act, O.C.G.A. § 16-9-93 *et seq.*, Against Defendants Barkoff and Droege)

112.   RoadSync incorporates by reference the allegations in Paragraphs 1-65 above.

113.   Barkoff and Droege were authorized to access and use RoadSync's computer network and computers solely for the benefit of RoadSync and for no other purpose.  Barkoff and Droege were not authorized to access and use RoadSync's computer network and computers for their own personal gain, for the gain of Relay Payments, or to compete with RoadSync to the detriment of RoadSync.

114.    Barkoff and Droege were authorized to access, reproduce, and use RoadSync's confidential, proprietary, and trade secret information solely for the benefit of RoadSync and for no other purpose.  Barkoff and Droege were not authorized to access, reproduce, retain, or use RoadSync's confidential, proprietary, and trade secret information for their own personal gain, for the gain of Relay Payments, or to otherwise compete with RoadSync to the detriment of RoadSync.  Accordingly, Barkoff and Droege were not authorized to access and create copies of RoadSync's confidential, proprietary, and trade secret information in their own personal Dropbox accounts or other unsecure locations.  Barkoff and Droege also were not authorized to steal and retain the RoadSync Laptop, which contained RoadSync's confidential, proprietary, and trade secret information, after Droege's termination.

115.    Barkoff and Droege knowingly and willfully accessed and used RoadSync's computer network and computers with knowledge that such use was unauthorized and with the intention of (1) taking or appropriating RoadSync's confidential, proprietary, and trade secret information; (2) obtaining RoadSync's confidential, proprietary, and trade secret information by deceitful means; (3) deleting RoadSync's confidential, proprietary, and trade secret information from RoadSync's computer network and computers; and (4) converting the RoadSync Laptop for their own use, in violation of Barkoff's and Droege's legal

obligations not to use the RoadSync Laptop other than for the benefit of RoadSync, and in violation of Droege's legal obligation to return the RoadSync Laptop upon his termination.

116.  Barkoff and Droege knowingly, willfully, and without authorization accessed and used RoadSync's computer network and computers to take and appropriate, and did take and appropriate, RoadSync's confidential, proprietary, and trade secret information and did so by deceitful means.  For example, Barkoff and Droege engaged in an unauthorized coordinated download of RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information. Droege also stole and refused to return the RoadSync Laptop containing RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information.  Barkoff and Droege further knowingly and willfully converted this information to their own personal use in violation of their legal obligation to maintain the confidentiality of the information, to not disclose the information, and to return the information to RoadSync under their Confidentiality Agreements and the 2018 Confidentiality Agreement.  Barkoff and Droege did not have any right, permission, or authorization to engage in this conduct.

117.  Accordingly, Barkoff and Droege have engaged in computer theft as prohibited under O.C.G.A. § 16-9-93(a).

118.   Barkoff and Droege also knowingly, willfully, and without authorization deleted RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information from RoadSync's computer network and computers. For example, Barkoff and Droege deleted emails confirming their unauthorized downloads of RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information.  Barkoff and Droege also deleted RoadSync emails reflecting RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information — after they had downloaded and created unauthorized personal copies.  Barkoff and Droege did not have any right, permission, or authorization to engage in this conduct.

119.   Accordingly, Barkoff and Droege have engaged in computer trespass as prohibited under O.C.G.A. § 16-9-93(b).

120.   By engaging in the above-alleged acts and conduct, Barkoff and Droege obtained RoadSync's Trade Secrets and RoadSync's other confidential and proprietary information, and then used that information to unlawfully compete against RoadSync.  Barkoff and Droege further deleted the records of their unauthorized downloads, RoadSync's Trade Secrets, and RoadSync's other confidential and proprietary information, leaving RoadSync competitively disadvantaged.

121.   By engaging in the above-alleged acts and conduct, Barkoff and Droege also caused RoadSync to have to devote substantial resources to forensically investigating their theft and trespass, to identifying the information taken and deleted, and to trying to restore the deleted data.

122.   As a direct and proximate result of the Barkoff and Droege's wrongful conduct, RoadSync has suffered and is continuing to suffer damages including lost profits and expenditures relating to forensic data examination and restoration. RoadSync also will suffer irreparable harm if Barkoff and Droege are allowed to continue to benefit from their unlawful activities.

### COUNT VI
### (Breach of Fiduciary Duty of Care and Good Faith Against Defendants Barkoff and Droege)

123.   RoadSync incorporates by reference the allegations in Paragraphs 1-65 above.

124.   While employed by RoadSync, Barkoff and Droege owed fiduciary duties and a duty of loyalty not to act contrary to RoadSync's interests, which included, but was not limited to, a duty to avoid misusing RoadSync's confidential and proprietary information, disclosing RoadSync's confidential and proprietary information to third parties, and taking steps to compete against RoadSync.

125.   Barkoff and Droege breached their fiduciary duties by, without limitation:

(a)    Wrongfully plotting to steal and misuse RoadSync's confidential and proprietary information to compete against RoadSync and for their own personal financial gain;

(b)    Wrongfully downloading and copying RoadSync's confidential and proprietary information by, without limitation, downloading the entire RoadSync Google drives to which they had access to their personal Dropbox accounts and then trying to cover up their theft by deleting emails confirming the downloads;

(c)    Wrongfully deleting files and data containing RoadSync's confidential and proprietary information from RoadSync's systems; and

(d)    Wrongfully stealing and refusing to return the RoadSync Laptop, which contained RoadSync's confidential, proprietary, and trade secret information, including its source code, for the unauthorized purpose of taking the source code with them and using it to compete against RoadSync for their own personal gain and for the gain of Relay Payments, a direct competitor to RoadSync.

126.   Barkoff and Droege also solicited RoadSync employees to leave with them and to compete against RoadSync before they were terminated.

127.   As a direct and proximate result of Barkoff's and Droege's breach of their fiduciary duties to RoadSync, RoadSync has suffered and will continue to

suffer damages including but not limited to lost business, lost revenue, lost

goodwill, compensatory damages, and other immeasurable and irreparable injuries.

## **PRAYER FOR RELIEF**

WHEREFORE RoadSync requests that the Court enter judgment in

RoadSync's favor and against Defendants as follows:

1.      Judgment in RoadSync's favor and against Defendants on all claims

for relief alleged herein;

2.      Actual damages as to each of the above claims in an amount to be

proven at trial;

3.      Reasonable royalties, restitution, and disgorgement of Defendants'

unjust enrichment and ill-gotten gains, as appropriate as to each of the above

claims, in an amount to be proven at trial;

4.      Disgorgement of any profits earned by Defendants due to their breach

of contract and/or misappropriation of RoadSync's Trade Secrets, as well as

damages sufficient to compensate RoadSync for the reasonable value of

RoadSync's Trade Secrets and/or RoadSync's confidential or proprietary

information based on the custom in the industry;

5.      Punitive, exemplary, and treble damages under the DTSA, the GTSA,

and for breaches of fiduciary duty, and any other damages authorized by law as to

each of the above claims;

6.      Entry of a preliminary and permanent injunction requiring the

Defendants to:

A.      Return all copies of RoadSync's Trade Secrets, and other

RoadSync confidential or proprietary information, including notes and any

materials Defendants possess that are based upon, or directly or indirectly

derived from, RoadSync's Trade Secrets or RoadSync's other confidential

and proprietary information, including the RoadSync Laptop;

B.      Stop accessing, using, and disclosing RoadSync's Trade

Secrets, and RoadSync's other confidential or proprietary information;

C.      Stop selling, offering for sale, marketing, or using any products

or features using or embodying RoadSync's Trade Secrets or RoadSync's

other confidential or proprietary information;

D.      Stop using, directly or indirectly, RoadSync's Trade Secrets

and/or RoadSync's confidential or proprietary information in connection

with securing funds and/or financing for competing business ventures,

including but not limited to current and future rounds of funding for Relay.

7.      Further equitable relief, as appropriate as to each of the above claims,

as to be determined by the Court;

8.      Prejudgment and post-judgment interest at the maximum legal rate as

applicable, as an element of damages that RoadSync has suffered as a result of

Defendants' wrongful and unlawful acts;

8.    An award of RoadSync's attorneys' fees and costs incurred; and

9.    Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

RoadSync demands a jury trial for all claims and issues in this action that are triable as a matter of right to a jury.

Dated:  August 20, 2021

Respectfully submitted,

WEINBERG WHEELER HUDGINS
GUNN & DIAL

By:  *s/ Jonathan R. Friedman*

Jonathan R. Friedman
3344 Peachtree Road, NE
Suite 2400
Atlanta, GA 30326
Tel:  (404) 832-9580
Fax:  (404) 875-9433
Email: jfriedman@wwhgd.com

*Attorneys for Plaintiff RoadSync Inc.*

OF COUNSEL:

MORRISON & FOERSTER LLP

Benjamin J. Fox (*pro hac vice* forthcoming)
707 Wilshire Boulevard
Los Angeles, CA  90017-3543
Tel:  (213) 892-5200
Fax:  (213) 892-5454
Email:  bfox@mofo.com

Kyle Mooney (*pro hac vice* forthcoming)
Andrea Scripa (*pro hac vice* forthcoming)
250 West 55th Street
New York, NY 10019
Tel:  (212) 468-8000
Fax:  (212) 468-7900
Email:  kmooney@mofo.com
          ascripa@mofo.com