# Exhibit E

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3   ROADSYNC, INC.,                )
                                    )
 4                   Plaintiff,     )
                 v.                 )   CIVIL ACTION
 5                                  )   FILE NO. 1:21-CV-03420-MLB
                                    )
 6   RELAY PAYMENTS, INC. ET AL,    )
                                    )
 7                   Defendants.    )
     _____)
 8

 9

10   ------------------------------------------------------------

11         BEFORE THE HONORABLE MICHAEL L. BROWN
                 TRANSCRIPT OF PROCEEDINGS
12                    JANUARY 11, 2023

13   ------------------------------------------------------------

14

15

16
             Proceedings recorded by mechanical stenography
17           and computer-aided transcript produced by

18
                 JANA B. COLTER, FAPR, RDR, CRR, CRC
19                    Official Court Reporter
                      1949 U.S. Courthouse
20                    75 Ted Turner Drive, SW
                      Atlanta, Georgia  30303
21                       (404) 215-1456

22

23

24

25
```

2

```
 1   APPEARANCES:

 2   For the Plaintiff:        BENJAMIN E. FOX
                               KYLE MOONEY
 3                             Attorneys at Law

 4   For the Defendants:       MICHAEL A. CAPLAN
                               RYAN LANDES
 5                             JESSICA CALEB
                               JARRED KLORFEIN
 6                             Attorneys at Law

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1        (Atlanta, Fulton County, Georgia, January 11, 2023, in
 2   open court.)
 3                              —  —  —
 4                      P R O C E E D I N G S
 5                              —  —  —
 6            THE COURT:  All right.  We are here in RoadSync v.
 7   Relay Payments.
 8            Can I get appearances starting with counsel for the
 9   plaintiff?
10            MR. FOX:  Yes, Your Honor.
11            Ben Fox from the law firm of Bondurant Mixson &
12   Elmore representing plaintiff, RoadSync.
13            Along with me is Kyle Mooney of the law firm Morrison
14   Foerster.
15            THE COURT:  All right.  And for the defendants?
16            MR. CAPLAN:  Good morning, Your Honor.
17            Mike Caplan on behalf of the defendants, along with
18   Ryan Landes and Jessica Caleb and Jarred Klorfein.
19            THE COURT:  Great.  Mr. Caplan, somebody told me
20   today you have a place up in Lake Burton.
21            MR. CAPLAN:  That is true.
22            THE COURT:  Whereabouts?
23            MR. CAPLAN:  Guilty, Your Honor.  At least half of a
24   place.  I split it with another family.  But on the southwest
25   tip.
```

4

```
1            THE COURT:  What road are you on?

2            MR. CAPLAN:  We're on -- it's Wildflower Circle.

3            THE COURT:  All right.  I have a place just up Laurel

4    Lodge from there.  Are you by the Belkins, by chance?

5            MR. CAPLAN:  I don't know the Belkins, but we are

6    right off Laurel Lodge.

7            THE COURT:  Yes.  I know Wildflower.  I've been going

8    up there since I was about four.

9            MR. CAPLAN:  What a great place.

10           THE COURT:  So my wife and I bought my folks' place

11   several years ago from them.  And Judge Boulee told me today

12   that you have a place up there.

13           MR. CAPLAN:  Oh, yeah.

14           THE COURT:  It's a great place.

15           MR. CAPLAN:  It's absolutely beautiful.  And he's got

16   a neat place, too.

17           THE COURT:  Yes.  I've not been there.  I've heard

18   about it.  I've gone fishing in that area.  But the place you

19   can fish in that area if you don't own land there is about

20   that big (indicating), or you can try to cast under the mark

21   of the potter.

22           MR. CAPLAN:  You've got to make agreements with all

23   of your neighbors so you can go on their portion of the river.

24           THE COURT:  Yes.

25           MR. CAPLAN:  That's right.
```

1           THE COURT:  Well, that's a great place.  That's a

2  great place.  Who do you own the place with?

3           MR. CAPLAN:  They're longtime friends, a family that

4  lives in Athens.

5           THE COURT:  Okay.

6           MR. CAPLAN:  They're not lawyers, but one of my close

7  friends from college.

8           THE COURT:  Yes.  All right.

9           At any rate, we are here for this.  I've got both of

10  your discovery disputes in front of me, and would like to

11  cover as much of it as I can today.

12           Is there an issue that you-all would like to address

13  first?  Is there one that anybody thinks is the primary issue?

14           MR. FOX:  Your Honor, I think the issue that has been

15  holding up discovery more than the other issue is the trade

16  secret identification issue.

17           But that being said, the laptop and hard drive

18  inspection is also very important to us.

19           THE COURT:  Okay.  Well, let's talk about the laptop.

20  I asked for the deposition of -- is it Droege?  Is that how

21  you say the gentleman's name?

22           MR. CAPLAN:  Ryan Droege.

23           THE COURT:  Ryan Droege.  I asked for his deposition

24  because I noted in your submission that the plaintiff says it

25  belongs to RoadSync and the defendants say it's a personal

1   computer.  And I thought well, how can that be.

2          And it's more complicated than that.  I understand

3   that he obtained it when he was thinking about whether to join

4   the company, when they were at a meeting at Georgia Tech, and

5   maybe it was bought by the former CEO with company money or

6   maybe it was bought by the former CEO with personal money.

7   And he thought maybe that it was in lieu of salary or that it

8   was given to him, and that really nobody went back on the

9   issue after that.

10          And so I just ask you-all as we move forward in this

11  case, don't act like things are clear when they're not.  I

12  like details.  And I don't like having to spend my time

13  ferreting out that what one person says is clearly this way is

14  clearly that way.  It's more complicated.  We can deal with

15  those complications.  But we should just be clear that it's

16  messy sometimes rather than saying it's one way and saying

17  it's the other and then I'm like, well, wait a minute, these

18  both can't be true.

19          But it's not clear to me that this case presents a

20  situation in which a party can obtain direct access to

21  somebody's computer rather than simply making a discovery

22  request.

23          But I understand you-all have agreed to that process;

24  is that right?

25          And by the way, I would like this to be informal.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  It's better if we have a conversation.  So if you want to say

2  something, please feel free to say something rather than

3  waiting for the other side and back and forth.

4       MR. FOX:  Your Honor, Kyle Mooney intends to speak to

5  the laptop and inspection protocol issues.

6       Would you like him to approach or do you just want a

7  colloquy?

8       THE COURT:  He can stay right there.

9       MR. FOX:  Okay.

10      THE COURT:  He can stay right there.  I'd like this

11 to be about as informal as it can be.  I feel like that kind

12 of gets us to the best spot.

13      MR. FOX:  Okay.  Good.

14      MR. MOONEY:  Well, your Honor, first, apologies for

15 the confusion regarding the laptop.  It was clear from

16 RoadSync's perspective.  We have the former CEO who submitted

17 a declaration that he purchased it and the computer is and

18 remains on our inventory internally, so we do believe that it

19 is our computer.

20      The parties are agreed, I believe, that a forensic

21 inspection should go forward.  The dispute as Your Honor knows

22 is the appropriate protocol for that inspection of the laptop

23 and of the hard drive.

24      THE COURT:  Do you-all agree with that?

25      MR. LANDES:  Yeah.  So I think, Your Honor,

1  Mr. Mooney is correct.  We agree that forensic evidence will

2  be relevant here to show what happened with these devices,

3  when certain things might have been accessed, the extent to

4  which things might have been moved or sent around, so I think

5  forensic evidence will be relevant in this case.

6         But again, as Mr. Mooney said, I think the question

7  is what is the protocol and how much can be examined, right?

8         THE COURT:  Okay.  So well, you know, I started off

9  looking at both the *Ford* case, and I thought Judge May's case,

10  the *Noorani* case was also a very helpful case.  But of course

11  those cases are which because of some misconduct by a party,

12  there is greater access provided to that item.

13        And that does not seem to be the case here.  Whatever

14  happened with the laptop and whoever has it, it does not seem

15  to be the case that there was some level of malfeasance as was

16  suggested in some of these -- at least in the *Noorani* case.

17        But since you-all are doing this, you are still

18  taking this case out of the sort of standard situation, where

19  I guess the way it would be now, defendant has the laptop,

20  right?

21        MR. MOONEY:  Right.

22        THE COURT:  So plaintiff would just ask defendant and

23  defendant would provide whatever off, off of the laptop that

24  you want to do.  You're not doing that.

25        It seems to me as though if there is a need for an

1  examination like this, we ought to make it as close to normal

2  as possible, right?

3          Because we don't have an egregious situation in which

4  one party gets to go have access to it because of malfeasance

5  by the first party, that we ought to treat this as normal as

6  possible in that regard.

7          And it seems to me as though the differences in the

8  protocol, I think, I think I agree with the defendants'

9  protocol, and we can talk about how we ought to adjust it.  I

10  know I said I don't want to be micromanaging the adjustments,

11  but let's talk about those.

12          Who creates the image?  The plaintiff says the

13  defendants' expert will do it, but the defendant says a

14  third-party neutral will do it.

15          Does that really matter to anybody?

16          MR. MOONEY:  Your Honor, for plaintiffs, if I might,

17  we did cite the *Ameriwood* case.  And I do believe that this is

18  not a case where discovery malfeasance has been proven.  I

19  would agree with that.

20          But this is a case where the RoadSync computer, and

21  there's a dispute regarding who owns that, was used,

22  admittedly used to download email and the Google Drive and all

23  of the RoadSync information from the RoadSync system, so it is

24  alleged to be the instrument of misappropriation and the root

25  of it.  And it has that very much in common with the *Ameriwood*

1 case, in which a forensic examination went forward.

2          As far as the image itself, what we had proposed, to

3 leave defendants in control of this to the extent possible,

4 would be that defendants' expert would take the image, our

5 expert could be there and watch.  Defendants' expert would

6 provide a hash value, a unique value.

7          THE COURT:  No.  Let me just interrupt you, though.

8 I'm just thinking about who does it.

9          MR. MOONEY:  So we believe that there is no need for

10 a neutral to do that.

11          THE COURT:  Why don't you want to use your own

12 expert?

13          MR. LANDES:  We don't have a problem using our own

14 expert.  Saying that it would be a neutral instead of our

15 expert, we view that as a concession, right?  So it sort of

16 takes out the possibility of an argument that it wasn't done

17 correctly.

18          But we want to set up a process that says here is how

19 the image is created, this is the official image that will be

20 the basis for the neutral exam, will be the source for the

21 forensic evidence that comes into the case.

22          THE COURT:  Okay.  So it seems to me as though y'all

23 can work it out.  If a neutral is not necessary, I guess that

24 might save some expense.  But it would seem to me as though

25 defendants' expert could do it just fine.  I don't know

1  whether that would be a problem for him being your expert in

2  other things.  It doesn't seem like it would.  But that, to

3  me, seems to be something that really doesn't matter much.

4         So then let's talk about what happens to the images.

5  My understanding is that plaintiff, you say you get a list of

6  all the files and emails.

7         Defendant says that instead of just giving a list,

8  that your expert ought to run or the expert ought to run

9  agreed-upon search terms and provide defendant a copy of the

10 report.

11        The defendant then reviews the report for

12 responsiveness and privilege and then produces any items that

13 are responsive to the search that are not protected from

14 discovery and also provides a privilege log.

15        Is that where you-all have essentially your

16 disagreement with each other?

17        MR. MOONEY:  The dispute does begin there,

18 Your Honor.  If I may, we are fine with defendants' expert, as

19 we proposed doing the imaging.  We would ask, though, that our

20 expert be permitted to be present and just be permitted a hash

21 value, that is a unique signature for the images, just to

22 maintain integrity.  But we're otherwise fine with that

23 approach, as far as step one.

24        THE COURT:  You can't quibble with giving them a hash

25 value.

```
 1          MR. LANDES:  Yeah.  No problem with giving the hash
 2   value.  And if they want to, you know, fly their expert to
 3   whatever city to sit there and watch us do the process, that's
 4   fine.
 5          THE COURT:  Okay.  So then the big issue, I think, is
 6   whether or not plaintiff gets a list of all of the files and
 7   all the emails.  Isn't that really essentially the big
 8   problem?
 9          MR. MOONEY:  Your Honor --
10          MR. LANDES:  Sorry, go ahead.
11          MR. MOONEY:  That's where the problem begins,
12   Your Honor, the difference between the protocols, yes.
13          And this is why a forensic examination is needed here
14   and why discovery can't just happen in the normal course.  The
15   reasons for that are a few.
16          First of all, the laptop, by Mr. Droege's admission,
17   has been deleted.
18          THE COURT:  Right.
19          MR. MOONEY:  So we're not going to find, presumably,
20   any complete files or documents on the laptop.
21          Second, the hard drive, we don't know for sure
22   whether or not files had been deleted from that hard drive.
23   And so again, we may not find actual responsive full files on
24   the hard drive.  That's the first issue that --
25          THE COURT:  So why is that remedied by giving you a
```

1  list of everything?

2         MR. MOONEY:  So the list of everything, the purpose

3  of the list of everything is to allow defendants an

4  opportunity to object to our forensic expert examining certain

5  files or disclosing the contents of certain files to counsel.

6         And so under our protocol, defendants' expert would

7  image the devices, sounds like we're agreed.  Defendants'

8  expert would next create a list of all of the files and email

9  found on the devices, if any.  I don't know the extent of the

10 full files or emails.

11        And then defendants, Mr. Droege, in particular, would

12 have a chance to object to the access of any of those files or

13 emails, based on privilege, based on work product or based on

14 any other personal medical, financial or family reason.  That

15 list would then be provided to our forensic expert.

16        And the rule that our forensic expert would abide by

17 is that none of those files and emails will be touched in your

18 examination, none of the contents of those would be disclosed

19 to RoadSync counsel unless and until Your Honor ruled

20 otherwise in connection with an objection that we had about

21 something that had been raised.

22        So the file and email list was set up as a screen to

23 make sure that our --

24        THE COURT:  I get that, but the issue is, though, it

25 gives you access to everything that exists.  So you, for

1  example, get to see the fact of a communication.

2          You're right, there might be nothing on these, and

3  this is all then -- but we have to deal with the fact that

4  data will be found.

5          And if, for example, you get a list of all of the

6  emails that are on the computer or on the hard drive, that is

7  giving you information that you are not entitled to get just

8  by having somebody open up their file.

9          Even if you were not to get -- even if you didn't

10 have the content of those emails, you would then know this

11 person and that person spoke on this day and that would be

12 something you would be able to use to guide depositions, other

13 discovery, things of that nature.  It seems to me as though

14 while that may be more efficient, that is not the way

15 discovery usually works.  Usually, you have to go through a

16 process to get that information.

17         The second problem would be that essentially what

18 you're leading to is a part where you get -- where plaintiff

19 gets everything that is not otherwise protected from

20 discovery, either because it is attorney/client work product

21 or personal information, but that would be sort of without

22 regard to whether it is discoverable under Rule 26.

23         And I'm trying to, because we don't have a process

24 here where there seems to have been malfeasance, I'm trying to

25 keep this process as close to the standard discovery processes

1   that there is, which is you will have to ask for something and

2   then, if challenged, you have to explain why it's properly

3   discoverable, given the broad nature of discovery, but you

4   still have to prove it if it's challenged, and then they have

5   the opportunity to produce it.

6           So you only get to open the files that you, through

7   your hard work and labor, have identified rather than making

8   them give you a list of everything that exists and then you

9   now know what to ask for.

10          Do you see what I mean?

11          I mean, essentially what you're asking would be no

12  different than if you were to say to somebody in standard

13  litigation give me a list of all of the emails you sent during

14  the relevant time period.  And then you could sit back and you

15  could say this one's date looks interesting, that one looks

16  interesting, the to and from is interesting to me.  And then

17  you would use that to guide your subsequent discovery.

18          And I think that's one of the things y'all object to;

19  is that right?

20          MR. LANDES:  Yes, Your Honor.  And of course the lack

21  of a relevance or responsiveness.

22          THE COURT:  Right.

23          MR. LANDES:  Or discoverability screen to get the

24  substance.

25          THE COURT:  Well, that's what I'm sort of saying.

1    I'm sort of saying they're getting one leg up just in the

2    identification of it, let alone if the only way in their

3    protocol that something's not produced is because it's

4    protected.

5            There are lots of things that are not produced that

6    are unprotected and still not produced, because they're not

7    responsive to a request that's asked, because somebody doesn't

8    think of it or because it's otherwise not relevant and

9    discoverable.  I should say not likely to lead to the

10   discovery of admissible information.  So I think in that

11   regard, you're sort of giving a list of everything moves too

12   far away from the norm given where we are.

13           MR. MOONEY:  If I may, Your Honor.

14           THE COURT:  Yes.

15           MR. MOONEY:  I think that the request is firmly

16   within the bounds of discovery under federal rules.  I think,

17   again, this is different -- I don't know that I'd say than the

18   normal course, but certainly different than many cases I

19   litigate and opposing counsel litigates and that are before

20   you.  And the difference is that in this case, the computer

21   that we're talking about was the work computer of a defendant

22   who admitted that he downloaded all of these documents from

23   our systems and then took them with him.  It is alleged to be

24   the instrumentality of the misappropriation.

25           THE COURT:  And so you ought to be able to get all of

1  the discovery in the world to focus on that.  That's what you

2  ought to get.

3          MR. MOONEY:  We ought to be -- we absolutely ought to

4  be able to get the information that is on that computer that

5  is relevant to this case.  And that is the protocol that we

6  have proposed.

7          And so when we get to this next step where we're

8  talking about us getting access to, you know, all of this

9  other information that might not be protected but might not be

10 responsive, I just want to be very clear as to what that is,

11 right?

12         We've already talked about the privileged documents.

13 Those would be logged, you know, in the normal -- in the

14 normal course and we'll get a log, and there will be no

15 additional information as to those documents.

16         The other personal documents, our proposal is that

17 our expert cannot look at those as part of the image, cannot

18 access them.

19         THE COURT:  You mean things that have sort of

20 personal information?

21         MR. MOONEY:  Right, correct.

22         THE COURT:  Yes.

23         MR. MOONEY:  We could be talking about a null set.  I

24 don't have the information to determine that.

25         THE COURT:  Right.

1          MR. MOONEY:  But as to those documents, what we're

2    really talking about is so what information are we going to

3    get in a log as to that personal set of documents that maybe

4    is a null set, maybe is not, that is more than we would get in

5    the ordinary course and is that fair as part of the protocol

6    to get the discovery we need here.

7          And we can talk about whether there are ways to log

8    or identify those documents that give us, you know, very

9    little information.  We don't want -- we don't care about

10   those documents.  We need enough, right, to be able to

11   determine whether, in fact, these, you know, really seem to be

12   personal documents, and so there needs to be some indication

13   as to why they've been withheld, but we don't need the

14   description of the content of all of those documents.  We

15   don't want it.  It's not relevant.  But we do think this is

16   required as a screen, right, this is -- so that our expert

17   does not look at these documents in conducting his forensic

18   examination.

19          THE COURT:  But I think there's a subcategory.

20   There's another category.  And that would be not your client's

21   information that was downloaded.

22          MR. MOONEY:  Um-hmm.

23          THE COURT:  But also not personal information, just

24   other stuff on the computer that might be emails that he was

25   sending at the time, that's the obvious one to think about.

1   Emails that he was sending.  Let's say that he was sending

2   emails about his decision to compete or whatever it was he was

3   going to do when he left the company.

4        As long as they don't include your protected

5   information, you ought to have to go find those through the

6   normal course of discovery rather than getting a list of them

7   now.  I think that's really the line I'm trying to draw is

8   just that you should have to go back and say we want all of

9   the communications between A and B that dealt with this.  And

10  you should have to go ask for that.  And then they should have

11  to give them to you or not give them to you and fight about

12  it.

13       But not give you a list so that you know at least,

14  for example, dates of communications.  Right?

15       Or what if he downloaded -- what if he was looking at

16  other industry data and those files are, say, they're not your

17  stuff but other industry data that might be something one

18  would look at while looking at your client's information.  You

19  shouldn't be entitled to know that he has that until you go

20  ask for it.

21       MR. MOONEY:  Two points, Your Honor.

22       One, the extent that there are any complete files or

23  emails on that hard drive and on that laptop, agreed, that's

24  absolutely discoverable in the normal course and those

25  documents would have to be produced in response to our regular

1    request for production.

2            THE COURT:  If you made it, if you made it, if you

3    successfully got around any obligation or challenge they made,

4    but shouldn't you have to go through that process?

5            MR. MOONEY:  We should get a forensic examination,

6    but as to that process, those documents would be produced in

7    the normal course.  We have served several requests for

8    production.  We don't have any documents yet.  But we've

9    served several requests for production.  And I don't believe

10   that there would be any emails or files on those devices that

11   are -- that would fall outside the scope of what we have asked

12   for and that is relevant to the case that we would, you know,

13   be tipped off about in this kind of a protocol.

14           THE COURT:  But you admit that if you were, you

15   shouldn't get the tipoff.

16           MR. MOONEY:  I don't want the tipoff, Your Honor.  I

17   want as little information in that log as possible.  The full

18   purpose of that log is to screen documents for them.  And so

19   if there are categories that aren't personal, financial,

20   family, medical that they think are on that computer, there's

21   another company that Mr. Droege is running, I don't know, then

22   we're happy to talk about carving those out and having the

23   absolute minimum information provided in the log.

24           We just need the log as a screen so that our expert

25   can perform the forensic examination.  And we'll get to that

```
 1   and why that's needed.  I'm happy to talk about that.  But the
 2   purpose of that is, as I've said, a screen for defendants.
 3   And if there's an additional category to add or we can agree
 4   on the amount of detail in a log, happy to, because we don't
 5   care about those documents that aren't relevant to the case.
 6             THE COURT:  So it seems like you agree with me
 7   that -- I think you and I might just disagree in the
 8   likelihood that that will happen.  I think I see it as more
 9   likely that there is going to be some things that are maybe
10   relevant but not your client's stuff, and that maybe you
11   haven't asked for that stuff yet, and you ought to have to do
12   that.
13             But maybe that's where the search that they want to
14   do comes in, maybe it gives you a chance of grabbing all of
15   those items.  Right?
16             Because what they want is after the forensic image is
17   made that you-all negotiate search terms or parameters of a
18   search to be run across it.
19             Is that right?  Is what y'all are asking for?
20             MR. LANDES:  That's right, Your Honor.  I mean, it
21   could be done now, it could have been done three months ago.
22             THE COURT:  So why doesn't that give you --
23   essentially when you get the output, why doesn't that give you
24   what you want?  Because you don't know what's not hit?  You
25   don't know what's not caught in the search?
```

1          MR. MOONEY:  Your Honor, a few problems.  I mean, it

2    sounds like we're getting into it, and so let me begin.

3          The first problem that we have with defendants'

4    protocol is timing.

5          THE COURT:  Yes, I agree with you.

6          MR. MOONEY:  The protocol, I read that protocol and

7    we had understood, Your Honor, that you wanted a protocol for

8    a forensic inspection of the computer.  We tried to do that.

9    My interpretation of defendants' protocol is that it is

10   effectively a protocol setting out a series of meet and

11   confers to try to agree on a protocol for an inspection.

12         And there is zero chance under that protocol that we

13   are going to be inspecting a computer in the next two or three

14   months and meeting the discovery deadlines in this case.

15         Two, as far as the substance of it, the reason that

16   agreeing on file types as part of that first meet and confer

17   doesn't work is we don't necessarily know all of the file

18   types that might be at issue.  Because, for example,

19   extensions on a file could have been changed, it would not be

20   picked up.  A file could have been saved into a different file

21   type, it wouldn't be picked up.  And so limiting it by file

22   type is troublesome.

23         Search terms, same thing, the list of search terms

24   here that we would have to propose in order to try to capture

25   any of the documents that we have identified or any cut and

1  paste, dupes or versions of some of those documents would be

2  enormous.  And the likelihood that these two parties are going

3  to agree on search terms, I think close to zero, and would

4  have us before Your Honor.

5      THE COURT:  Yes, but why couldn't we just agree that

6  you get to decide the search terms?

7      MR. MOONEY:  Well, I think that it would be a long

8  list that would include almost all of the words, frankly, on

9  those -- on the trade secret identified documents.  It would

10  be a very long list.  But I think the biggest problem with

11  this is that at the end of the day, it's not just the

12  documents we need, right?  And this is what's -- what's

13  critical.

14      There are going to be three things on the laptop and

15  the hard drive, three buckets, if you will.  The first bucket

16  are files that still exist saved in the so-called allocated, I

17  guess for lack of a better word, space of the computer,

18  existing files.  And I don't know how many of those there will

19  be.  It sounds as though on the laptop, they have been

20  deleted.  On the hard drive, I don't know.

21      That's all really that that search term protocol is

22  going to get to, but these are the other two buckets that are

23  critical to us.

24      Bucket two is the unallocated space of the computer,

25  right?  That's where our expert can look.  That's the scraps,

1  so to speak.  Your Honor is familiar with this, right?

2          THE COURT:  Yes.

3          MR. MOONEY:  Where we can find, okay, this isn't a

4  document extension here, this isn't a search term word, but I

5  can tell based on my professional training that this is a

6  trace of X document, Y document and it goes back here.  The

7  unallocated space will show us what has been, for example,

8  deleted that used to be on that computer and potentially when.

9          The third bucket that doesn't get picked up that's

10 absolutely critical in this case is the artifact bucket,

11 right?

12         And the artifacts are -- they're not files, they're

13 not unallocated space, it's a separate bucket, log files,

14 other information, if you will.  So why is that important?

15 Well, the artifacts are going to tell us things like when was

16 that computer turned on and off.  When were documents

17 accessed, right?

18         Even if they weren't changed, when they were accessed

19 and looked at.  When were files moved from that computer.

20 When were hard drives hooked up to the computer.  When were

21 FTP, like electronic transfer programs and protocols used on

22 that computer.  And that other sort of information.

23         And so those last two buckets of the unallocated

24 space and the artifacts, that's what's critical here for us to

25 know exactly what and when there was a download, what and

```
 1  when, you know, documents were accessed and where they were
 2  moved.
 3          And so what we've tried to do is propose a very
 4  efficient streamlined protocol that allows our expert to do
 5  that, that hard work, but has this first screen to get rid of,
 6  you know, all of this stuff that, again, frankly he is not
 7  going to care about and neither are we.
 8          THE COURT:  And you don't think you would get bucket
 9  two or three through their protocol?
10          MR. MOONEY:  We would not.
11          THE COURT:  Because they're not searchable in
12  unallocated --
13          MR. MOONEY:  The search term/file type portion,
14  that's the first meet and confer step, that would not give us
15  any of that information.
16          THE COURT:  Why is that?
17          MR. MOONEY:  Because search terms and file types
18  aren't going to pick up the artifacts or the unallocated.
19          THE COURT:  You can't search across unallocated
20  space?
21          MR. MOONEY:  Not in that way.
22          THE COURT:  No, because first you have to do
23  something.
24          MR. MOONEY:  That's my understanding, Your Honor,
25  yes.
```

1     There is a second -- this is at the second meet and

2  confer -- I'm sorry, the third meet and confer in their

3  protocol, which allows for an opportunity for the parties to

4  discuss whether we could look for the use of any mass deletion

5  programs or certain other software on the computer.

6     And so that's sort of a nod, if you will, to the fact

7  that there are other things on there, but it falls woefully

8  short of providing access to the artifacts and the unallocated

9  space.

10     THE COURT:  Okay.  Here's what I think.  As I've said

11  before, I want to keep as close to the norm as we can.  And I

12  want to make sure that the plaintiff has to do the discovery

13  process of asking for the things that they're entitled to get,

14  and not just opening the drawer of something of the

15  defendants.

16     But it's hard to say what's going to be there right

17  now, because a lot might have been deleted off of there.  And

18  the concern I have with the plaintiff's protocol is the

19  assumption that it would provide access to things to which

20  they're not entitled.

21     So I would like to do the first two steps first and

22  see what we're dealing with.  The first step would be the

23  defendants' expert creates an image, right?  And from that

24  image, then provides -- the first step of the plaintiff's

25  process is that a list of all files is then created, right, of

1  all items on it is created; is that right?

2      MR. MOONEY:  We had proposed a list of the files and

3  emails would be created so that they can provide objections,

4  yes, or with instruction not to access, yes.

5      Your Honor, if I may, I mean, it strikes me again

6  that when we're talking about plaintiff's --

7      THE COURT:  Let me just interrupt you for one second.

8      Marshal, do you need me for something?

9      MARSHAL:  No, sir.  No, sir.

10     THE COURT:  Okay.  All right.  If you did, I didn't

11 want you to have to sit back there and wait.

12     All right.  Sorry.  Go ahead.

13     MR. MOONEY:  It strikes me again that all we're

14 talking about here, right, is personal, medical, financial,

15 family or other completely unrelated information.

16     THE COURT:  No.  No.  See, you keep ignoring the

17 thing I'm concerned about, which is totally relevant discovery

18 that you have to go find and fight for, that you don't get

19 handed to you on a silver platter, because this is not a case

20 where now you've proven any malfeasance.

21     So you keep ignoring the thing that I'm mostly

22 concerned about, which is totally relevant discovery that is

23 not your client's stuff that you have to find a path to get

24 it.

25     Do you see what I mean?

1         MR. LANDES:  And, Your Honor, if I could add briefly.
2  That's a primary concern, that might be 1A.
3         But 1B is the material that wouldn't be discoverable
4  in the first instance, that they wouldn't even ask for, right,
5  so that is not relevant.
6         THE COURT:  Like what?
7         MR. LANDES:  So, I mean, Your Honor, gave the example
8  of, you know, maybe what Mr. Droege is doing in his free time,
9  communications he's having with friends about new business
10 ideas.
11        THE COURT:  Well, see, he's putting that under purely
12 personal and totally irrelevant, right?
13        MR. MOONEY:  Yes.
14        THE COURT:  He's putting that in sort of the purely
15 personal, it's about family stuff or other stuff.  He's
16 putting that in the purely personal.  You would never want it.
17 They would never want it.  It would have nothing to do with
18 this case.
19        MR. LANDES:  All right.  Then fine.  How about
20 material that Mr. Droege -- just his day-to-day work at Relay
21 that has nothing to do with their stuff, nothing to do with
22 the products at issue, but his day-to-day work in that
23 company.  His emails, his day-to-day work in that, his
24 planning for that, for material three, four years removed from
25 when he left RoadSync.

```
 1              THE COURT:  That's the type of stuff I'm worried
 2   about.  Or the stuff that's like, you know, he hears about the
 3   lawsuit and what does he say to somebody.  I don't know.  I
 4   don't know what else he would do.
 5              What are the other documents if on the day that he
 6   downloaded files, what are the other documents that he looked
 7   at on the Internet or saved himself or wrote or created?  You
 8   should have to go find those.  You should not be given a
 9   roadmap to them right off the bat.  You have to go find those.
10   Because you keep ignoring that sort of subset.
11              Do you understand now?
12              MR. MOONEY:  I understand, Your Honor.
13              THE COURT:  But you don't agree with me?
14              MR. MOONEY:  I would find it hard to believe that
15   there is information that was relevant to this case that
16   didn't fall within the scope of our outstanding RFP, so I do
17   believe --
18              THE COURT:  Sure.
19              MR. MOONEY:  -- I'm in agreement with opposing
20   counsel that the category is more in the metes and bounds of
21   the personal or irrelevant information.
22              THE COURT:  So I don't know the full extent of your
23   other discovery responses, but they ought to get a chance to
24   argue against them when they see something.
25              MR. MOONEY:  What I was wondering, Your Honor, was
```

1   whether there was -- and I'm thinking out loud here -- always

2   dangerous -- a path forward that would provide satisfactory

3   protection but get this moving along.

4       And that would be if there was some way that the list

5   and the objections could be presented to our expert and

6   outside counsel in a way that would not reveal unnecessarily

7   the substance of these documents that Your Honor is most

8   concerned about and that counsel and I, I think, believe to be

9   the irrelevant personal information or certainly information

10  about other companies or products that are completely

11  irrelevant to the case.

12      There may be a way for us to continue to meet and

13  confer as to how we resolve that issue, but yet move forward

14  under our protocol in a way that doesn't give us the

15  informational advantage that Your Honor is concerned about.

16      THE COURT:  So yes.  I'm trying to think of that,

17  too.  So tell me, what is the output that the forensic expert

18  makes of the laptop and the hard drive?  I think you say in

19  yours in Step 14 is that defendant will serve on the plaintiff

20  objection to the production of any files.

21      What is it that they would look at, that you would

22  look at, or that you would have them look at?

23      MR. MOONEY:  Under our protocol?

24      THE COURT:  Yes.

25      MR. MOONEY:  So under our protocol, a list of

1  objections would be provided by defendants to our expert.  Our

2  expert has agreed, he could agree in writing, he certainly's

3  subscribed in the PO, but he could agree in writing as well

4  not to access or look at any documents where there is an

5  objection unless and until Your Honor were to overrule that.

6          THE COURT:  Well, do you see Part 4 or Step 4?

7          MR. MOONEY:  I do.

8          THE COURT:  So you say:  Plaintiff's forensic expert

9  will retain a copy of the forensic images and provide a copy

10  to the defendant but shall not disclose the forensic images to

11  plaintiff's counsel or any other person.

12          So what they're giving is a forensic image, right,

13  and that's what you would then have the defendant review and

14  object to.

15          MR. MOONEY:  Correct.  The forensic image would be

16  provided to defendants.  The objected to information would be

17  identified.

18          THE COURT:  Okay.  Now, does that forensic image,

19  when that's created, will that let us know what we're dealing

20  with?  I mean, I'm just wondering whether at that point we can

21  address the issue of whether or not production or giving --

22  putting the burden on the defendant to object would be too

23  onerous.  Maybe I'm not saying that clearly.

24          MR. MOONEY:  I think I understand, Your Honor.

25          THE COURT:  Does it allow us to --

1          MR. MOONEY:  The volume of data, for example.

2          THE COURT:  Yes.  Because it may be that there is

3    nothing.  It may be that what we find out is that everything's

4    unallocated and in your third bucket and therefore is not

5    searchable.  And then we know we can't follow the defendants'

6    protocol, because we can't search across it.

7          MR. LANDES:  So, Your Honor, I just want to note that

8    I vehemently disagree with the representation that you can't

9    search artifacts and that you can't search unallocated space.

10   When experts do this work, they don't sit there and open up

11   unallocated space and read it character by character, they

12   search it for materials.

13         THE COURT:  Well, I know.  Yes.  But sometimes in the

14   unallocated space, you just have a fragment, and I don't know

15   if that makes a difference or not, I don't know.

16         MR. LANDES:  But the fragment would still have

17   something that's searchable.

18         THE COURT:  Yes.

19         MR. LANDES:  Their expert is not going to sit there

20   and read character by character.  He conducts searches.

21   That's the way that the process works.  There are searches

22   that are run.

23         Now, can he search for a hash value for an entire

24   file?  Is he searching for search terms?  Is he searching for

25   file names?  All of those things can be searched for, but an

1 expert -- the notion that you can't search this material, that

2 experts in these cases read line by line gigabytes and

3 millions of pages looking for something that they can infer is

4 a copy, that's not how it happens.  These are searches that

5 are run.  And that -- that's a process that's embodied in Step

6 2 of our protocol.

7          And Mr. Mooney cited the *Ameriwood* case.

8          THE COURT:  Right.

9          MR. LANDES:  Well, you can see our Step 2, to the

10 extent there is any vagary or imprecision in it, it's because

11 we took a block quote from the process in *Ameriwood*.

12          THE COURT:  I know.

13          MR. LANDES:  And put that in our protocol.  And so if

14 Mr. Mooney says, well, there has to be a step where this

15 search is run on the artifacts, that's fine, we have no

16 objection to that.

17          MR. MOONEY:  Your Honor, a couple of points.  One, on

18 *Ameriwood*, a different case, and the parties agreed in that

19 case, that's the second of the *Ameriwood* decisions, that was a

20 proposal that the parties agreed to and put before the Court,

21 so presumably both sides agreed that that would be an

22 effective mechanism in that case.

23          Two, as far as the searching, this is a point that

24 probably should be emphasized, as counsel was, I absolutely

25 agree that forensic examiners with years of training in this

1  area have the wherewithal to effectively look through

2  unallocated space and look through artifacts.

3       The question for is us here, right, is whether that

4  is more efficiently done by those experts or whether it is

5  efficient for outside counsel to try to come to an agreement

6  as to each and everything that a forensic examiner would do,

7  you know, as part of this iterative process, in performing

8  that search.

9       And I fear that we would be frequently before

10  your Honor.  But I do think that again, as Your Honor had

11  mentioned earlier, there could be a way to have the image

12  taken, to get that going, and the hash value, we're agreed, to

13  then have defendants provide a list of objections in some way

14  that doesn't reveal anything about the documents they're

15  objecting to, other than enough for our expert to not look at

16  them.  I mean, a date, for example, we could -- we could

17  figure it out.

18       That way, our expert could, you know -- and their

19  expert could move forward with the examination.  None of those

20  documents or files would be touched.  And we, in parallel,

21  without holding up discovery could try to work together to

22  figure out, number one, is there a problem, because again, we

23  don't know whether there is, and, two, how big is it and what

24  is the solution.  But those paths could move together.

25       MR. LANDES:  One thing I want to note, Your Honor,

1  just briefly.  I mean, you know Your Honor has spoken about

2  trying to make this process look as much like normal discovery

3  as we can.  And what's not normal in discovery, what's not

4  part of the normal process of discovery is for the plaintiff

5  to say give us everything, and then it's the defendants'

6  obligation --

7          THE COURT:  I agree.

8          MR. LANDES:  -- to go through document by document

9  one by one, artifact by artifact, and assert a specific

10  objection to each one as being personal and then group those

11  and categorize them for the plaintiff.  That's not normal

12  discovery.

13          THE COURT:  I completely agree with you.  And that's

14  what I want to avoid.

15          What I don't know is whether that really is going to

16  happen.  One of the reasons I say that is because -- I mean,

17  you-all know a lot more about this and what might be on it and

18  all of those things.  But I'm trying to --

19          Mr. Mooney does not seem to believe that that is

20  going to be an issue, because of the breadth of discovery

21  that's been requested or for what he believes might be on it,

22  I don't know.

23          But I think what we ought to do is I think we ought

24  to do Steps 1, 2 and 3 of the plaintiff's updated protocol,

25  except that it ought to only go to defendants' counsel.  And

1  at that point, defendants' counsel can look at that list and

2  can let me know whether that list creates exactly the problem

3  that you-all are afraid of, that the defendant is afraid of.

4        Okay?

5        I think, I think that if it is, then the process then

6  ought to be some type of search across it.  I think that is

7  more the appropriate path than requiring the defendant to

8  defend each and every item on a list, but we might not be

9  talking about much.  I guess it depends on how good he was at

10 wiping the computer, I don't know.

11       MR. LANDES:  Well, and so, Your Honor, I just want

12 to -- just a slight point of clarification, because I know you

13 said Your Honor appreciates details, and I believe this is in

14 the deposition transcript.  What he did is called a factory

15 reset.

16       THE COURT:  Yes.

17       MR. LANDES:  And so that's not a process -- it's not

18 evidence destruction software where items are deleted.  It's a

19 setting in every computer that says essentially turn this back

20 to the way that it came from the factory.

21       THE COURT:  Right.  But it depends -- I mean, I guess

22 how much he put back on it after that would control how much

23 of the space has been written over, right?

24       MR. LANDES:  That's -- that's right, Your Honor.  I'm

25 not as familiar with the intricacies of factory reset and

1  unallocated space, so I can't speak to that entirely, but,

2  yes, it would depend on things like future usage of the

3  computer and what might be there or preserved somewhere.

4          THE COURT:  All right.

5          MR. LANDES:  But it's not an empty laptop, but

6  it's --

7          THE COURT:  Yes.

8          MR. LANDES:  As far as we can -- as far as we know,

9  based on the testimony, devoid of whatever he downloaded from

10 RoadSync.

11         THE COURT:  All right.  So let's do the plaintiff's

12 updated proposed examination Step 1, 2 and 3, with the caveat

13 that in 3, the defendant gets the list and gets to look at it

14 and then you can let me know whether it creates that issue.

15         Okay?

16         MR. LANDES:  Understood.

17         THE COURT:  And the way we'd be able to do it would

18 be to tell me that there are X number of files on here and

19 we've concluded that they include things that are not

20 personal, that we think are not relevant to this, and that we

21 shouldn't have to disclose for whatever reason.

22         And if you want to do something like that, I don't

23 know, I could -- talk to them first, but I can look at that

24 in-camera, if need be, to see whether or not I think that

25 they're getting more than they ought to get.

```
 1              Okay?

 2              MR. LANDES:  Understood, Your Honor.

 3              THE COURT:  But I want to try to do this efficiently.

 4    Because what I don't like is what the plaintiff identified,

 5    which is the long, drawn-out process that is part of the

 6    protocol afterwards of all the search terms and then you run

 7    it and that does look like it would take quite a long time.

 8              Okay?

 9              MR. LANDES:  Understood, Your Honor.

10              THE COURT:  So I'd like to try to see if we can

11    figure out a way of speeding that up if we get there.

12              Okay?  All right?  Does that make sense?

13              I know it's just taking it one more step, but they

14    say that's how you eat an elephant.  And so that's kind of the

15    way I am.

16              Okay?

17              MR. MOONEY:  I'm not sure about the elephant,

18    Your Honor, but it does make sense.

19              THE COURT:  You don't know that's how you eat an

20    elephant, one bite at a time?

21              MR. MOONEY:  I have heard.  I have heard.  I've not

22    witnessed it.  But I think that the information that we get

23    from that, I mean --

24              THE COURT:  Right.

25              MR. MOONEY:  We may not agree on everything and we
```

1    may be back before you, but I'm sure that we will be able to

2    resolve perhaps some of it based on that information.

3         THE COURT:  I actually don't think you-all disagree

4    on what's right.

5         MR. MOONEY:  Right.

6         THE COURT:  I think you-all just disagree on what's

7    going to be there and whether all of those other parameters

8    matter, and so let's figure whether they matter or not.

9         Okay?

10        MR. MOONEY:  Yes, sir.

11        THE COURT:  All right.  Now, let's talk about the

12   other issue, which is the trade secret issue.

13        I have looked at the customer list and data

14   compilations and perspective customer lists and the source

15   code.

16        I'm not clear what else y'all want, what else the

17   defendant wants.  I understand that you're frustrated at them

18   for updating it and changing it.  I don't think I can prevent

19   them from doing that.  I think they have a right, if they were

20   to go through discovery and find something else that was

21   allegedly stolen, to assert that as a trade secret.

22        So maybe I'm not exactly sure what the problem is.  I

23   think that they've given you a fairly good list.  I looked at

24   some and I see that there's some financial information that

25   might not be protected, but I also saw some things, one was I

1  saw data for Coyote Logistics.

2          If I was going out in the business, I think that's

3  who I'd target, because I think some of the information I saw

4  showed me that Coyote Logistics had a lot of money they were

5  spending for a period of time.  Maybe that's not protected or

6  maybe it is, but I do think there was some information in

7  there that looked like it could be protected information, so

8  what more do you want?

9          MR. LANDES:  Yeah.  So there's a couple of points

10 there, Your Honor.  The first one has to do with the adequacy

11 of the identification itself.

12          And the second one has to do with the right to amend.

13          So I want to take those actually in reverse order and

14 I'll start with the right to amend.  And apologies if our

15 papers were unclear on this.  We're working with limited

16 space.

17          We're not asking for an outright prohibition on them

18 ever amending their trade secret identification.  If they find

19 something new in discovery that they couldn't have known about

20 before, right, we're asking for a good cause requirement,

21 which is consistent with the authority that we've cited, if

22 they want to amend it.

23          So if, for instance, they're going through discovery

24 and they say, oh, my gosh, in addition to the 12 files we

25 identified, there's these two other files that we had no idea

1  you took, they could come back and say, well, we learned in

2  discovery you took those other files, right?  That's something

3  that's new information, they wouldn't be able to tell that

4  before discovery.

5          What we're trying to avoid is a situation where we

6  get a dump of documents, right, 800 pages, where you flip

7  through and you say, well, maybe that's a trade secret, maybe

8  it isn't.  And then three months from now after discovery,

9  when we prove the fact that Coyote Logistics is one of the

10  largest players in the market, you can find that with a

11  ten-second Google search.

12          THE COURT:  I know you can.

13          MR. LANDES:  Right.

14          THE COURT:  But the data was more than that.

15          MR. LANDES:  I understand that, Your Honor, right.

16          But once we've proven that that material is public,

17  right, or that it wasn't misappropriated, it never came over

18  to Relay, we get something new that says, oh, you know what,

19  you were looking at the wrong part of the spreadsheet.  It's

20  actually this other part over here.

21          Or actually, you know what it is, it's this

22  combination of these three disparate pieces from these three

23  separate spreadsheets, that's what the trade secret is.

24          Now, they would be -- they should be able to tell the

25  time of that now.  What is -- what's in and what's out.  And I

1　think a pointed example, Your Honor, I'm going to refer you to

2　Appendix D, which relates to the source code.

3　　　　　THE COURT:  So give me a second.

4　　　　　MR. LANDES:  Yeah, so it's -- and Mr. Mooney and I

5　conferred ahead of time on the sealing motion, and he can

6　correct me if I'm wrong, we've agreed that Exhibit B to the

7　trade secret ID joint statement --

8　　　　　THE COURT:  Okay.

9　　　　　MR. LANDES:  -- which is Appendices A through D.

10　　　　　THE COURT:  It's the customer information and the

11　compilation of data, but not the code?

12　　　　　MR. LANDES:  Well, not quite, Your Honor.  So it's

13　essentially the list of file names.

14　　　　　THE COURT:  Okay.

15　　　　　MR. MOONEY:  Just before you do -- we had agreed,

16　Your Honor, that that Exhibit B, Appendices A through D, could

17　be unsealed.  The request to seal would be withdrawn, provided

18　that defendants withdrew their opposition to sealing Exhibit

19　C.  That's the 800-page trade secret identification.

20　　　　　MR. LANDES:  This (indicating).  The printout of the

21　customer lists.

22　　　　　MR. MOONEY:  The trade secret.  Correct.  The

23　information that is alleged to be trade secret, that was the

24　agreement that we reached.

25　　　　　THE COURT:  So Appendix A will be unsealed, Appendix

1 B and C will be unsealed and D, but Exhibit C -- in front of

2 me I've got your provisional under seal filing.

3           MR. LANDES:  Yes.  So we have Exhibit -- Exhibit A,

4 if we just march through it, Exhibit A is the written

5 interrogatory responses.

6           THE COURT:  Yes, okay.

7           MR. LANDES:  Those are already -- those are not --

8 those weren't asked to be sealed.

9           Exhibit B is about five pages, maybe, and it's a

10 series of tables labeled Appendix A, Appendix B, Appendix C

11 and Appendix D.  The parties have agreed that that will be

12 unsealed.

13           Appendix C is 821 pages, it's a printout of the -- to

14 use a shorthand term, the customer list --

15           THE COURT:  Yes.

16           MR. LANDES:  -- data.  We've agreed that Appendix C

17 will remain sealed.  Obviously with defendants' reservation of

18 rights that we don't think this material is confidential or a

19 trade secret or anything like that.

20           THE COURT:  Okay.  Mr. Barton, they're doing to me

21 now what they did to me in their writing documents.

22           I don't think we're using the same terminology, and I

23 know you-all know this a lot better than I do.

24           I'm looking at the provisionally sealed record or

25 document at 70-2.  Do you-all have that?

1          MR. LANDES:  I don't know that I have that specific

2    docket entry.

3          THE COURT:  I think what you're referring to there,

4    that has Exhibit B to the joint statement.  It includes

5    Appendix A, which is 10 or 12 file names.

6          MR. LANDES:  Right.

7          THE COURT:  Exhibit B, which is just over a page of

8    file names.

9          MR. LANDES:  Appendix B.

10         THE COURT:  I'm sorry, Appendix B.  And Appendix C,

11   which is one page of file names.  And Appendix D, which is two

12   pages of file names.  All of those may be unsealed.

13         MR. LANDES:  Correct.

14         THE COURT:  It also has Exhibit C, which starts with

15   an index of exhibits and then goes into what I think you care

16   about, which is the spreadsheets.

17         MR. LANDES:  Right.  So, you know, obviously we would

18   reserve the right to challenge Exhibit C, but for purposes of

19   today, we've agreed, while reserving rights, that Exhibit C

20   can remain sealed.

21         THE COURT:  Okay.  All right.  That's what we will do

22   then.  All right.

23         MR. LANDES:  Okay.  So getting back on to the main

24   road then, if you're looking, Your Honor, at Exhibit B,

25   Appendix D.

```
 1              THE COURT:  Okay.  I'm with you.
 2              MR. LANDES:  Okay.  And if you look at the -- it's
 3    the first entry on the top page, which is RoadSync web.  And
 4    it says:  All front-end code for RoadSync's checkout to allow
 5    users --
 6              THE COURT:  No, that's not what I have.
 7              MR. LANDES:  Oh.
 8              THE COURT:  That's not what I have.  I have that as
 9    the second page.
10              MR. LANDES:  Right.  I meant to say I'm looking at
11    the first entry on the second page.
12              THE COURT:  Okay.  All right.
13              MR. LANDES:  RoadSync web.  Are you with me?
14              THE COURT:  I am.  All front-end code for RoadSync's
15    checkout.
16              MR. LANDES:  Correct.  To allow users to access the
17    functionalities of the software as implemented in the APIs in
18    a way that is user friendly and industry appropriate.
19              I would say, Your Honor, that description is devoid
20    of substance.  When our expert reviews the source code, he has
21    no idea what he is supposed to be looking for.
22              To understand what does it mean to have code that is
23    user friendly and industry appropriate.  That describes every
24    piece of software that has ever been written or ever will be
25    written.
```

1            And so when he looks through these files, what is he

2    looking for?  Now, if we're looking for these specific source

3    code files on the Relay system, that's an easy process.  We

4    can just show those files aren't there.  If we show that Relay

5    source code was written from scratch, right, we can easily

6    show that as well.

7            But then how do we understand the -- literally the

8    infinite set of possibilities of what they might come back and

9    say somewhere within the dozens and dozens of files is trade

10   secret in there.  What are we supposed to be looking for?

11   What are we supposed to be comparing?  What are we supposed to

12   be analyzing?  What am I -- what are we supposed to ask their

13   witnesses about in discovery?  Right?

14           I mean, we can't sit there with literally thousands

15   of files of source code and go through line by line and say is

16   it this?  Is it this?  What is it that we're supposed to be

17   evaluating?  And that's the issue we're concerned about.

18   We're concerned about a situation where we go down these blind

19   alleys in discovery to try to understand what it is within

20   these files that's actually claimed to be trade secret.

21           And then all of a sudden at summary judgment, we

22   don't even know what we were aiming at.  Right?  And,

23   Your Honor doesn't know what he has to resolve, because it

24   could be anything.  Right?

25           And so it's a similar function.  You know, if you

1    look, for instance, check printer, right?  Source code to
2    print checks.  I don't know what we're supposed to be looking
3    for in there.

4         Is it the notion that you can print a check?
5         Is it how you communicate with a printer, which every
6    computer does?

7         I don't know.  Right?

8         I don't know what we're looking for.  And it's
9    similar in the customer lists, right, so when we --

10        THE COURT:  Hold on.  Let's take this again a bite at
11   a time.

12        What do you say about these examples?

13        MR. FOX:  With respect to the source code, we have
14   fully described and produced all the source code.  The cases
15   say if you produce all the source code, which you are claiming
16   is a trade secret, not in its entirety, we break it down by
17   functions, we identify the four key functions, we even
18   identify the folders and repositories in which the code
19   files -- that correspond to each of those functions.  That
20   satisfies this initial threshold of reasonable particularity,
21   Your Honor.

22        What I'm hearing amounts to a merits defense that
23   might be appropriate down the road after discovery in a motion
24   for summary judgment, in a motion for directed verdict after
25   the close of plaintiff's case, or to a jury after they've been

1    instructed on all of the potential defenses and requirements

2    of a trade secret under federal or state law.

3            Under the case law with respect to what we're doing

4    today, which is getting past this threshold identification,

5    we've done that.

6            He seems to be taking issue with some of our sort of

7    English language descriptions of this functionality, but we go

8    far beyond that.  We're not just at a high level describing

9    it.

10            THE COURT:  Where do you go beyond that?

11            MR. FOX:  By producing the code.  We've produced the

12    entire code set to their expert.

13            THE COURT:  So what do they do?  What do they do with

14    their expert?

15            MR. FOX:  I don't know what they're trying to do with

16    their expert.  But we've made it available.  All we have to do

17    now is identify the trade secrets.  And we've done that by

18    producing the entire code in each of the key functions that

19    comprise the program, the checkout program, and shown all of

20    the code that comprises each of those functions and where it

21    is kept within the code set.

22            THE COURT:  So when do you give them more

23    information?

24            MR. FOX:  We've given them the entire code set.

25            THE COURT:  No.  But when do you give them -- explain

1  to them in not this written description here but why you can

2  consider it a trade secret?

3        MR. FOX:  Well, as -- as the case is litigated,

4  they're going to have their defense as to why it's not a trade

5  secret, the information in there, and we're going to be

6  presenting our case as to why it is a trade secret, if

7  they're --

8        THE COURT:  How are you going to do that?

9        MR. FOX:  How do we intend to do that?

10        THE COURT:  Yes.

11        MR. FOX:  Well, we're -- we had asked for access to

12  their code set and we're going to see what in each code set

13  matches up.

14        THE COURT:  Because you want to see if their code set

15  mirrors your code set?

16        MR. FOX:  That is correct, Your Honor.

17        THE COURT:  Why isn't that an avenue for doing that?

18        MR. LANDES:  Yeah, so, Your Honor, I think that's a

19  helpful distinction, right?

20        So if the issue was do these files appear in your

21  code set?  It's an easy process.  Right?

22        We can look, these files will not be there.  I can

23  assure you of that.

24        But what we will come back and see is, well, when we

25  hear what's actually litigated is it will be reverse

1  engineered to match whatever they find in our code set.  So

2  they'll say, well, yeah, the files aren't there.  Well, yeah,

3  you didn't actually copy any of this code.  But what our trade

4  secret is, is putting these three steps together from these

5  separate files, having that there, that's what the trade

6  secret is.  And oh, lo and behold, you also used those three

7  open source libraries.  Right?

8          THE COURT:  So you're talking about they're going to

9  say that you've got three different codes put together to do

10  this?

11          MR. LANDES:  Yeah, right.

12          THE COURT:  You've linked this part of the process

13  with that part of the process and this part of the process?

14          MR. LANDES:  Potentially.  It could be anything.  Or

15  it might be there's a random parameter here and that parameter

16  could be anything from one to ten and, lo and behold, the

17  parameter four that you picked.  And well, if you look through

18  our 2500 source code files for our entire code set, we use a

19  parameter of four somewhere.

20          THE COURT:  And then you've got to go prove that you

21  got it on your own.

22          MR. LANDES:  Exactly.  And we might not hear that

23  parameter four is the super important parameter until expert

24  discovery, after we've taken the depositions.

25          THE COURT:  So when does this occur in the case?

1    When do you guys get locked into what your positions are?

2          MR. LANDES:  Well, so --

3          MR. FOX:  Not at this stage, Your Honor.

4          THE COURT:  I know.  When?

5          MR. FOX:  When?  As -- as the case progresses, we're

6    going to -- they'll file a motion for summary judgment saying

7    no reasonable jury could conclude that the code set, which is

8    one of the categories --

9          THE COURT:  Yes.  But then they don't want you to be

10   able to come back and say, well, you've said it's A, B and C,

11   but really it's D.

12         MR. FOX:  Well --

13         THE COURT:  Right?  Because they're saying -- I mean,

14   look, I think it's great that you've said your source code,

15   but if you don't find their source code -- but the way I see

16   this --

17         MR. FOX:  Umm-hmm.

18         THE COURT:  -- is if you don't find the source code

19   in their system --

20         MR. FOX:  Umm-hmm.

21         THE COURT:  -- then you're out of luck.

22         But what they're afraid you're going to do is you're

23   going to pivot and say, oh, even though the source code is not

24   the same, what it is is the way it's been arranged or you

25   might have modified it in this way to make it look different,

1    but really, you've got these similar functionality.

2            MR. FOX:  Well, we're going to learn a lot about this

3    in depositions and in their response to interrogatories.

4            THE COURT:  No, but shouldn't it be you that's saying

5    it?

6            MR. FOX:  Well, we have said the source code is the

7    information within these lines of code, right?  That's our

8    trade secret.

9            To the extent that none of the lines of code, as

10   opposed to the files, they're saying none of the files will

11   match.  Well, these files contain thousands of lines of code.

12   They can rename a file.  They can change out -- and of course

13   they're going to be -- they're not going to be absolutely

14   identical, but it's going to come down to this question of

15   what is a trade secret.  We're saying the code, the way it is

16   arranged are our trade secrets.

17           And what I'm hearing is a merits defense that they

18   have every opportunity --

19           THE COURT:  Well, no.

20           MR. FOX:  -- to develop and present during merits

21   arguments.

22           THE COURT:  Yes.  But what they're saying is it would

23   be fundamentally unfair for them not to know what to target

24   during discovery.

25           MR. FOX:  Well, we're not going to --

1          THE COURT:  If you can just come in later and

2   identify -- because what you've said now is you've conceded.

3   You're not going to find it exactly the same.

4          MR. FOX:  It doesn't have to be exactly the same,

5   Your Honor.

6          THE COURT:  So I understand that.  I'm not suggesting

7   that.

8          But since it can be different, you should have to

9   identify what it is with specificity or with whatever the

10  requirement is because otherwise, how can they know?

11         MR. FOX:  Well, Your Honor, if you look at the

12  customer list, we're not going to find that -- well, maybe we

13  will -- but it's quite possible that they've simply taken

14  pieces of information from our customer list or our customer

15  data repositories and used them.  Those can be trade secrets

16  in isolation.

17         We can't at the outset of discovery predict what they

18  did with our computer information, just like we can't predict

19  exactly what they did with each of our lines of code.

20         But if they used our code in order to develop their

21  code, we think through forensic analysis, we'll be able to

22  identify that.  But right now, they've asked what our trade

23  secrets are, just like our trade secrets on the customer data

24  compilations, it's the information within those compilations,

25  it's the information within our code.

1          THE COURT:  So have you put out to them -- so I look

2    at the description in RoadSync web, and I say users to

3    allow -- users to access the functionalities of the software,

4    in a user friendly and industry appropriate way.  Those seem

5    pretty wide open.

6          Have you asked them what type of user friendly and

7    industry appropriate way they mean by that?

8          MR. LANDES:  Well, we served -- I mean, this was in

9    response to an interrogatory.

10          THE COURT:  I know.

11          MR. LANDES:  It said describe this with

12    particularity.  We also asked for the development history of

13    these trade secrets.  I mean, the level of generality that

14    you're seeing is what we've gotten, right?

15          THE COURT:  Right.  But is that what you would expect

16    to do?

17          MR. LANDES:  Is what?

18          THE COURT:  To access the functionality, what

19    functionality are you referring to?

20          MR. MOONEY:  We're referring to the functionality of

21    the robo dialer functionality, the pay codes functionality and

22    the check printer functionality, but, Your Honor, that's just

23    the English language --

24          THE COURT:  Is that new?  Is that something you've

25    just learned?

1          MR. LANDES:  Well, what he just read was the four

2    categories in the left column.

3          THE COURT:  Right.  But at least you know now that

4    that's what he's referring to, I guess.

5          MR. LANDES:  Well, but what he's referring to,

6    Your Honor, is in this Exhibit C is probably 50 or 60 pages of

7    file names, thousands of files, and so -- and again, I'll

8    bring it back to our expert.

9          He looks at this list and he says, all right, I sit

10   down with the RoadSync source code.  I'm looking at all of

11   the -- the source code for their entire web interface.  And

12   it's going to be my duty to issue a report about whether

13   there's a trade secret in here to make this user friendly and

14   industry appropriate.  And he -- he tells us I don't know

15   where to start.

16         And if they serve us discovery -- remember, the other

17   purpose of the trade secret identification is to be able to

18   evaluate whether the discovery they serve on us is relevant

19   and proportional.  If they serve a discovery on us or a

20   discovery request on us that says give us all of your source

21   code that makes your products and services user friendly and

22   industry appropriate, what are we supposed to do with that?

23         How is Your Honor supposed to evaluate what's in and

24   what's out?  And that's what the problem is.  So this is not a

25   merits discussion, right?  I'm not saying --

```
 1              THE COURT:  No.  I understand that.  I don't think it
 2    is either.  I think you're trying to make sure that you don't
 3    get caught at the end of the day not knowing what you're
 4    accused of having stolen.
 5              MR. LANDES:  That's right.  And so just briefly --
 6    very briefly, Your Honor, Mr. Fox said, you know, what's --
 7    what's secret is -- well, it's the arrangement of the code.
 8    Well, what -- what arrangement?
 9              Is it the arrangement of these 60 files?
10              Is it the arrangement of one tiny piece of one of
11    these files combined with another piece of another file
12    contained with another piece of another file?
13              That's -- that's what we don't know.  And there's no
14    reason they shouldn't be able to tell us now what that
15    arrangement is, what the trade secret is.  Not just, well,
16    here's all of our code, here's everything, it's in there
17    somewhere.
18              THE COURT:  I think they should have to do that.  I
19    think they have to do that at some point in discovery.  I
20    think you've got to continue to hone in on it.
21              Is everyone here for our 1:15?
22              COURTROOM DEPUTY:  I believe they may be outside, and
23    I believe that may have been what the marshal was sitting here
24    for.
25              THE COURT:  Are they outside?
```

1          MS. DUTCHER:  Mr. Olivera is in custody, but I'll

2    check to see if Ms. Alterman is here.

3          THE COURT:  Would you see if they're ready to bring

4    him up?

5          I had an 11:15, and this young lady, it's her last

6    day in the office, and I don't want to keep her waiting when

7    she probably wants to say good-bye to people and packing.

8          MS. DUTCHER:  I'm so happy to be in Court.  Ms.

9    Alterman does not appear to be outside.

10          THE COURT:  Defense counsel?

11          MS. DUTCHER:  Yes, that's right.

12          THE COURT:  Okay.  Well, as soon as we hear from

13    them, will you just find out if they're downstairs ready to

14    bring him up, and then we'll just take a break at that point,

15    okay?

16          I mean, I don't --

17          MR. FOX:  And, Your Honor, speaking to their request

18    that we make some showing of good cause.  I note that in the

19    earlier conversation, Your Honor had a preference, and we

20    share that preference at least with respect to this issue, to

21    proceeding in the normal course of discovery.

22          And in the normal course of discovery, not only are

23    we able and permitted to supplement interrogatory responses,

24    we're indeed required to supplement interrogatory responses

25    under Federal Rule 26E.

1          To the extent that, as Your Honor suggested, we find

2     that another customer data compilation was taken, we will

3     supplement our interrogatory responses to capture that.

4          We -- arguably, it falls into some of our

5     descriptions of our trade secrets, but we've been -- we've

6     gone to great effort to be as specific as possible.

7          And one of the things we did to do that was to

8     identify certain files and the information within those files.

9     If we learn that there was a new file taken, it still falls

10    under customer data compilations, which is what we identified

11    in our complaint, but we should be able to, without having to

12    go to the Court and make a special showing that's not required

13    under the rules, to say the information within that file as

14    well.

15          THE COURT:  I do think that identifying the files and

16    the functionality is what they're required to do at this time.

17    I think you have to go through the discovery you need to go

18    through to get additional clarity, if you think you need it.

19    And that might mean adjusting the discovery process to make

20    sure that you have everything you need to give to your expert.

21          But I do think that the plaintiff ought to be

22    required and will be required during the discovery process to

23    explain this more.

24          Won't you, Mr. Fox?

25          MR. FOX:  Well, the more we learn about how we

1  contend our code set was used, whether we're revealing it or

2  whether the evidence that is shared reveals it, ultimately,

3  that's where we're going to be heading and that's where the

4  case is going to go.

5          The objections we're hearing really don't deal with

6  this threshold showing.  They deal with these merits defenses,

7  that this can't be a trade secret, as opposed to the exercise

8  we're going through today, which is just identification of

9  what the trade secrets are.

10         I mean, I hear defenses like, oh, it will only be a

11  couple of lines and it's open source.  Well, that's a defense

12  that has nothing to do with the identification under the

13  rules -- under the authority in the Northern District.

14         THE COURT:  Say that again.  Open source?

15         MR. FOX:  What I'm hearing is down the road they're

16  afraid that we're going to say, well, it's just this one line

17  of code and they're going to say well, that's an open source

18  line that we developed independently or it should be open and

19  obvious.  I mean, that's kind of where the language that I'm

20  hearing is headed.  But those are defenses down the road and

21  they don't speak to the threshold showing that we have before

22  us, Your Honor.

23         MR. LANDES:  Your Honor, if I could briefly respond.

24         THE COURT:  Yes.

25         MR. LANDES:  And I know that you hear me on this, but

1  that really isn't what we're concerned about.  Like my concern

2  is that when we depose their witnesses, right, it's -- you

3  know, again, Your Honor, this is double-sided, but it's 800

4  pages.  I can't ask about every line in here.  The source

5  code, it would probably be thousands of pages if we were to

6  print it out.  I can't ask about every line.

7        We need to know what we're targeting here.  And

8  what's at issue.  And that can't be something that's a

9  guessing game.  Right?

10        And it can't be something that's defined only after

11  they've had the opportunity to root through all of our files

12  for everything that might relate to being user friendly and

13  industry appropriate.  We need to know what the case is about.

14        MR. FOX:  But, Your Honor, those terms are further

15  narrowed by our production of the actual code.  We're not

16  saying, you know, the concept of user friendliness or even the

17  concept of these functions.  It's as narrowed by the code

18  that -- that makes that functionality possible.

19        And we've produced, as of I think two days ago, every

20  version of this code in existence, not just the code during

21  the period that the defendants left the employ of RoadSync.

22        THE COURT:  So I'm looking at -- I think one of

23  you-all cited the *WeRide* case.

24        MR. FOX:  Um-hmm.

25        THE COURT:  And that case said pretty clearly, and

| | |
|---|---|
| 1 | it's not binding of course, but identifying lines of codes or |
| 2 | files named was enough. |
| 3 | MR. FOX:  And, Your Honor, if I might add. |
| 4 | THE COURT:  Yes. |
| 5 | MR. FOX:  That is under -- |
| 6 | THE COURT:  No, that's under California law? |
| 7 | MR. FOX:  Yes, which is a stricter standard. |
| 8 | THE COURT:  Yes. |
| 9 | MR. LANDES:  So, Your Honor, the *WeRide* case, I'm |
| 10 | familiar with that.  I was lead counsel on that case.  If you |
| 11 | look at the trade secret identification, I signed it, so I'm |
| 12 | very familiar with that case.  I argued a hearing just like |
| 13 | this one. |
| 14 | First of all, it was -- |
| 15 | THE COURT:  Did you win? |
| 16 | MR. LANDES:  We did win.  As the plaintiff, we got |
| 17 | terminating sanctions, because as the Court said, the |
| 18 | spoliation in that case was staggering, but that's an issue |
| 19 | for another day. |
| 20 | The trade secret identification in the case and the |
| 21 | decision that's cited there, first of all, it was not under |
| 22 | the California State standard, it was asking whether the |
| 23 | California standard would apply to the DTSA, all right, so it |
| 24 | was a DTSA claim.  The Court said I don't need to decide that |
| 25 | because this meets the standard regardless, this means the |

1  DTSA standard.

2          The Court described that trade secret identification,

3  you can see a redacted version on the docket.

4          THE COURT:  Yes, I couldn't find much else on it.

5          MR. LANDES:  Okay.  We'd be happy to submit it to

6  Your Honor.  I don't have the document --

7          THE COURT:  You're saying it takes lot more than they

8  did here?

9          MR. LANDES:  Yes.  It was 20 pages long.  That's

10  noted in the opinion.

11          THE COURT:  Yes.

12          MR. LANDES:  It describes the functionality of the

13  files, and it describes -- this is noted in the Court's

14  opinion, Judge Davila's opinion.  It describes what's in and

15  what's out.  It says, well, these are the processes that we

16  acknowledge are public, that's not included.

17          But this separate piece that is within -- within it.

18  And then it lists a limited -- not thousands of files, but a

19  limited number of files.  And that was further supported,

20  Your Honor, by probably a 40-page expert declaration going

21  through the files in excruciating detail and separating what

22  was trade secret from what was not.

23          THE COURT:  All right.  You hit on exactly where I

24  came to in that opinion, which is where he describes the

25  20-page file -- well, he logs the 20-page filing --

1           MR. LANDES:  He notes it.

2           THE COURT:  -- as so much.  And I just couldn't find

3    out what it showed.

4           MR. LANDES:  We'd be happy to submit that,

5    Your Honor.  I don't have it with me, and I apologize I don't

6    have the docket cite, but I was actually reviewing it

7    recently.

8           THE COURT:  I think that this could use more briefing

9    on this.  You-all have gone through the process we've gone

10   through, but I'd like you to go through a larger motion to

11   compel.

12          The reason for that is twofold, is I recognize both

13   of your concerns that we are just at a pleading stage right

14   now, we are not at summary judgment yet and a lot needs to be

15   done before you can get to that.

16          I'm also concerned with the defendants wanting to

17   avoid the fact where they get all the way down the line and

18   they think they've been looking at the right thing and all of

19   a sudden, they should been looking to the left rather than to

20   the right.

21          I'm also, frankly, not -- plaintiff has not disabused

22   me of that later concern, that this is going to be fully

23   explained and highlighted in a way during the discovery

24   process.

25          And I did exactly what you-all were describing, I

1    sort of ran into that wall in preparing in that I can't see

2    another case that shows exactly what it is.  It's great to say

3    providing the source code and giving an example or describing

4    the functionality is one thing, but it's another thing to say

5    what that is, or the level of the detail of it.

6           MR. FOX:  Your Honor, if I may.

7           THE COURT:  Yes.

8           MR. FOX:  I want to make sure that we're clear on the

9    issues that we're discussing.  We've identified customer

10   lists, prospective customer lists and customer data

11   compilations.

12          Do you want further briefing on that issue?  I think

13   the record and the case law is really clear that what we've

14   done should satisfy with respect to that category --

15          THE COURT:  I think it does, too, and -- well, why is

16   that one -- well, we haven't heard anything about that yet.  I

17   want this on the source code, because I am concerned with the

18   relatively benign description that has been provided so far

19   of, you know, it helps with -- it makes it user friendly.  I

20   mean, that's pretty vague.  I assume that there was more than

21   that in front of Judge Davila, because he was pretty impressed

22   with it, but I don't know.

23          MR. FOX:  If I could just frame some context in one

24   of our concerns is with respect to both the customer list and

25   the source code, we understand that Your Honor would

1   appreciate additional briefing on this and we're happy to do

2   that.

3         Our concern is that we've received -- they stand --

4   they've stood on their objections to our identification of the

5   trade secrets and haven't produced any responsive discovery on

6   trade secrets and they haven't actually produced any other

7   documents in the case thus far.

8         Our concerns are growing as discovery is scheduled,

9   fact discovery is scheduled to close on July 13th.  The normal

10  briefing schedule would put us out another month.

11        THE COURT:  I don't need that.  I can give you-all

12  ten days and then you-all can have ten days to respond.

13        Okay?  Does that make sense?

14        MR. LANDES:  Yeah, absolutely, Your Honor.

15        THE COURT:  If you need a couple more, let me know,

16  but I don't need a lot.  You can provide me additional cases

17  or an example of how this one is deficient to something that's

18  been found to be sufficient.  That would be the most helpful.

19  Or something from your expert that tells me exactly what he

20  says he can't do or from an expert that tells me what he can

21  do.  That's kind of the thing that I'm looking for.

22        Okay?

23        MR. LANDES:  Understood.

24        THE COURT:  All right.  I understand discovery.  I

25  really don't want to be a delay in it.  Does this really have

1  to stop all of the other discovery?

2        MR. FOX:  We don't believe so, but we have claims

3  outside of our trade secret claims, they still haven't

4  produced any documents.  If --

5        THE COURT:  Why not?  Why not?

6        MR. FOX:  -- this briefing is just limited to the

7  source code, then -- and Your Honor rules that our

8  identification and trade secrets with respect to the other

9  categories is sufficient, then that would extinguish their

10 objections with respect to discovery requests on those bases

11 and we would hope that discovery starts moving forward.

12        They haven't even committed to a date upon which

13 their production will begin on the non-trade secret claims.

14        MR. LANDES:  So, Your Honor, I'll note that the

15 parties have been meeting and conferring about discovery.

16 There's material we've agreed to produce, just as there's

17 material that the plaintiff has agreed to produce.

18        We're still in the process of negotiating the -- I'm

19 sorry -- the scope of the requests and what will be produced.

20 We have to discuss things like search terms and custodians and

21 that process still needs to occur.

22        The only thing the plaintiff has produced, to my

23 knowledge in this case, is the collection of documents that

24 were alleged to be downloaded.  But no one's done an email

25 search, no one has discussed custodians or search terms, we're

1  open for that discussion.

2          And our concern, the reason that the trade secret ID

3  is always required before discovery is there's this concern of

4  a fishing expedition.

5          THE COURT:  I understand.

6          MR. LANDES:  Right?  And so when we see a discovery

7  request that says send us all of your communications with all

8  of your customers, right, that's a problematic request when we

9  don't know what the trade secrets are ahead of time.  Right?

10         When we see an RFP that says give us all of your

11 business plans.  Give us every communication between the

12 individual defendants over a 14-month period, all of them,

13 before we have an identification of what's at issue in this

14 case, that is a problematic request.

15         Because the concern is that once we produce, you

16 know, if we're ordered to produce 14 months of email

17 communications, and text message communications, and social

18 media communications between two people, then all of a sudden,

19 I suspect they'll be able to tell us what the supposed trade

20 secrets are.  And it's whatever we were discussing, right?  It

21 will be reverse engineered.  And that's why the trade secret

22 ID has to come first.

23         THE COURT:  Well, let's talk about the other trade

24 secrets, the customer lists, perspective customer lists and

25 data.  What's your problem with that?

1          MR. LANDES:  So I --

2          THE COURT:  I know there's a lot of pages.

3          MR. LANDES:  I agree it's a lot of pages, Your Honor.

4          THE COURT:  And that's okay.

5          MR. LANDES:  This is -- well, this is the problem

6   that gets raised in other cases, right, which is it sort of

7   becomes this needle in a haystack issue.

8          And we have all of these different lists that are

9   filled with names of companies in the industry, they have

10  different names, they have different customers, they have

11  different dates, they have different websites, right?

12         And I don't know what in here is relevant to this

13  case, especially when we're told, well, the trade secret isn't

14  just these lists, right?

15         It's not just the lists, but it's every piece of

16  information within all of these lists, and it's every

17  combination, possible combination of information within these

18  lists, right?

19         That doesn't allow us to determine relevance of

20  discovery and it doesn't -- it doesn't allow us to prepare a

21  defense and it doesn't allow Your Honor to manage the case at

22  the summary judgment stage, for instance, right?

23         So anyone can find a list of the top players in the

24  industry.  Anyone can do that, right?

25         THE COURT:  Well, why don't you just take a

1  deposition and ask somebody?

2          MR. LANDES:  Well, because, Your Honor, this is -- I

3  mean, again, 800 pages single-spaced.  Is this deposition

4  going to be three weeks long as I go through and ask?  Right?

5          That's -- that's the problem.  And so we'll -- we

6  will take a deposition and we will show that this material,

7  right, is -- you know, is public, was public, was not valued

8  by the -- by the plaintiff, they didn't take reasonable

9  measures to protect it.

10         I have -- I have a very strong feeling RoadSync

11  doesn't even know what half of these documents are.  We will

12  show that in depositions.

13         But what we don't want to see, and Your Honor keeps

14  bringing it back to this, is after we've -- we've done all of

15  that, we've gone through that process, it's some combination

16  of material in here that they could have identified at the

17  outset but that we only learn about in an expert report after

18  we've lost the opportunity to depose their 30(b)(6) witness.

19         Or we only find out about it in an opposition to a

20  summary judgment motion after discovery is closed.  Right?

21  Sort of this gotcha, ah-ha moment.  You didn't realize that

22  what we were really talking about was this line item.

23         MR. FOX:  Your Honor, just to be clear, this is not

24  public information.  Some of the information, the names of the

25  companies may be public, our compilation of them and, you

1  know, if you look at some of the fields in the data,

2  Your Honor, we have month-by-month transaction histories with

3  our customers, we have revenue numbers that were generated

4  from each of those customers.

5       Use of this information would allow them the ability

6  to prioritize what customers they're going to call on, would

7  allow them to, you know, undercut pricing.  This is incredibly

8  valuable stuff.  This isn't off-the-shelf lead lists.

9       Even our list of perspective customers include when

10 those customers were contacted by us, the decision makers and

11 the contacts within those customers.  This is -- these are the

12 outputs of what would effectively be, you know, a fully

13 featured, customer relations management system.

14      THE COURT:  I just think that these lists are fairly

15 within the main of trade secrets cases, and it may be onerous,

16 and it may be that these depositions take a while, but I think

17 you can get what you're looking at on the customer lists in

18 that way.

19      And so I don't see the threat that when you get

20 there, they're going to pivot to something else, as I -- as I

21 do with the code.

22      MR. LANDES:  So I would say, Your Honor, first of

23 all, maybe I'm a pessimist, I don't share your optimism on

24 that.

25      THE COURT:  I know.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1        MR. LANDES:  What I would request, Your Honor, is

2   that this be included in the further briefing and at a minimum

3   what be included is the question about whether they can amend

4   or what showing they would have to make in order to amend to

5   add more detail later.

6        THE COURT:  Well, we just put out an order on that,

7   didn't we, in another case about amending late?

8        LAW CLERK:  Amending a complaint.

9        THE COURT:  Yes, but it's kind of the same thing.

10  It's kind of the good cause standard.

11       MR. FOX:  But not to amend the interrogatory

12  responses.

13       THE COURT:  I understand.  I understand.  But if you

14  sit on it you get to the end of the day and all of a sudden

15  you pop something on them that you should have done a long

16  time ago, I think there's something I could say about that.

17       MR. FOX:  They can raise that at the time,

18  Your Honor.

19       THE COURT:  Yes.  So I don't think I'm going to put

20  them on a clock now, but I hear what you're saying.  That they

21  ought to know what these things are.  They've come up with all

22  of these things, if they want to add another 800 pages later,

23  they ought to have some explanation for why they're doing it

24  later.

25       MR. LANDES:  And not -- not just adding the 800 pages

1  later, Your Honor, which we're concerned about --

2          THE COURT:  We're saying it's something else in here.

3          MR. LANDES:  Yeah, telling us later, well, it's not

4  all 800 pages, it's really these one or two lines over here.

5  That's what we're really talking about.

6          MR. FOX:  Your Honor, we'll say today it's not all --

7  it could be all 800 hundred pages, but they would have

8  misappropriated our trade secrets if, you know, four of the

9  pages of our customer histories they used.  Now, what would

10  the resulting damages be if it were only four pages?  Well, it

11  would be much different than if it were 400 pages.  But it

12  wouldn't undermine our claim.  We've appropriately identified

13  it to the extent that we need to at this point in the case.

14          THE COURT:  I think that's right.  I don't think I

15  need more briefing on this.  I think they have done enough in

16  identifying these lists.  These are not remarkable type of

17  trade secrets claims.  If you get to a point in discovery

18  where you don't think you're getting clear lines, then we can

19  talk about what to do in that regard.

20          Because I do think that the plaintiff is required to

21  provide those clear lines in the way that the defendant is

22  asking for them during the scope of discovery.  They are

23  entitled to know that of which they are accused.  And not be

24  left to learn it in response to summary judgment.

25          But if you don't get it, we can adjust at that time.

```
1   But I don't see how I can make them do that now when we're
2   just at the start of the discovery process.
3           Okay?
4           MR. LANDES:  So, Your Honor, and maybe this is
5   something that we explore in the briefing, but I think what
6   might be helpful is an early 30(b)(6) deposition.
7           THE COURT:  I was thinking the same thing.
8           MR. LANDES:  Now, my concern, and I know with the
9   30(b)(6) --
10          THE COURT:  Didn't I give you-all one?
11          MR. LANDES:  Well, you gave them one.
12          THE COURT:  I gave them one?
13          MR. LANDES:  Well, you gave them one, yes.
14          THE COURT:  That didn't count for later.
15          MR. FOX:  That didn't count.
16          MR. LANDES:  That didn't count, and so that's what I
17  was going to get to is if we could get a 30(b)(6) deposition
18  on these customer lists that doesn't count, so that we can try
19  to get some understanding of what we're actually talking about
20  here.
21          THE COURT:  Well, let's not do that yet.  I think go
22  through some discovery, but I think you're on the right
23  thinking about that.  If you get to a point where you think
24  that's necessary, then we can talk about that.
25          You'll have a chance to do 30(b)(6) depositions.
```

1          MR. LANDES:  Yes.

2          THE COURT:  But if you think that one would be

3    helpful earlier --

4          MR. LANDES:  I do, Your Honor.  I do, Your Honor.

5          THE COURT:  I know, but see, they may not be fully --

6          MR. LANDES:  And again, Your Honor, I have a feeling,

7    I have a strong feeling that a lot of the answers to the

8    30(b)(6) deposition is going to be I don't know if this is off

9    the shelf.  When they're under oath, and when they have to --

10   when someone has to testify how these came into existence and

11   what happened with them and how RoadSync used them, there's

12   going to be a lot of I don't knows until they see our customer

13   list.

14          And then, and then, all of a sudden, there will be a

15   moment of clarity about what within these lists is supposedly

16   so special.  And that's what we want to avoid.

17          And so I think it's important to get them on record

18   ahead of time about what these are, where they come from, and

19   what's so special about them.

20          THE COURT:  But if that happened, let's say they were

21   to see to your list and then say, ah-ha, that's from us, would

22   your defense be, no, we got that on our own?  Or would it be,

23   no, that's not a trade secret?

24          MR. LANDES:  In most instances --

25          THE COURT:  We took it from you, but it's not a trade

1   secret.

2          MR. LANDES:  I think -- well, I think the took from

3   you is sort of a question, right?  So it has to be

4   misappropriation, which is the second step of a trade secret.

5   I think in most instances, these aren't trade secrets, right?

6   And they weren't misappropriated, right?  So the names of

7   these customers, you can go online --

8          THE COURT:  Yes.

9          MR. LANDES:  -- RoadSync advertises who its customers

10  are.  And the information in here, they're websites, right?

11         So now look, if they tell us the thing that's

12  special, obviously we know that Coyote Logistics is a big

13  player in this industry.  Obviously we know their website is

14  the www.coyotelogistics.com.

15         THE COURT:  I could call and find out who the contact

16  is.

17         MR. LANDES:  You could call or look on LinkedIn,

18  right?  But that's not the trade secret.

19         The trade secret is having Coyote ranked as Number 3

20  in combination with having these 11 other players ranked as

21  one through 12.  That's what the trade secret is.  Right?

22         Because, you know, look, Your Honor, it's in the --

23  you can see it in Mr. Droege's deposition transcript.  We've

24  had discussions with Coyote Logistics, we've had discussions

25  with other players.  It's inevitable, right?  It's like

1    saying, well, Amazon is on our vendor list, right?  Yes, we

2    order supplies from Amazon.

3         THE COURT:  Yes.

4         MR. LANDES:  But so it's a combination where we

5    really don't know where we're aiming, and so I think it would

6    be helpful to know, even in a 30(b)(6) deposition or, you

7    know, whether it's in some other form of further discovery,

8    where we should be targeting this, because we are going to be,

9    you know, challenging this on a number of fronts, right?

10        And Your Honor got this I think right at the head of

11   the hearing.  This is not a noncompete case.  We were allowed

12   to work with these customers.  And so they should be able to

13   tell us what we're not allowed to do.

14        And if it's that you're not allowed to use these --

15   these actual files, you can't take this binder and sift

16   through it, that's fine, right?  There will be no evidence

17   that we took this binder and sifted through it.  That won't

18   show up.

19        But maybe it will be something like, well, you

20   called -- you know, you called John Smith at Walmart and

21   that's the trade secret, calling John Smith at Walmart.  How

22   did you know to call John Smith at Walmart, right?

23        And maybe we don't have perfect records of how we

24   knew to call John Smith at Walmart.  But we can't do that

25   10,000 times for everyone on this list and everyone we've ever

1    contacted.  And that's -- that's what the problem is.

2            THE COURT:  I mean, all of those sound like

3    appropriate questions at the right time, don't they?

4            MR. FOX:  What I'm hearing is we're going to have

5    some defenses if the evidence works out.

6            THE COURT:  But aren't the questions that he's asking

7    appropriate questions to ask at the right time?

8            MR. FOX:  In a 30(b)(6) at the right time, in the

9    normal course of discovery.  They haven't produced and they

10   are standing on their trade secret identification objection,

11   any discovery responses dealing with trade secrets.

12           THE COURT:  Why shouldn't you as the plaintiff have

13   to have the first 30(b)(6) deposition and tell them what's so

14   special about this list?

15           MR. FOX:  Well --

16           THE COURT:  You already know.  It's your secret.

17           MR. FOX:  We know what's special about the list,

18   we -- we have every right to know what -- in the normal course

19   of discovery, what they've taken from our list.  We -- you

20   know, he's making the representation none of the files were

21   taken, as far as the full files, like these big Excel

22   spreadsheets.

23           Assuming that's the case, well, that's not the sum of

24   our trade secrets.  Our trade secrets are all the call

25   information, the month-by-month revenue.

1              If at the end of the day we find that they have

2    developed all their customer call sheets, based upon publicly

3    available information, which I hear is a defense that they may

4    very well be trying to roll out, fine.  But that's a merits

5    defense.

6              We've stated, you know, under all of the case law

7    producing all of this information and saying it's not the

8    files, it's the information within those files.

9              THE COURT:  Yes, I know.  I'm with you on that.  But

10   I'm just saying that, you know, now that we're in discovery --

11             MR. FOX:  Umm-hmm.

12             THE COURT:  -- why not let your guy go first?

13             MR. FOX:  Well, have they noticed our deposition?  I

14   mean, we have already served them with discovery that they

15   haven't responded to.

16             THE COURT:  Have you noticed a deposition?

17             MR. LANDES:  Well, we -- this is the issue.  We don't

18   want to use our one 30(b)(6) right now.

19             And I will say, Your Honor, Interrogatory Number 1

20   it's in front of you, Interrogatory Number 1, because it's the

21   first one:  Describe with particularity and individually each

22   alleged trade secret you contend defendants' misappropriated,

23   so forth and so on.

24             Your description must be with sufficient

25   particularity to allow defendants to meaningfully compare and

1  distinguish each asserted trade secret to information that is

2  generally known or readily ascertainable and to permit the

3  parties in the Court to understand what specific information

4  you claim to be trade secret.

5         And what did they do?  They sent us this binder, and

6  said that it's in there, that's it.

7         MR. FOX:  Your Honor, meeting the reasonable

8  particularity standard that we're here to discuss and that was

9  the nature of the joint statement that was filed with the

10 Court is a separate issue than whether they are satisfied with

11 our interrogatory response.

12        MR. CAPLAN:  Your Honor, may I be excused for a

13 moment to use the restroom?

14        THE COURT:  Yes.  Anybody else want a break for a

15 minute?  Okay.

16        MR. LANDES:  And I'll also point Your Honor to

17 Interrogatory Number 3:  Identify specifically and

18 individually each piece of information or combination of

19 information contained within your customer lists or

20 compilations that you contend is a trade secret.  To the

21 extent the response incorporates a document, state

22 specifically what information or combination within each

23 document you contend is a trade secret.

24        And it's a -- that response is effectively a copy and

25 paste of Interrogatory Number 1 that says look at the binder.

```
 1              So, I mean, you know, I could sit someone down in a
 2    chair at a deposition and read these interrogatories to them,
 3    but this is an interrogatory-type question, and to the extent
 4    they think it's a deposition question, we can do it there, but
 5    I don't want to burn my one -- or defendants' one 30(b)(6)
 6    deposition asking them to -- to, you know, talk about an
 7    interrogatory response.
 8              MR. FOX:  As Your Honor has noted, there is nothing
 9    exotic about customer lists.
10              THE COURT:  No.  The point is, though, is that he
11    asked for a lot of stuff there.  And all you said was here's
12    the list.
13              MR. FOX:  We've identified the data, artifacts within
14    our customer list, we've identified the data artifacts within
15    our customer data compilations, and our perspective customer
16    list.  If they at the appropriate point want to take a
17    30(b)(6) deposition and ask us, you know -- apparently they
18    want to ask us if -- how we developed those lists.  We're
19    prepared to respond to that.
20              THE COURT:  So you say in customer lists, customer
21    names, addresses, contacts, decision makers, contact history
22    and potential revenue for warehouses handlers and carriers,
23    that's your trade secret.
24              MR. FOX:  Those are the fields in the customer list,
25    Your Honor.
```

```
1              THE COURT:  Those are the fields.  Oh, okay.  I guess
2    I didn't understand that's that what you meant by lists, or
3    that includes.  You're not saying those are the trade secrets,
4    you are just saying those are the fields.
5              MR. FOX:  No, that each -- like this -- this concept
6    of a trade secret, it isn't all one trade secret, but it is a
7    trade secret that exactly what a particular customer bought
8    from us on any individual month, that's -- if -- you know,
9    they're going to have their defenses, where they're apparently
10   going to say that we didn't, you know, restrict the data or
11   that it's from publicly available sources.  That's a separate
12   merits defense.  I mean, this isn't a discovery fishing
13   expedition.  We think they took these categories of
14   information.
15             THE COURT:  I know.
16             MR. FOX:  And are using them.
17             THE COURT:  Well, you're not asking for anything in
18   this.  It's not you that's fishing.
19             MR. FOX:  Um-hmm.
20             THE COURT:  I'm not suggesting that you are.
21             MR. LANDES:  Well, no, but Your Honor, we are facing
22   discovery requests that say --
23             THE COURT:  Yes.
24             MR. LANDES:  -- give us a list of all of your
25   customers, all of them.  Give us all of your sales records for
```

1  all of your customers, all of them.  Give us all of your

2  marketing history to all of your customers, all of them.

3       Not -- not the individuals who are listed in here,

4  and I'll note, Your Honor, if you -- if you thumb through the

5  30 or 40 spreadsheets in here, they don't all have these

6  fields, right?

7       THE COURT:  Yes.

8       MR. LANDES:  And they have conflicting information

9  for, you know, who supposedly is the key contact or key

10 contacts, it's different.  I mean, it doesn't say key contact,

11 there's just sometimes an email address.

12      THE COURT:  Yes.

13      MR. LANDES:  But it's not consistent across the

14 spreadsheets, right?  And so that's -- that's the rub, right?

15 That's where it becomes challenging, because we are facing a

16 fishing expedition.  The same we have a request that says give

17 us your entire laptop and hard drive.  Give us all of your

18 source code.

19      We're facing the same thing on the customer front.

20 Give us everything about all of your customers and then --

21 then you can depose us and we'll tell you what we care about.

22      MR. FOX:  Your Honor, we've already addressed one of

23 the complaints I just heard, which is we've asked for their

24 customers, and he said it's not limited to the customers in

25 these data compilations.  In a conferral, I believe last week,

1   they asked if we would limit it and we said yes, accordingly,

2   we will.

3            THE COURT:  How many customers are there in those

4   lists?

5            MR. LANDES:  So, well, it depends on what you mean by

6   customers, Your Honor.  So how many actual customers does

7   RoadSync have that might be at issue in this case?  I don't

8   know that number, maybe it's dozens.

9            How many company names are in these spreadsheets,

10  probably hundreds, maybe thousands.  Relay has, I believe,

11  tens of thousands of customers, if you define it in the

12  broadest sense.  Right?

13           And so a lot of these are not -- they're not -- this

14  is not an export from a CRM system.  Some of these really are

15  just spreadsheets of industry players, so it's just a list of

16  everybody.

17           And so it's, you know -- if it really is, well, it's

18  just everyone in the whole industry, tell us everything about

19  everyone in the whole industry, you can't proceed in a case in

20  that fashion.

21           THE COURT:  Well, I can see where this is going in

22  terms of other discovery disputes.  And I'm glad you-all agree

23  that the defendant is not required to produce information

24  about all of their customers.  That seems to me to be overly

25  broad.

1          And that what the plaintiff is entitled to do is to

2     determine whether or not customer lists that contain protected

3     information were used by the defendant, so it seems like it

4     would be limited to that.

5          MR. FOX:  Just on a -- Your Honor, you know, the

6     number of the cases say that the general concern that, you

7     know, your competitor is going to be asking for all of your

8     customer contact information, and that's one of the reasons

9     that we require this reasonable particularity standard, that's

10    protected for by attorney's eyes only designation.

11         THE COURT:  Yes.

12         MR. FOX:  We have no problem, our clients are not

13    going to have access to these documents.

14         THE COURT:  I understand.  But you've already agreed

15    to that?

16         MR. FOX:  Yes, Your Honor.  And the cases say that

17    alleviates this concern for competitive misuse of the data.

18         THE COURT:  No.  You've already agreed to limit it to

19    the customers in your lists?

20         MR. FOX:  Yes.

21         THE COURT:  So I need not address that issue, because

22    otherwise, there is also just the question of the burden.

23    Regardless of how it could be weaponized.  Because I agree

24    with you that a protective order can prevent the

25    weaponization, but that still doesn't do away with the burden

1  or just that it's beyond the appropriate scope of discovery.

2        Okay.  I mean, I am inclined to allow the defendant

3  to have a 30(b)(6) deposition, in which they can seek to

4  identify this information.  When that ought to be, I don't

5  know.

6        I gave the plaintiff an early deposition that didn't

7  count, because I thought it would advance things.  And I think

8  that doing that here would advance things.

9        But I don't want to put a schedule on it, because I

10 do want to make sure that the plaintiff has an opportunity to

11 prepare for it.  But I think that could be done in the next 30

12 days.  And I think that could move things along.

13       It seems to me as though there's a lot of unknown and

14 there's a lot of jockeying going on of who is going to show

15 who their data first in order to either -- I mean, the way

16 that y'all have put it is that you're going to adjust to what

17 you hear.  You're going to learn something and then adjust

18 your allegations to what you hear.  But that just will freeze

19 everybody.  And this might break through it.  And also there

20 is a lot in those documents.

21       MR. FOX:  Um-hmm.

22       THE COURT:  And I have a feeling that it's not quite

23 so difficult and confusion.  I mean, I don't know.  I've

24 worked with a lot of companies, and if there is something

25 there that's crucial, I think somebody can probably explain it

1  without too much difficulty.

2      It doesn't seem to be like the source code, where

3  apparently I've got an expert that's saying he can't do

4  anything with what he's got.  That's what I'm concerned about

5  in the source code is the inability to do something with what

6  the person has.

7      So you-all decide when you want to do the 30(b)(6) in

8  the next 30 days.  And one thing that that ought to do is when

9  that's completed, that ought to alleviate the logjam of the

10  defendant not producing documents, because then the defendant

11  ought to begin producing documents.  Okay?

12      MR. FOX:  In the interim, Your Honor, will they not

13  be producing documents?  Are they still going to --

14      THE COURT:  Well, if they have other things that are

15  ready to be produced that are not about this, yes, discovery

16  ought to be moving.  If you have documents that you agree

17  should be produced that are responsive, they ought to be

18  produced.  There's no reason to wait for everything.  And I

19  suppose including customer lists that have to do with these

20  customers, why can't you produce those now?

21      MR. LANDES:  So I guess it would depend what the

22  request is, right?

23      So again, if we're talking about, you know, producing

24  our entire customer list.

25      THE COURT:  No, no.  The customer list, they've

| | |
|---|---|
| 1 | agreed to limit it to this group of people identified in |
| 2 | the -- |
| 3 | MR. LANDES: So again, the group of people here is, |
| 4 | you know, in some of these documents thousands -- hundreds and |
| 5 | hundreds of names, so if it's produce everything you have |
| 6 | about everyone who's even mentioned in one line on this |
| 7 | spreadsheet -- in any one of these spreadsheets, that's a -- |
| 8 | it's a big imbalance. |
| 9 | THE COURT: Is that what you want? |
| 10 | MR. MOONEY: Your Honor, I've been part of the meet |
| 11 | and confers this week, but no, we've not asked for that. |
| 12 | THE COURT: What do you want? |
| 13 | MR. FOX: We had very specific requests that go to |
| 14 | certain types of information about certain customers. We did |
| 15 | have a discussion last week along the very lines that we've |
| 16 | talked about here, which I think was -- I personally agreed we |
| 17 | could begin with only the customers that are identified in |
| 18 | that binder. |
| 19 | We're happy to talk to them about those requests, but |
| 20 | again, I just wanted to emphasize something that Your Honor, I |
| 21 | think, is well aware of, but discovery has effectively not |
| 22 | started. We don't even have an agreement -- this is the first |
| 23 | I've heard that they're agreeing to produce any specific |
| 24 | documents. |
| 25 | Because throughout these meet and confers, we've not |

1    gotten assurance that any documents are going to be produced

2    in response to any requests for production.

3           It seems that this trade secret issue is the -- is

4    the holdup and nothing happens until it's resolved, so I

5    understand we're briefing the source code issue.

6           We are, of course, happy to go forward with the

7    30(b)(6) which, you know, could have been noticed at any time.

8    But I guess we just wanted some clarity around that, the

9    subject that Your Honor thought -- or subjects Your Honor

10   thought that might cover, whether there's a ruling on the

11   customer lists and compilations in the interim, what happens

12   with discovery until that point.

13          THE COURT:  I think discovery ought to be moving

14   along.  I don't think that it ought to be -- especially, if it

15   has to do with customers and customers in those lists.  If you

16   want to give them -- if you want to put them in more of a box,

17   you could give them the specific customers you're interested

18   in right now.

19          He's saying that it's hundreds -- dozens or maybe

20   hundreds.  Well, give him a list of the 25 that you want now.

21   And why can't we just get going?  Right?

22          MR. MOONEY:  We could certainly help to prioritize it

23   to get things going, Your Honor.  As far as, then, this

24   request for additional particularity on the customer lists,

25   prospective customer lists and data compilations, it wasn't

```
1    clear to me where I -- Your Honor had said a few times, I
2    think, that you were inclined to believe that we had met the
3    burden, but I know there was a request that we brief that
4    issue.
5         THE COURT:  I don't think so.  I think your customer
6    list and data -- I want briefing on the source code.
7         MR. MOONEY:  Source code, got it, Your Honor.
8         THE COURT:  I think the rest are clearly identified.
9         MR. MOONEY:  Understood.
10        THE COURT:  The holdup I see is the dispute about
11   whether they're sufficiently identified is causing a logjam in
12   discovery.  I think from what I'm hearing one thing to
13   alleviate it would be to allow an early 30(b)(6), additional
14   30(b)(6) deposition, so they can have some clarity on what
15   exactly your claim is as to some of these lists or as to these
16   lists.
17        But in the interim, there's no doubt that there's
18   some number of these customers that are going to be at issue
19   and so why don't you give them -- but the only thing I've
20   heard from them, from the defendant is that there is so many
21   of them.
22        Well, give them a list of 25 or 30, or whatever
23   the -- you know, the 80/20 rule?  20 percent of your customers
24   are going to be the most -- are going to account for
25   80 percent of your revenue or whatever.  Give them that, some
```

1  number of them that's that 20 percent that really are the ones

2  that are going to be pushing everything along.  And then they

3  really don't have an argument for not producing that, do you?

4        MR. LANDES:  Well, I mean, it depends on the

5  particular request, right.

6        THE COURT:  But I doubt they do.

7        MR. LANDES:  Yeah, not every communication with every

8  customer is necessarily relevant, but I think that would be a

9  very good start.

10        MR. FOX:  The difference between what's discoverable

11  and what's relevant.

12        THE COURT:  Right, right.

13        MR. LANDES:  Right.  Understood.

14        MR. FOX:  And so --

15        THE COURT:  And if you have a logjam, come back to me

16  quickly.  But I do think that discovery ought to be moving.  I

17  do think it ought to be going along.  I think that as you do

18  that, you'll get a lot more clarity.  And things that

19  everybody thinks matter so much might not matter so much at

20  all.

21        But I think that if you have requests for specific

22  information about some number of customers, that's a great

23  place to start, because you-all have a right to know whether

24  or not they were targeting your customers using your trade

25  secrets, and that's a good way to start it off.

1          Okay?

2          MR. MOONEY:  Understood, Your Honor.

3          MR. FOX:  Yes, Your Honor.

4          THE COURT:  Everybody understand?  I know I'm not

5   giving you what those are, but I don't have those specific

6   requests in front of me.

7          MR. FOX:  Just one point of clarification, the

8   30(b)(6) deposition that we've been discussing would, as I

9   understand it, be limited to the customer lists, customer data

10  compilations and prospective customer list, categories of

11  trade secrets.

12         THE COURT:  Yes, exactly.  What are the trade secrets

13  in there.  From those things in there, what is it that

14  provides that type of proprietary or important information.

15         Does that make sense?

16         MR. LANDES:  Yes, Your Honor.

17         MR. MOONEY:  Yes.

18         THE COURT:  Sort of like what did your guy do when he

19  left.  That's a very finite or limited deposition.  Okay?

20         Everybody good on that?

21         MR. LANDES:  Yes, Your Honor.

22         MR. FOX:  Yes, Your Honor.

23         THE COURT:  And look, if you guys get together and

24  you can't figure out what discovery ought to be done now,

25  let's get on the phone, because I do think discovery ought to

be moving.  The case has been a while and discovery is ready

to go, and I think that everybody knows that there is some

number of documents.

        But like I said, I like to take it a bite at a time,

so if you've got eight things you want to bring to me at a

time or four or three or two, let's do that.  We don't need to

wait until there is a big problem.

        Okay?

        Same thing on the -- how long did I give you on the

forensics, the first three steps?

        MR. MOONEY:  The first three steps, the timing is

specified in the first three steps, and that takes place over

the next month.

        THE COURT:  Well, I won't be the holdup.  If you-all

get something to me, I'll try to get back to you within the

week or the following week to make sure that I'm not the

holdup to what to do next.

        Okay?

        MR. MOONEY:  Understood, Your Honor.

        THE COURT:  All right.  Do you want to put a time to

talk about the forensics or do you just see what happens?

        MR. LANDES:  I think the parties can confer on that

productively, Your Honor.

        THE COURT:  Okay.  All right.  Anything else?

        MR. LANDES:  I do have one other housekeeping issue.

```
 1            THE COURT:  Yes.

 2            MR. LANDES:  And this has to do with the case

 3  schedule and the close of discovery.  There's actually two

 4  conflicting orders about the close of discovery.  There's one

 5  that has it, I think, August 2nd and one that has it on

 6  July 13th.  And those are at Docket 68 and Docket 70.  The one

 7  that has the August 2nd close of expert discovery is sort of a

 8  play-by-play schedule that the parties negotiated.

 9            THE COURT:  Yes.

10            MR. LANDES:  And I think Your Honor entered an order

11  adopting that schedule and also noting a discovery cutoff of

12  July 13th, about two weeks earlier.  So there's a slight

13  conflict there, and I'm just not sure what the -- what we

14  should be targeting.

15            THE COURT:  I don't know why I did that.  I'm sure it

16  was well thought out.  But it escapes me as to why.  The only

17  issue -- the only uncertainty is the date of the close of

18  discovery?

19            MR. LANDES:  Correct.  Yeah.

20            THE COURT:  What date do you-all want?

21            MR. MOONEY:  I mean, Your Honor, we thought it's

22  clear that Your Honor had set this for an eight-month

23  discovery track, beginning 30 days after the answer.  That was

24  in Docket Entry 40.

25            Defendants answered October 14th, and so eight months
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1   from that -- that November 14th date is July 13th or 14th.

2           THE COURT:  So it appears all I did was calculate

3   exactly what is eight months rather than pick the date y'all

4   did.

5           MR. MOONEY:  It sounds like the close of fact

6   discovery, we understand it to be July 13th.

7           THE COURT:  Okay.  That's fine.

8           MR. LANDES:  Okay.  So we will probably then have

9   to -- and we can do this -- confer with counsel and agree on,

10  you know, lead-up dates.  Here's when fact discovery closes.

11  Here's when opening experts reports are due.  Here's the

12  expert deposition procedure.  We will just need to --

13          THE COURT:  Right.  Because that needs to be done

14  within the time to allow --

15          MR. LANDES:  Right.

16          THE COURT:  -- completion of that.

17          MR. LANDES:  Exactly.  So we can certainly confer on

18  that.

19          MR. MOONEY:  We agree with that except, Your Honor,

20  the close of fact discovery is July 13th, so we can talk about

21  dates around that.

22          THE COURT:  Right.

23          MR. LANDES:  Oh, I'm sorry.  So I'm not clear now.

24          THE COURT:  And experts after?

25          MR. LANDES:  Close of fact discovery July 13th.

```
1              MR. MOONEY:  Right.

2              MR. LANDES:  Understood.  Because the order says, I

3    think, close of all discovery, and that was my confusion.

4              THE COURT:  I have not looked at it.  Let me look.

5              MR. LANDES:  Your Honor, I think the -- if -- and

6    I -- I think Mr. Mooney and I and our respective teams can

7    confer about this and maybe we just submit a proposed

8    stipulation.

9              THE COURT:  That's fine.

10             MR. MOONEY:  That's fine with us, Your Honor.

11             THE COURT:  Okay.  That's fine.  But typically fact

12   discovery would close and then expert discovery would follow.

13             MR. LANDES:  Got it.  Okay.

14             MR. FOX:  Yes, Your Honor.

15             MR. LANDES:  That might have been a misunderstanding

16   on our part.

17             THE COURT:  The only thing I would say is if you want

18   an extension of discovery, ask for an extension of discovery

19   ahead of time.  And tell me the new dates that you want for

20   everything.  Don't agree amongst yourselves that discovery

21   will close X, okay?  Don't do that.

22             Because that will inevitably not occur and then, you

23   know, I'll be in the spot where I didn't agree to something

24   and y'all did.  So don't do that.

25             Okay?
```

| | |
|---|---|
| 1 | And remember where you get squoze with experts if you |
| 2 | extend facts, okay?  All right. |
| 3 | MR. LANDES:  Yes. |
| 4 | MR. MOONEY:  Yes, sir. |
| 5 | THE COURT:  Anything else? |
| 6 | MR. FOX:  Nothing else. |
| 7 | MR. MOONEY:  Not from plaintiff, Your Honor. |
| 8 | THE COURT:  Do you know Alex Spiro? |
| 9 | MR. LANDES:  I do.  I do know him.  He's in our |
| 10 | New York office, although he's been spending more time in |
| 11 | Miami lately, but he's -- he's had a busy few years, as you |
| 12 | might imagine. |
| 13 | THE COURT:  What is he doing in Miami?  I don't know |
| 14 | what he's doing down there. |
| 15 | MR. LANDES:  He's being a lawyer, but maybe he's also |
| 16 | surfing on the weekends, I don't know. |
| 17 | THE COURT:  Does he have a big case down there? |
| 18 | MR. MOONEY:  Oh, no.  I think he just likes Miami. |
| 19 | We had a pretty fair contingent of Quinn Emanuel lawyers head |
| 20 | down to Miami.  It was Miami and Utah, I think, where people |
| 21 | went to when offices in New York started closing and you |
| 22 | realize maybe it's not worth being up here if the restaurants |
| 23 | are closed. |
| 24 | THE COURT:  Well, my last trial was in Connecticut in |
| 25 | a securities fraud case, and Alex tried the case with me. |

```
 1              MR. LANDES:  Oh.

 2              THE COURT:  He was still on his own then or maybe he

 3    was associated with another criminal defense lawyer.  He

 4    wasn't at Quinn yet.

 5              MR. LANDES:  Yeah.  Ms. Thompson, who is on our team,

 6    she's actually up in San Francisco right now starting a trial

 7    with Mr. Spiro.

 8              THE COURT:  Yes?

 9              MR. LANDES:  Yeah, it's the funding secured Elon Musk

10    tweet case.

11              THE COURT:  Oh, right.  Yes.

12              MR. LANDES:  So it should be -- I'm sure you'll be

13    reading about it in the news.

14              THE COURT:  Well, if she wants some advice about how

15    to deal with Mr. Spiro at trial.

16              MR. LANDES:  That's probably a long book, Your Honor.

17              THE COURT:  I would be happy to talk to her.  He's a

18    good lawyer, but sometimes at trial you just want to sit back

19    and do nothing, you know.

20              MR. LANDES:  Until the verdict and then --

21              THE COURT:  Alex is not one to do nothing.  So

22    sometimes it's like wait --

23              MR. LANDES:  That's one way to put it, Your Honor.

24              THE COURT:  -- why are we crossing this guy?  He's

25    not even talking about our defendant.  But at any rate, I
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1  really like Alex.  He's obviously been very successful.  And
 2  he's a very loyal person, too.
 3           MR. LANDES:  I will pass that along, Your Honor.
 4           THE COURT:  We had a young client, it was a very
 5  difficult case, he was accused of big bad fraud, we had about
 6  maybe a six-week trial and, you know, the bond between Alex
 7  and our client was something else.
 8           MR. LANDES:  He has some sort of special knack that I
 9  think is unique.
10           THE COURT:  Yes.
11           MR. LANDES:  And the amount of trust that clients put
12  in him is pretty remarkable.
13           THE COURT:  Yes.  Our client was acquitted.  I got
14  mad at our client, because the jury was out for about a week,
15  and the day before, he and Alex went to go play basketball,
16  and I thought that was bad mojo.  But Alex, I mean, you know,
17  he --
18           MR. LANDES:  I'm sure it's something.
19           THE COURT:  Yes.  It was a good time.  At any rate.
20  All right.  Thank you-all very much.
21
22           (Whereupon, the proceedings were adjourned at 12:16
23  p.m.)
24
25
```

```
 1                    REPORTERS CERTIFICATE

 2

 3

 4        I, Jana B. Colter, Official Court Reporter for the

 5   United States District Court for the Northern District of

 6   Georgia, with offices at Atlanta, do hereby certify:

 7        That I reported on the Stenograph machine the

 8   proceedings held in open court on January 11, 2023, in the

 9   matter of RoadSync, Inc. v. Relay Payments, Inc., Case Number

10   1:21-CV-03420-MLB; that said proceedings in connection with

11   the hearing were reduced to typewritten form by me; and that

12   the foregoing transcript (98 Pages) is a true and accurate

13   record of the proceedings.

14        This the 12th day of January, 2023.

15

16

17

18                        _____
                          /s/ Jana B. Colter, FAPR, RDR, CRR, CRC
19                              Official Court Reporter

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA