The following is the PDF of an official transcript.  Official transcripts may be filed in CM/ECF only by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
CERTIFIED OFFICIAL TRANSCRIPT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


ROADSYNC, INC.                    )
                                  )   CIVIL CASE NO.
          Plaintff,               )   1:21-CV-03420-MLB
     vs.                          )
                                  )
RELAY PAYMENTS, INC. ET AL.,      )
                                  )
          Defendants.             )
_____    )

------------------------------------------------------------

BEFORE THE HONORABLE MICHAEL L. BROWN
TRANSCRIPT OF STATUS CONFERENCE
NOVEMBER 13, 2023
------------------------------------------------------------

APPEARANCES OF COUNSEL:

For the Plaintiff:        JONATHAN R. CHALLY
                          JOSHUA P. GUNNEMANN
                          REBECCA L. KOLB
                          KATHERINE L. D'AMBROSIO
                          COUNCILL, GUNNEMANN & CHALLY, LLC


For the Defendants:       RYAN LANDES
                          QUINN EMANUEL URQUHART &
                          SULLIVAN, LLP

                          MICHAEL A. CAPLAN
                          CAPLAN COBB, LLP


          *Proceedings recorded by mechanical stenography
           and computer-aided transcript produced by*

               KEISHA M. CRUMP, RCR, RMR, RPR
                  Official Court Reporter
                   1759 U.S. Courthouse
                  75 Ted Turner Drive, SW
                  Atlanta, Georgia  30303
                      (404) 215-1354

UNITED STATES DISTRICT COURT
CERTIFIED OFFICIAL TRANSCRIPT

(Atlanta, Fulton County, Georgia, November 13, 2023, in open court.)

- - -

P R O C E E D I N G S

THE COURT:  All right.  We're here for a hearing status conference in RoadSync versus Relay, 21-CV-3420.

May I have appearances starting with counsel for the plaintiff.

MR. CHALLY:  Good afternoon, Your Honor.  I'm Jon Chally, and with me is Josh Gunnemann, Rebecca Kolb, and Kadie D'Ambrosio representing RoadSync.  We also have Robin Gregg, who I believe you've met last time.

I just want to say at the outset, thank you for accommodating us, letting us out at the last hearing.  Glad to be here.

THE COURT:  Sure.

MR. CHALLY:  I apologize for the conflict, but I appreciate you allowing us to do that.

THE COURT:  Okay.  And for the defendants.

MR. CAPLAN:  Good morning, Judge Brown.  Mike Caplan on behalf of the defendants, joined by Ryan Landes from Quinn Emanuel, as well as our client, Ryan Droege, the CEO of Relay Payments, Inc.

We'd also like to express appreciation to the Court for moving up the hearing time to facilitate my law school

class.  If we do go beyond about 3:30, 3:45, I may beg the Court's forgiveness for walking out.

THE COURT:  Not a problem.

MR. CAPLAN:  Thank you.

THE COURT:  Okay.  So we have a good bit to cover today.  First, on the motion to strike, do you-all agree that that's ready to be decided and how we ought to proceed on that?  Nobody wants -- anybody want to argue more about that? Do we at least now agree that the features and functions was not part of the case from the start as far as the trade secret is concerned?

MR. GUNNEMANN:  Judge, Josh Gunnemann for the plaintiff.  And I want to address that and talk with the Court to make sure that we're using the right vocabulary in our having a conversation that -- that is addressing the claims that are asserted, alleged, and have been pursued on the one hand, and what we are trying to accomplish with the amendment of the trade secret ID, and the amendment of the interrogatories.

And the reason I'm focused on that is because the word "features and functions" is not in the U.S. Code, right? That's just not a term of art.  It's not a defined trade secret.

And what we want to be crystal clear about is that the existing source code trade secret that's been alleged from

the complaint, been prosecuted through discovery, it's been the subject of the Court's order on a motion to dismiss deals with not only source code, but the way the source code accomplishes what it's trying to do.

And if we need to have a conversation about that, we should have that conversation. I just want to put a marker down and make sure that's the way we view the source code allegation. It's the way it's always been alleged. It's the way we think the Court dealt with it on a motion to dismiss.

But what it's not is it's not an allegation that the trier of fact in this case can simply look at the two programs side-by-side, examine the features and the functions of the program, and reach a conclusion that the one steals from the other completely divorced from the source code.

THE COURT: Okay.

MR. GUNNEMANN: And that's what we're trying to -- I'm going to say expand the allegations to include. And if that's what the Court means by features and functions are not included, then we agree. But if the Court means that the source code trade secret is limited to a literal cut and paste of the source code, we'd have a disagreement there. But that's not what we understand. And if we need to address that, we can address that. Does that make sense? Because I'm concerned --

THE COURT: Well, it -- I think I hear what you're

saying.  I think it's different than I had thought it was going to be, and I think Mr. Caplan's schedule might have just taken a hit.

MR. GUNNEMANN:  Okay.

THE COURT:  What do you say about that, Mr. -- is it Landes?

MR. LANDES:  Landes, yes.

THE COURT:  What do you say about that?

MR. LANDES:  So I'm not --

THE COURT:  Because it -- it really doesn't matter to me the phraseology you use, provided you all have the same understanding.  What I think you're saying is that part of your trade secret is how the source code causes the software to function or what it causes the software to do.

MR. GUNNEMANN:  Yeah.  Judge, to be precise, to put it within the language of 8 (sic) U.S.C. 1839, that says a trade secret includes the code itself.  But it also includes patterns, compilations, formula, methods, processes, procedures, and programs.

So translating that into the way this was alleged in paragraph 25 of the complaint, we said the source code, the source code is the trade secret, but not just the source code, also the software and the related functionality of the software.  And what does that mean?  That means the system architecture, the logic behind the code, the way the code

achieves what it does.

So let's give a hypothetical example.  If the code --
if our code is written in one programming language, and the
other code is written in another programming language, you
wouldn't have a cut and paste of the code, but they might do
the exact same things in a confidential pattern using
confidential logic, using logic that's not open and obvious to
the rest of the world, and that's clearly within the scope of
8 (sic) U.S.C. 1839, and --

THE COURT:  Do you understand what he's saying?

MR. LANDES:  I'll say, Your Honor, the notion that
this has been in the case, this argument that we're hearing
since the beginning, I don't even know how to parse that.
This wasn't even in their briefing.  This is --

THE COURT:  You mean the briefing for today?

MR. LANDES:  Any of the briefing that has occurred at
any point since the complaint was filed until now.

THE COURT:  I don't remember this being --

MR. LANDES:  This is the first time I'm ever hearing
this.

THE COURT:  Yeah, I think it -- is it not the first
time I'm hearing it?  I thought I was going to hear that's
right because I'm looking at 185-17, which is an email from
Mr. Chally to others that says, we don't think an evidentiary
hearing is needed or appropriate in the light of the position

we've described, that the first instance in which -- open paren, quote -- that the first instance in which RoadSync's claimed features/functions to be a part of its claimed trade secret was our June 23rd disclosure, close quote.

And then at 186-10, where someone on behalf of your client, and I don't think it -- I don't know which lawyer it is -- says that, "We understood prior counsel believed features and functions to be part of the fiduciary duty claim. We made the election to claim theft of the identified features and the functions" -- we, meaning the new lawyers that came in -- "made the election to claim theft of the features and functions as a component of the claimed trade secrets.  On that basis, we do not believe that an evidentiary hearing to be required or appropriate."

MR. GUNNEMANN:  Right.

THE COURT:  I thought -- I thought the answer was going to be, yes, that's right.

MR. GUNNEMANN:  Well, Judge, that's -- that's why I wanted to start with this because I think we --

THE COURT:  Yeah, but how does he not know what you're going to say until now?  Why is -- is he not telling the truth when he says this is the first he's heard of this?

MR. GUNNEMANN:  Well, Judge, it's -- it's in our interrogatory responses.  It's in the Court's order on the motion to dismiss.  It's in our requests for production.  It's

in our complaint, and it's in our trade secret ID, so I don't know -- I'm not -- I'm not going to say he's wrong.  I am going to say that the written documents that are in the case records support this.

And -- and that's why I'm trying to say we've gotten wrapped around the axle of this term "features and functions" that's not in the code, and I'm worried that the parties and the Court have all been talking past each other, and I'm grateful for the opportunity to make sure we're not.

THE COURT:  Well, I want to make sure that the parties and the Court weren't talking with one understanding and then new counsel has come in with a revised understanding. That's what I want to make sure.

MR. GUNNEMANN:  I completely agree.

THE COURT:  Okay.  So --

MR. GUNNEMANN:  I completely agree.

THE COURT:  -- Mr. Landes, what did you understand to be the source code claim following my motion to dismiss?

MR. LANDES:  I understood that the source code claim after the motion to dismiss was that Mr. Droege and Mr. Barkoff had downloaded RoadSync's code, and then used that code that they downloaded from RoadSync to create the source code at Relay.

THE COURT:  In which case, your client disclosed some amount of its source code?

MR. LANDES:  Disclosed and used, yes.

THE COURT:  No, no, no.  No, in -- as part of this discovery --

MR. LANDES:  Oh.

THE COURT:  -- your client has produced its program, its soft -- it's source code --

MR. LANDES:  Correct.

THE COURT:  -- so that plaintiff's expert could examine that source code and look for remanence or evidence that it was, in fact, plaintiff's source code?

MR. LANDES:  That's correct.  And there's the other side also, which is that we have discovery from the plaintiff's system of what was downloaded and what was accessed.

THE COURT:  Right.  Okay.

MR. LANDES:  So you have both -- both sides of it.

THE COURT:  So why is -- I understand what the statute says as to what can be a trade secret.  But coming from where this case has been since the motion to dismiss, why is the plaintiff's claim in this regard not to look at the function -- the source code that the defendant now has and see if it has the plaintiff's source code in it?

MR. GUNNEMANN:  So, Judge, I actually agree with that formulation.  But I think we need to be really careful what we mean by when we say see if it has the plaintiff's source code

10

in it because I don't think that either the complaint, the discovery, or the Court's order on the motion to dismiss -- and I'll point you to a citation here in just a minute -- I don't think any of that limited it to a literal cut and paste of the source code.

And, again, I do think that the way that the trade secret is currently -- well, before we have tried to do this, what I would call expansion, before that expansion, I think we are required to examine to prove the case, examine the source code and find instances of copying.  But copying of what?  I don't --

THE COURT:  Because that is essentially the claim: they downloaded stuff, brought it over here, and compiled it over there, and used it over there.

MR. GUNNEMANN:  We agree the --

THE COURT:  Road -- Relay is a copy of RoadSync; is that a substantive claim?

MR. LANDES:  A copy -- well, no, because there's a -- there's no non-compete obligation.  There's no non-compete, so --

THE COURT:  So Relay uses stolen RoadSync, the software?

MR. LANDES:  Correct.  Source code, right.

MR. GUNNEMANN:  I agree with that.  But, again, it's what is copying.  I don't think copying is limited by the

allegations or the U.S. Code to the -- the literal cut and paste.  So if our experts examine their code and see that the code operates in the exact same way, let's say ours is written to now -- I'll use probably what's an inappropriate metaphor.  Ours is written in English, and theirs is written in German, but it does the same things in the same way.  It takes these five logical steps to get somewhere, and those five logical steps to get somewhere are copied.  The steps are copied.  That is a copy, and that is a use of the source code under the U.S. Code, and that's all of --

THE COURT:  Okay.  Let me -- let me just interrupt you.

MR. GUNNEMANN:  Yes.

THE COURT:  Do you believe they could do that?

MR. LANDES:  So here's -- here's the problem with that, Your Honor.  In order for that to be a misappropriation, you still have to be starting with the stolen source code, right?  So we're talking about looking at source code.  So if you talk about in one instance it's in English, and in one instance it's in German, you would say, well, you copied the source code, right, because what you did is you took the English source code, and you translated it to German, and you copied the source code.  What you can't say is you copied the plot elements, including because the plot elements weren't added as an item to the trade secret identification until the

end of June.  That's what we're here about, right?

THE COURT:  Do you disagree with that?

MR. GUNNEMANN:  Yeah, we disagree with that, Judge.

THE COURT:  Okay.  Now, I think we have a dispute. So now you have to -- because I think there's a middle ground. It may not be a verbatim translation.  It may be that you've taken something, and in translating it, you've changed it in some ways.  I still think that's copying.  I still think that's copying.  But what I think you're saying is you have tried to do the same thing with source code that we do with our source code.  And that sounds like a functionality issue apart from a copying issue.

MR. GUNNEMANN:  Well, that -- that's where these issues get super tight together, Judge.  And it's a matter that we think, frankly, is an -- is an issue for an expert determination.  Because the expert witnesses who are familiar with the way software works and the way software functions can look at this and opine on whether this is a copying of code or a -- or not.  And that's exactly what the role of experts is and is why we are highlighting the need for a full and fair access to their system.

Judge, I promised you a citation from your motion to dismiss, and I would -- I would like to give it to you if that's okay.

THE COURT:  Go ahead.

MR. GUNNEMANN:  It's Docket 56 at pages 10 to 11, where the Court --

THE COURT:  I know.  I know.  We used the word "functionality."

MR. GUNNEMANN:  Well, you described, Judge, the -- what our complaint covered.  And I'd say it's more than using the word "functionality."  At the bottom of page 10, you say, "It", and the "it" is the complaint, "Seeks to protect source code for three Checkout functionalities."  And then what you cite, Your Honor, is paragraphs 58 to 60 of the complaint, where the complaint discusses the software and its functionality.

The point here is not to argue to you that we should be able to compare -- just look at the two, which is what we're trying to now do.  We're trying to say we should be able to simply compare the functionalities of the system.  That's the amendment to the interrogatory that -- that's at issue.

But what we are saying is within the source code from the very beginning, within the source code trade secret, has not simply been a literal cut and paste, but has been the fundamental concept of if the code that they copy does the same -- copying encompasses doing the same thing, using the same system architecture or logic, et cetera, all of which is -- is within the definition of trade secret in the code, so it's in the complaint.  It's in the discovery we served.  It's

14

in the Court's order.  It's been there.

That is different, of course, than what we are trying and asking the Court for -- to do, which is to also say that it is an appropriate vehicle to prove our case by simply having an expert, and ultimately the trier of facts, look at the two products side-by-side divorced from the source code and say these establish -- these accomplish the same thing in the same way, and that's a copy.

That's the new element that we added at the end of the discovery period, where we came here, Judge, and said we looked at the case with fresh eyes, and that's what we have.

But what we think that the Court and the parties have lost -- gotten lost in communication is making sure that we've -- we've alleged from the beginning this concept that system architecture or system logic can be copied and reflected in the source code.  To be sure, to be sure, we would have to link that to the source code, right, and say the code is establishing those mechanisms in the same way, fully acknowledge that.  But that's part of the source code.

THE COURT:  So how -- how would you do that?

MR. GUNNEMANN:  I can give you an example.

THE COURT:  Yeah.

MR. GUNNEMANN:  So in this case -- I'm not going to get this a hundred percent right.  I'm going from -- from memory, so if it proves a little different later, please

15

excuse me.  But in this case, there's different ways to effectuate CheckPay, and the system logic goes through five steps in our system.  According to our experts, it goes through five steps.

They've looked at some of the source code that's been produced, our experts have, and they see the five -- same five steps as stressed from the code.  That's a -- that's a design choice.  That's a -- a programming choice that copies from our system.  It might be in a different language, but it's the same five steps.  That's something you could only see if you have confidential access to our source code if you know it inside and out because you've observed it, because you've used it, and ultimately because you've copied it.

Specific example, it's different than saying, hey, both of these systems allow for CheckPay, okay?  That -- that would be what we're trying to expand into, but that's a code-based comparison of design features of architecture that's built into the code that an expert can say, I see that RoadSync's code has programmed five steps; I see that Relay's code has programmed five steps.  You could only see that if you're examining the two codes side-by-side.

THE COURT:  And you would say that that is evidence that they stole your code and used it to create their own code that does the same thing?

MR. GUNNEMANN:  Absolutely.  Circumstantial evidence,

16

of course, because you don't have -- that's not direct evidence of copying, but it's strong circumstantial evidence and enough to support a claim.  And that's exactly the reason that I say, Your Honor, that this is where experts are needed to define what strong circumstantial evidence of copying looks like.

MR. LANDES:  I'm -- I'm having deja vu, Your Honor, to ten months ago.  I'm going to read a quote from you from the January 11th hearing.  "What they, the defendants, are afraid you're going to do is you're going to pivot and say, oh, even though the source code isn't the same, you've got these similar functionalities."  That was the concern, and so we have a whole series of orders and briefing that they're not allowed to do exactly what they've done.

I'm going to give you a peek behind the curtain, Your Honor.  We've looked at the evidence about source code access from the plaintiff's side.  The defendants did not access it or download it.  There are no records of downloads.  They've looked at our source code.  It's available.  There is no RoadSync source code in there.

So where are we now?  There's a new situation where they say, shoot, there's no source code that came over; it's not there.  And we heard the judge at the last hearing say, well, he's not going to allow these features and functions in that then.

So I'll tell you, Your Honor, I think when the fresh eyes came in, it wasn't seven months ago in May when -- when new counsel came in.  It was in the last three weeks when they saw the writing on the wall, and they said, okay, Judge Brown is not going to allow features and functions, so we'll try to get it in through a new side door, and we'll say, well, we're not actually claiming features and functions.  We're claiming -- we're claiming architecture within the source code itself.

So let me -- let me say, Your Honor, that formulation, I don't even think it exists in writing now, but it certainly, certainly did not exist before June 23rd.  We're going back to the same day.

THE COURT:  Yeah, but what he's describing, though -- so let me just be clear.  Let me -- let me just take one cut through something.  In terms of features and functions, I'm going to grant their -- the defendants' motion to strike as -- as what I think we've been discussing as features and functions.  And you-all can tell me what language I ought to use to carve out that thing -- Mr. Gunnemann, is that right?  That thing that you are asking me to allow you to do, I'm not going to allow you to do that through a motion -- through amending your disclosure, okay?

If you think you can do that and add that function -- features and functions, you're going to have to do that

through a motion to amend the complaint, okay?  At this late date, you're going to have to meet the Rule 16 standard, okay?  That thing that you're telling me you want to do that you've admitted is new from fresh eyes, you know what I'm referring to?

MR. GUNNEMANN:  Yes, Your Honor.

THE COURT:  And you know what I'm referring to, and you know what I'm referring to, and that's referred to in the two emails?  I am going to grant their motion to strike that.  So if you want to bring that into the case, you're going to have to do that through the front door of a motion to amend.  I'm not going to let you bring it in at the back end.  And I think we need to make sure that we are all on the same page as to what that means because I do -- I thought the answer was going to be to my first question, yes, and it is not.  It's sort of like a kind of.

So I would like you-all to write up to me or just tell me the portions of the trade secret identification that is being struck, okay?  Because I want to make sure that this doesn't change over time, that we -- that we are -- as we're getting to the end, that we know what's been taken out.

But it seems to me what plaintiff is saying here is that perhaps it's not -- that it's -- it's not a functionality analysis, that it does seem to be a purloining and use of source code, but that it is not seeing at -- it's established

through more of circumstantial evidence rather than direct evidence because of the way -- it's still code-based, I think, because it's a comparison of Road -- of the plaintiff's code and the defendants' code, but saying it doesn't have to be a verbatim translation or a cut and paste; it just has to be close enough that an expert says this is evidence of copying.

MR. GUNNEMANN:  Yeah.  Your Honor, that's -- that's exactly right.

THE COURT:  So you understand what I'm saying?

MR. LANDES:  I -- I understand, but this -- this is converging entirely with --

THE COURT:  But I'm trying -- I'm trying to keep it from converging.

MR. LANDES:  Yeah, so -- and so here's -- and let me tell you --

THE COURT:  Because it's not output -- output determinative.  It's not because they do the same things.  It has to be based on because here is Code A, and Code B is similar in these ways, and the only way you could get them to be similar is by copying, or they're so similar or here's the -- here's the mistake in Code A that exists in Code B, and one would not make that mistake twice, those types of things.

MR. LANDES:  If there's -- if there's a mistake that gets copied over, right, if there's something like that, that's one thing.  But I want to go back again to the point we

have, which is that there is zero evidence of source code download on their side, right, and no evidence of source code retention on our side, so what this is getting into is --

THE COURT: Do you-all agree with that?

MR. GUNNEMANN: Well, Judge, this -- this overlaps with our existing motion to compel. It's -- it's ironic that they say there's no evidence when they haven't given us a full and fair production of --

THE COURT: Okay. Well, then let's not -- let's not characterize evidence right now.

MR. LANDES: Fine. I won't say that, right? But what I can say is there is zero evidence of download or access on their side. That's plaintiff's evidence.

MR. GUNNEMANN: Well, Judge, I mean, we disagree with that, and I'm happy to talk to you about --

THE COURT: Okay. That's okay. I'm not going to decide it based on that.

MR. LANDES: Okay. I'll -- I'll scale that back too, right? But, eventually, they're going to have to, you know, put their cards on the table, and they haven't yet in any interrogatory response about how the code moved over, right? Because what you can't have is someone remembering, well, here's the feature as it existed, and this feature is in my head --

THE COURT: That's right.

MR. LANDES:  -- and now I'm going to code it.  You can't have that.  There needs to be a theft of source code.  And so if we get to a point where we're talking about, you know, what he said, here are five steps for processing a check that everyone in the world uses, and they're mandatory if you're going to process a check.  He says, well, you process checks, we process checks, and we both do it using source code, therefore, you copied our source code.  That's what features and functions are.

THE COURT:  I agree.

MR. LANDES:  And I'll note -- I'll also note, Your Honor, even --

THE COURT:  Hold on.  Hold on.

MR. LANDES:  Yeah.

THE COURT:  Let's -- I agree if you're saying what it does is it processes checks, and he -- I agree with you now.  But what he's -- what they're trying to say is that -- I think, is that a person could copy code and could then use it in a way it was intended to obfuscate the copying, right?  So -- so it's not plagiarism word for word, but it's rewriting it in a way that any teacher is going to put it through a process and is going say, yeah, this diction, this word choice, these -- this shows it's copied.  I think that's what you're trying to say, so, in other words, circumstantial evidence of copying code rather than cut and paste, and the

circumstantial evidence is not just what it does.  Does that make sense?

MR. LANDES:  Well, it would -- it would absolutely need to be more than just what it does.

THE COURT:  Yeah.

MR. LANDES:  Or how it does it.

THE COURT:  That's what I'm carving out.

MR. LANDES:  Yeah.  But here's -- here's the issue again to get back to this -- this problem, if you were to say, well, it's not the theft of the code, this is what we fought over a year is tell us what code we stole, right?  If it's the theft of, well, you do these same five steps, those same five steps would be, wherever they are, would need to be in the trade secret ID, in the interrogatory responses, and they never were.  So what's happening --

THE COURT:  But, again, I think you're trying -- that's the functionality that I'm saying is not part of it.

MR. LANDES:  Okay.

THE COURT:  It has to be a code-based process.  It has to -- I think the way this case has been litigated is it starts with here is our code, here is your code.  This is why we say your code, the defense code, is copied or it shows the theft of our code, and it's not because they do the same thing.  It's because of something else, right?  It's something else that tells us this is nothing more than a translation of

one to the other.  Does that make sense?

MR. LANDES:  Yeah, it -- it makes sense, but the discovery and the source code trade secret identification has not been framed in that way.

THE COURT:  Well, I understand that.

MR. LANDES:  What's that?

THE COURT:  I understand that.

MR. LANDES:  Yeah.

THE COURT:  Because they've tried to pool it into something else.

MR. LANDES:  But -- but exactly.

THE COURT:  But as far as they've identified what the code is that they say you took, you have that, right?

MR. LANDES:  Yeah.  Yeah.  Well, they say we took everything and, in fact, we took nothing.

THE COURT:  Right.  Well, they've -- they've identified it more specifically than that.

MR. LANDES:  Well, at this point, no, because the current trade secret ID, this is what we're -- why we're moving to strike the other category, which is just everything that doesn't fit in the things that they've actually described.  They're still saying you took all of our code, and all of our code is trade secret.

THE COURT:  Yeah.

MR. LANDES:  And any -- and this is the other piece

to get a little bit ahead of ourselves, any combination of anything within our code.  And so this -- this, again, was the problem at January 11th, which is if you -- if you have a situation like this where it can be anything that the code sort of does in any of the code or that sort of looks like it if you squint your eyes or any combination of different things within that, we're right back where we started a year ago where this is just limitless.  And that's why we reined it in on theft of code, and theft of specifically identified trade secrets within that code.

THE COURT:  So I -- I think you are right when you -- when you say it can't -- it can't be anything that the code does.  I think you said it can't be anything the code does, or if you squint your eyes, it looks like the code.  I'm trying to draw a line again.

I think your first categorization or characterization, something that just does what the code does is out unless they can amend the complaint.  That's -- that, I think, is another way of saying functionality.  But if you squint your eyes and you see the code, I think it's in because that squinting is just a way of finding out that it's stolen code.

MR. LANDES:  Well, it depends -- it depends on what you're squinting at.

THE COURT:  Right.

MR. LANDES:  Maybe that was a -- maybe that was a word --

THE COURT:  Well, but, no, no.  But my point, though, is -- is it is tying them to stolen code.  It's only giving them room to say it might not be a cut-and-paste job.  It might be a cut-and-paste job, and then it's modified either intentionally or by chance so it doesn't look like a mere -- a reflection.

MR. LANDES:  So -- right.  And it's important to draw lines here, right.  So if we're talking about something like, you know, English to German, or all of the variables used to be called, you know, RoadSync 1, RoadSync 2, RoadSync 3, but now they're called Relay 1, Relay 2, Relay 3, no -- no question.  That's fair game.  It doesn't need to be verbatim all the way through.  But when you start saying something like, well, your software cashes checks --

THE COURT:  Yeah, but we're not defining it by what it does.

MR. LANDES:  I understand.  I understand.  But when you say the software cashes checks, and it uses five steps to cash checks, and lo and behold, RoadSync's software and source code also cashes checks in five steps, therefore, you stole our source code.  These two things collapse into each other, and they become -- it becomes the same argument.

So it's -- if we're talking about, you know, changing

words, right, and tweaking things like that, that's one thing. But the only example that I heard from the other side is, well, you cash checks, and you use five steps to do it. That's -- that's a function.  That is not copying source code.

THE COURT:  Yeah, so it's -- you're identifying the portion of the source code that accomplishes a certain action or function.  But his example went on from that to talk about how one could see stolen source code from one to the other.

MR. LANDES:  So if it's -- if it's in a different programming language, right, I understand that point, but when the only example you give of circumstantial evidence that the code was copied is that they achieved the same function.

THE COURT:  That's not what he said.  You're -- you're -- you're simplifying what he said.  What he said was he was characterizing a section of code that does something, and then he was explaining from there how an expert would look at the code itself and would see in the code itself evidence of copying, not because it does the same thing but because of other things that an expert would see.

MR. LANDES:  But, Your Honor, you're --

THE COURT:  And I actually think this is -- I actually think this is -- what you're entitled to is their -- if this is what they're saying is very precise identification of where they think when you squint you can see the same code.

MR. LANDES:  That -- that's right, and we were

27

entitled to that six months ago.

THE COURT:  I agree.  I agree.

MR. LANDES:  Right, and so --

THE COURT:  My only point is that -- is that they're not -- you're trying to push them into a functionality definition, and I take them at their word that they're identifying functionality to show a where the code you all looked for, the code that does this with a check.  And so look in this part of the code that doesn't, but then once you break open the code, now they're looking at essentially a copying of the code; is that right?

MR. GUNNEMANN:  So, Judge, that's right.

THE COURT:  Okay.

MR. GUNNEMANN:  I'm a little concerned about what you said that they were entitled to that six months ago because --

THE COURT:  Well, okay.

MR. GUNNEMANN:  -- because --

THE COURT:  Can we not -- can we not -- let's keep moving forward to get us on the same page, and then we can quibble over whether it's been done -- not quibble.  We can discuss what's going on.  But I do think -- I do think that the defendant maybe has been going along saying I'm looking for cut and paste, right?

MR. LANDES:  Again, if it's, you know, you change RoadSync 1 to Relay 1, right, or, you know, a code like this

changes in that way, then that's -- you know, that obviously would be within. But the formulation I'm hearing today is brand new.

THE COURT: Okay. And I'm going to require the plaintiff to provide a much more detailed disclosure of this type of claim. I don't know how else to require it.

MR. CHALLY: Your Honor, if I -- if I may, we've produced -- this is part of what they seek to strike. We've produced a trade secret disclosure that links to extensive portions of our code that we believe is our trade secret and that we believe should be the focus of discovery.

THE COURT: Right. So let's look at that. Let's look at this.

MR. CHALLY: Yeah. My point to you, Your Honor, if I may, would be absent a motion for leave to amend granted and then us being able to pursue claimed features and functions, put that to the side, as we sit here right now, our expert would be focused on the components of the code that are specifically referenced in our trade secret identification, and pulling out from that code portions of that code that we believe matches what we have or we hope to receive from the defendant, and then providing, in an expert report, evidence of how our code is copied in the way that the law prohibits in their code.

But it is in that trade secret identification, the

specific lines of code, the -- the structure of the code.

THE COURT:  So if I'm looking at 186-8, page 6 -- see that?

MR. CHALLY:  Page 6, yes, sir.

THE COURT:  Yeah, it's just got -- we can go to page 7.

MR. CHALLY:  Yes, these are all -- that's a great example.  These are all links that are live, not in the ECF version --

THE COURT:  Yeah.

MR. CHALLY:  -- but are live to them, and our expert then -- in this source code trade secret, our expert would be looking at that, comparing that to what's in their system and giving evidence that we think will show copy.

THE COURT:  And not because it does the same thing?

MR. CHALLY:  No.

THE COURT:  But because here's the way looking at code here and code there makes me think that their code could only exist this way because they stole our code?

MR. CHALLY:  Correct.

THE COURT:  I think they're allowed to do that.

MR. LANDES:  So, again, Your Honor, in theory, could they have done this at the beginning of the case and pursued this sooner?

THE COURT:  Well, why isn't this part of -- why isn't

this exactly what they've alleged --

MR. LANDES:  Because --

THE COURT:  -- stolen code that's then been used?

MR. LANDES:  Because, Your Honor, we have -- and I'm looking for it -- an interrogatory --

THE COURT:  Okay.

MR. LANDES:  -- that asked them to identify -- oh, here we go.  One second.  Let me find the interrogatory.  We -- we asked them in the interrogatory to describe what they alleged was the misappropriation, right.  And what we got was --

THE COURT:  Is this something I could look up online or is it...?

MR. LANDES:  Yeah, I'm looking for a cite.  I apologize.

THE COURT:  All right.  Go ahead.

MR. LANDES:  I don't have it handy right now.  One moment.  I will find this.

MR. GUNNEMANN:  I think you're looking for the December 21, 2022, interrogatory response is my guess.

MR. LANDES:  Yes, likely, but I want to have the language here so I can provide a cite.

MR. GUNNEMANN:  I think it's in Docket 89-2 that you're looking for.

MR. LANDES:  Okay.  I don't have the docket.  I'll

take a look at that.  One moment.  Ah.

THE COURT:  All right.  I've got 89-2.

MR. LANDES:  So --

THE COURT:  What page?

MR. LANDES:  Oh, one second.  Let me look at 89-2.

MR. GUNNEMANN:  Well, one place we answered in our interrogatory there that I think is relevant to this, Your Honor, is at page 5.

THE COURT:  Well, let Mr. Landes direct me.

MR. GUNNEMANN:  Sure.

MR. LANDES:  89-2.  Okay.  Let me see if this is the right one.  No, because this is about defining misappropriation -- or I'm sorry, defining the trade secret, not defining the misappropriation, so that's the wrong interrogatory.  I think we wanted the interrogatory -- give me one second again.  Okay.  So Interrogatory Number 4, the response -- and I apologize we don't have a docket site for this.

THE COURT:  Okay.

MR. LANDES:  But it's something that I can fill in later.

THE COURT:  Sure.

MR. LANDES:  The interrogatory says, "Describe with particularity and individually each piece of alleged RoadSync confidential information you contend defendants or any

defendant misappropriated or retained in breach of any defendants' confidentiality agreements."  And then the response lists the four categories that we had back in January that Your Honor said were insufficient.

And then we have this language, which is, "Through Defendants Droege and Barkoff's unauthorized downloads on August 23, 2018, and their subsequent retention and use of the information in connection with launching and business of Relay Payments, Inc., Droege and Barkoff improperly retained, and defendants misappropriated additional confidential information belonging to RoadSync.  Plaintiff will respond to this portion of the interrogatory and identify the additional confidential information unlawfully retained and misappropriated by defendants 30 days following the commencement of discovery."

And I don't know that we ever got a more substantive answer about what the theft of source code entailed.  So here's what we were entitled to within fact discovery, by June 13th, we were entitled to this, is something that we'd say, for instance, you misappropriated our source code because you have these five steps, and we have these five steps, and those five steps --

THE COURT:  No, that's out.  That's out.

MR. LANDES:  Well, then -- then, fine, Your Honor.  Then here's -- here's how it would be phrased.  I think -- I apologize.  But here's how it would be phrased.  We think you

misappropriated our code that implements these five steps, and we -- and our proof, our proof, our evidence that you misappropriated our code, this code that does these five steps, is that you have completely different code, but it also does these five steps.

THE COURT:  No.  No.  You just start over.  You defined it as functionality.  It is -- it is we think it's the same because of whatever the similarities are that our expert has said that is not just what it does.

MR. LANDES:  Okay, fine.  But maybe the reason I'm having so much trouble coming up with the example of what would be sufficient is because it has never in this case been articulated or even hinted at what would be sufficient, not in a trade secret identification, not in an interrogatory response, not in a 30(b)(6) deposition, not in question of our witnesses, not for any of the search terms.  It is all -- this is all completely new, right?

And so this is -- again, I'm sitting here, I honestly don't know, right, what it is we're supposed to be aiming at, and I would love the opportunity, once they tell us, oh, you stole this code, to be able to go back and depose their witnesses about whatever that code is.

THE COURT:  Yeah, but didn't they -- didn't they identify -- they have in their code identification.  They've identified the code that they say was a trade secret.

34

MR. LANDES:  It's all of it.  It's all of it.

THE COURT:  Well, okay.  Okay.

MR. LANDES:  It's all of it.

THE COURT:  So the next question would be:  Have they been able to link that code to having been improperly downloaded?

MR. LANDES:  Down -- you mean downloaded from RoadSync?

THE COURT:  Taken, improperly taken in whatever way.

MR. LANDES:  No.

MR. CHALLY:  I disagree with that.

THE COURT:  Okay.

MR. CHALLY:  I disagree with that.  First and foremost, while I appreciate the Court's focus on this particular issue now, this is not a question of whether we properly identified the trade secret.  This is not a question of whether or not the source code has been a trade secret in this case from the beginning.

THE COURT:  Well, I understand.

MR. CHALLY:  And -- and all of the evidence that we have as to how they misappropriated the source code is appropriate at a time, right?  It's not something that needs to be addressed right now.  That's first and foremost. Second, we do have -- the reason I say that, Your Honor --

THE COURT:  Aren't we at the end of discovery?

35

MR. CHALLY:  We are, but we still don't have their code.

THE COURT:  Yes, you do.

MR. CHALLY:  No.  No, sir.  No, sir, we do not.

THE COURT:  I thought you gave a bunch of code.

MR. CHALLY:  We do not have all of their code. That's part of the motion to compel that we're separately here to talk about.

THE COURT:  Right.  But they say we've given you all of the code.  You don't need code about a parking system because that's not part of this.

MR. CHALLY:  If that were the only thing they had excluded, then we wouldn't be here in front of you today.  But they have excluded 300 other files and modules that our experts have identified that have nothing to do with parking and have nothing to do with mocks.  Those are things that from our expert's analysis, at least as best as we can tell, are directly relevant to the components of the code that we think they would have misappropriated.

THE COURT:  Okay.  Well, let me -- let me -- let me take us back on track.

MR. LANDES:  Can I make -- can I make one more comment, Your Honor?

THE COURT:  Yes.

MR. LANDES:  This formulation of source code that

we're hearing now, I think -- this is the sort of thing where I would like to question prior counsel about whether this was in the case before.

THE COURT:  Okay.

MR. LANDES:  And I -- I really feel like we're getting sort of spun in circles where every time we pin them down and say this wasn't there before, we know it wasn't there before, we get some new formulation, something new that if you look at it in a slightly different light, oh, it was -- they say it was in the case before.

But I'm -- I'm very confident that if we went back and I had a chance to cross-examine prior counsel about whether this is what they meant when they said, here is our source code trade secret, I don't think he'd say this unless we have a declaration in the record.

THE COURT:  All right.  Let -- let me be clear.  I am granting your motion to strike features and functions.  I say that full-throatedly.  Is that the proper word?

MR. LANDES:  Yes.

THE COURT:  Without hesitation because I do think that was not part of it from the start.  And I am trying to keep the plaintiff on what it was from the start.  I've offered them an opportunity to present evidence that that was always there.  I read the -- the documents that you've filed that I've already cited at 186 and 187 to -- or 185 to

indicate an acknowledgement that was not part of this claim. I am granting that completely.  The -- I am making sure that we stay on source code.

What I think that they're trying to do is to say that source code does not have to be a cut-and-paste job, and that you can look at other things, but it's still, I think -- I think what I'm trying -- I know what I'm trying to do, and I think what I'm saying is that you're still looking at a comparison of allegedly purloined source code, an existing source code in order to show that theft, not the theft of the idea of what you want to do, not a theft of some abstract architecture, but a theft of code that was used to write new code or build new code.  And however we get there, we'll talk more about how we get there, but that -- that's step one, okay?

MR. LANDES:  I agree with that formulation, Your Honor.

THE COURT:  Okay.  So the second question is the -- this argument about you have moved to throw out compilation.

MR. LANDES:  Yes.

THE COURT:  I think -- I think compilation is a back door to features and functions.  When I read it, I may leave out a couple of parts of the code -- of the description and use of the word "compilation."  I think compilation here is just sort of throwing in fuzziness.

Page 9, "The compilation of this feature with the other features of the system described in this document within a single platform are the trade secrets.  A compilation" -- and it says on the same page -- "a compilation of these components with the remaining aspects of the code are also trade secrets."

There's one that says, "Of the compilation of the features described herein with other features of the system described in this document within a single platform are the trade secrets.  The compilation of the code to provide the features and functions of the RoadSync system is the trade secret.  The way in which this feature can be used and the compilation of this feature with other features of the system described in this document within a single platform are the trade secret."

Well, I -- I kind of laugh when I say that because I'm not even sure what it means, the compilation of this feature and the compilation of that feature and other features.  It's -- it's -- I mean, this is -- this violates almost every part of my order requiring reasonable particularity.

It doesn't identify the files, lines, or portions of lines that contain it.  It doesn't identify any confidential information within that material claimed as a trade secret.  It doesn't unreasonably describe the algorithm, process,

business, logic, modules, data structures, architectures, design choices, or anything like that such that any expert could distinguish that between something else.

It's just like -- it is really like the fuzziest of the fuzzy. And so I'm going to grant that. And it really wasn't defended in the pleading on the motion to strike, so I'm going to grant that as well.

MR. GUNNEMANN: Judge, just so --

THE COURT: Yes.

MR. GUNNEMANN: -- I could understand what you're -- what you're granting with respect to that, the -- I'm looking at Document 186-8. And on page 24, there's this -- there's the -- a category of both code and functions listed that starts --

THE COURT: On page -- what page?

MR. GUNNEMANN: Page 24 of 186-8.

THE COURT: Okay.

MR. GUNNEMANN: So there --

THE COURT: That's the other?

MR. GUNNEMANN: That's this -- there's -- so what we did is we organized the trade secret ID by functions, and then we identified specific code under each of those functions. There was a section in there that we included that didn't fit in the other sections, and we called that other.

THE COURT: Yeah, but I'm not at other yet.

MR. GUNNEMANN:  Okay.

THE COURT:  Other is the next part they seek to strike.

MR. GUNNEMANN:  That's what I wasn't clear on.  I thought you said you were striking the other.

THE COURT:  No, I'm striking the -- I'm sorry, maybe I misspoke.  I'm striking the compilation category.

MR. GUNNEMANN:  Okay.  That you're -- you're striking the references in the trade secret ID to compilations?

THE COURT:  Yeah, like the ones I just read.  I think -- I don't know if I've read all of them, but if you -- if you go through it when you're -- when you're describing, for example, payments, you describe code for that.  But then you also say, "The way in which this feature can be used alone and in compilation of this feature with other features described here in a single platform are the trade secrets." And that's what I'm saying.  And that is so fuzzy, I don't even know -- I doubt anybody can tell us what that means.

MR. GUNNEMANN:  Well, I just misunderstood you, Your Honor.

THE COURT:  Yeah.

MR. GUNNEMANN:  I thought you were striking that cat -- the whole paragraph.

THE COURT:  No, I'm going to get to that in a minute.

MR. GUNNEMANN:  Okay.

THE COURT:  But what I'm saying is at several parts of your disclosure, you identify with particularity certain source code.  And then you have language that makes it sound as though it's this functionality when it's used in compilation with other things.  That's what you-all were moving on; am I right?

MR. CHALLY:  Correct, yes.  And, Your Honor, I think just -- I don't know if this helps you in fashioning the order you're contemplating, but if you look at our trade secret identification --

THE COURT:  Yeah.

MR. CHALLY:  -- it's intended to have each section, meaning each function --

THE COURT:  Yup.

MR. CHALLY:  -- we're referencing.  It's going to have two different components.  First, when we say description of the component --

THE COURT:  Yeah.

MR. CHALLY:  -- that is where we are describing, as best we could do it in narrative form, the aspect of that function, the feature, right, that we believe to be a trade secret.  That's what we understand them to be, moving on to you being critical of.  Got it.

Following that, in each of these different sections, there is trade secret source code components.  That's what

those -- that first is the feature and function that we are intending to expand, as we've been talking about today. The second is the source code component. There are, I believe, references in the source code components of each of those too. If you grab a piece of the source code from this file and a piece of the source code from that file, that is still a compilation that we would believe to be covered, but it's all focused on the code.

THE COURT: That -- but that's still source code.

MR. CHALLY: Absolutely source code.

THE COURT: What I'm trying to do is prevent you from expanding it into what the code does.

MR. CHALLY: Right. And again --

THE COURT: Well, what the code does with something else.

MR. CHALLY: And if you look at, for instance, under the payment section, so this is --

THE COURT: I'm at invoicing. But I'll look at these. I'm at -- okay. I'm at payments now.

MR. CHALLY: Yeah, 186-8, page 8 of 33.

THE COURT: Yeah.

MR. CHALLY: Two payments, description of the component. And then we have A as it relates to fleet checks.

THE COURT: Yeah.

MR. CHALLY: The narrative that you see under fleet

43

checks, the next one, two, three, five paragraphs, that is our effort to include features and functions into the case, which we understand you to be critical of.

THE COURT:  That's right.

MR. CHALLY:  That's different than what follows as the trade secret source code components.

THE COURT:  The compilation of these components with the remaining aspects of the code are also trade secrets?

MR. CHALLY:  The -- the source code.

THE COURT:  Yup.  I agree.  I'm not trying to take out any of the source code.

MR. CHALLY:  Yeah.

MR. LANDES:  So what -- what we're trying to take out, Your Honor, is the sentence -- to point where they're looking at, the sentence "In addition" --

THE COURT:  I know.

MR. LANDES:  -- "compilation" -- so the source code itself is in, but what we don't want to have happen is, say, well, Part A of the source code is not trade secret; Part B of the source code is not trade secret, but when you combine A and B, that combination is the trade secret.  And if they needed to do that, Docket 141, Your Honor's order, required them to say the trade secret is combining component A with component B, and they didn't do that, right.

THE COURT:  In here they didn't do it?

44

MR. LANDES:  Right.

THE COURT:  In this document?

MR. LANDES:  Yeah.  Yeah, exactly.  And although, Your Honor -- okay.  I'll -- I'll save that for the other category.

THE COURT:  Okay.  Well --

MR. LANDES:  I think if we get rid of the language about -- you know, I think we cited them all in our brief, but all these -- all the sentences that are akin to the one Your Honor read, those are out because if they wanted to claim trade secret was putting two things together or three things or five things, they had to say the trade secret is Item A, F, G, W, and X.

THE COURT:  That's what I'm granting.  That's not to say that you can't -- again, I don't know how to say it any clearer.  I'm trying to keep this to what you-all always agree on this topic is, which is that it's the source code.  And -- and maybe if that sentence was in addition to compilation of these, I think what -- I think what you're trying to say maybe in moving forward is that it could be a combination of pieces of source code.

MR. CHALLY:  That's exactly what that's intending to cover.

THE COURT:  But it doesn't -- but that -- again, a combination of the source code is merely a way of showing that

it's stolen source code.  It's not -- I'm not moving it into a functionality of what it does when it's together.  Do you understand?

MR. CHALLY:  I -- we completely --

THE COURT:  So I don't know that this in addition language, for example, on page 8, says anything because you either prove it by showing that this piece of the source code was stolen or you don't.

MR. LANDES:  Well, here's -- here's our -- I'm sorry.  Go ahead.

MR. CHALLY:  If I could, I don't know exactly the numbers of lines of code that fall under each of the bulleted lengths that you see here.  The point would be what we are trying to say this is our trade secret as it relates to the code.  It is these components of code.  We -- they may say, well, that's a very short line of code, and there's nothing particularly unique or interesting about that particular line of code.

And so then this is intending to reference the fact that if you put that even with their argument that that's not unique with the rest of the lines of code that is identified separately, those are our compilation trade secret.  It's still the code.  It's never moving away from the code.  But it is to say that it isn't -- it is both each of these individually, and it is the combination of them collectively.

46

THE COURT:  So, well -- go ahead.

MR. LANDES:  So I'll -- I think you're -- again, Your Honor, I'm going to try to go swim down -- downstream here. Here's the issue.  They're looking for maximum optionality to be able to define the trade secrets later to be anything they want them to be.  So let me take this example here, right.  So they say they find one line of code, right.  It's very, very short, and we say it wasn't misappropriated, and we also say that one line of code is useless.  It's not a trade secret.

What they want to be able to do is come back later and say, well, fine.  Even if that one line of code by itself isn't the trade secret, taking this line -- one line of code with this other line of code from over here and this other line of code from over here, when you put those three together, that's what forms the trade secret.

But if they wanted to do that, if they wanted to say it's not this one line, it's line 1 plus line 2 plus line 3, page 3 of Your Honor's order at Docket 141 required them to say in this what the combination is.

THE COURT:  I think it did.  I think it did.  I think that even if you could say it's a combination instead of a compilation, even if you say that, how is that not -- I mean, doesn't my order require that to be done?

MR. CHALLY:  I think, Your Honor, that's what we did. We listed out all --

THE COURT:  No, you're saying essentially any way that these might be organized or some fractions of these might be organized in some other way would also be a trade secret.

MR. CHALLY:  No, sir.  No.

THE COURT:  Okay.

MR. CHALLY:  That's not what we're saying.  We're saying this code is our trade secret.  That's -- that is the trade secret.  We are saying for sure that if they misappropriated one section and another section, that that is still actionable.  We are absolutely saying that, too, but that's a different question than whether we have identified what we believe to be our trade secrets.  Is -- it is these components that --

THE COURT:  Okay.  Then I'm going to strike that language, that line, for example, on page 8 because what you're saying is, I think, it's still the code.  It just shows up in a different way.  I -- otherwise, I don't know how you can say it more than that and suggest that you've complied with my order as to reasonable particularity because this is a one-sentence thing that says the compilation of these components with the remaining aspects are also -- regardless of whether this fits within the definition of the stolen trade secret, regardless of that issue.  In other words, I've thrown out functionality, features and functionality for that reason. I'm granting that motion.

On this second part, the compilation, regardless of that, it's just nothing -- there's nothing here.  I can't tell what you mean.  How could anybody know what this means?

MR. CHALLY:  Your Honor, we -- we understand what you're --

THE COURT:  You don't know what it means yet.  You're just wanting an edge in case you see something later.  If you know, you should say it.

MR. CHALLY:  Your Honor --

THE COURT:  It's this piece here and this piece here and this piece here, and it does this.

MR. CHALLY:  That's what we did in all of the linked files, but I understand what you're saying.

THE COURT:  Wait.  So you think these files below?  I thought this was the source code.

MR. CHALLY:  Exactly what I'm referring to, yes.

THE COURT:  Right.  But now you're saying that it could be a snippet of this one, a snippet of that one, a snippet of this one, none of which are individually protected but together become protected?

MR. CHALLY:  All of which was identified in these linked files.

THE COURT:  Yeah.

MR. CHALLY:  So the point, it has to --

THE COURT:  That's like saying -- that's like -- I

mean, what you've done -- I don't know how else to describe it, but it's like you're describing in the link files all of the individual menu items or recipe items, and then you're claiming however you, like, mix them together is also.

And what I'm saying is if you've got a mixture that you think was protected, you need to tell about that mixture now. I think you were supposed to tell about it before, and it may or may not be too late, but you can't say here is all of the individual ingredients, and we're also claiming any way they might be mixed, which I think is what you're saying.

MR. CHALLY: It's actually not what I'm trying to say.

THE COURT: Oh.

MR. CHALLY: Maybe I'm not doing a very good job of it. Let me -- let's take the recipe for Coke, okay? So if we were trying -- the recipe for Coke is what it is. The ingredients for Coke are on the back of every can, okay? The -- if we were to claim that the ingredients for Coke were somehow a protected trade secret, then we'd better be telling you more than just what's on the back of the can, right? We better be telling them and the Court how it is that those things are combined in a way that's confidential in trade secret.

THE COURT: No. No. That -- Coke is a bad example because they do -- maybe all food is. But let's say -- let's

say that no one knows what the ingredients of Coke are --

MR. CHALLY:  That's --

THE COURT:  And you've just claimed that they stole the ingredients, and -- and it wouldn't be that.  It would be a system.  It would be a finished product, so I don't know, maybe food is not the right answer.  But, in other words, there is -- each standalone item is a potential trade secret.  It is a secret that we use this, and it's a secret that we use that, and these are the secrets for how we create Ingredient A, this is the secret for how we create -- include Ingredient B., and -- and you've listed all of those different secrets of how you make each ingredient.  That's what you have here in the bullet points.

But now you're also just saying something fuzzy, like, and so is if you take a little bit of this one and a little bit of that one, how they go together afterwards.  If you think they did it, say it.

MR. CHALLY:  Well, Your Honor, I think -- I want to make sure we're speaking the same language.  You can use the food analogy.  Think of this as a list of ingredients that are, in fact, confidential proprietary in trade secret.  That's what our trade secret identification identifies.  So -- and we believe they all are.  That's why they're there.  That's why we -- this was not an easy thing to put together, I can assure you.  And we -- we limited this to those components

of the system that we believe were truly confidential and competitive and sensitive in value.

We are intending to identify all of those. We believe that combinations of those things, not that they are somehow uniquely a trade secret, but that they can nevertheless be part of the claim that we're pursuing if they were to have copied those components.

So if we've -- if the five recipes for Coke are not on the back of the can, they are all trade secrets. If they took Component 1 and Component 5, then we would believe that's fairly within the case, and that's fairly within our trade secret identification, and that they couldn't criticize us for somehow untimely asserting a claim based on those things.

THE COURT: Okay.

MR. CHALLY: It is because 1 and 5 are, as we are disclosing in the trade secret ID, actually trade secrets.

MR. LANDES: So I think we're -- I think if we strike that language, it sounds like Your Honor is in agreement that it should be stricken.

What we don't want to hear, though, if this is a concern, is when we prove that -- to use Mr. Chally's example, Item 1 is not a trade secret, and Item 5 is not a trade secret, and we come back and hear, well, putting Item 1 together with Item 5 is the trade secret because that's what I think we -- Your Honor agrees is not in here and would need to

be.

THE COURT:  All right.  So we -- this is a fairly easy question.  I'm not going to try to describe what it might mean later, but I put in my order that if the alleged trade secret consists of a combination of files or portions of lines, you have to identify the files or portions that constitute the alleged trade secret combination, including the identity of any confidential -- within the combination of files, lines, or portions of lines claimed.  The identification of individual or combination trade secrets must be more particularized than relisting of the entire source code listed on RoadSync's prior 1600 -- 1630 files and any possible combinations thereof.

I know you have not listed all 1600 files anymore, but you're doing no more than just saying any possible combination of these items.  I think that whether or not what you're describing, what plaintiff is describing, is a viable claim in a trade secret case, or even in this case going forward.  It is not adequately identified in the disclosure, so I'm going to strike that language for that purpose.  This is where we are in the case today.  It has not been adequately described.  Defendant is entitled because of my order to a better description than something that just says kind of any combination of these things, so I'm going to grant that in that regard, okay?

MR. GUNNEMANN:  Sure.  Judge, could I -- could I just point out the --

THE COURT:  Yes.

MR. GUNNEMANN:  -- the one thing that trade secret ID does that's different than the listing of the 1600 files that we've given is it takes each of these listings of code, and it organizes them --

THE COURT:  I understand.  Into what they do?

MR. GUNNEMANN:  Yeah.

THE COURT:  Right.

MR. GUNNEMANN:  Right, okay.

THE COURT:  But what my point, though, in reading from that is to say you were on notice that it's not okay just to say any combination of these.  And, you know, that's almost exactly what you've done other than using compilation instead of combination.  I mean, you just kind of changed the word.

MR. CHALLY:  We understand where you're going.

THE COURT:  Okay.

MR. CHALLY:  We don't want to belabor the point.  All I will say is we're not claiming that a combination of these things is what makes it confidential and competitively sensitive.

THE COURT:  I understand.

MR. CHALLY:  We're saying that the things listed here are, in fact, confidential and competitively sensitive.

THE COURT:  Yes.  And the source code is what you've listed there.

MR. CHALLY:  Correct.

THE COURT:  And by any stretch of the imagination, the source code is in the case.  There's no world where it's not, right?

MR. LANDES:  The source code is in the case, yes.

THE COURT:  Yeah, okay.  All right.  Let's talk about the other.  I'm not sure what to do with the other.  It doesn't seem that expansive.

MR. LANDES:  So, Your Honor, if I can make one --

THE COURT:  Yes.

MR. LANDES:  -- maybe clarifying note?

THE COURT:  Yeah.

MR. LANDES:  And I don't know what you meant by expansive there.  But I just want to clarify that the bullets here with file names, those are not -- that's not the source code itself.  It's a link to a spreadsheet that is a list of files, so some of these individual bullets contain dozens or hundreds of files within them.

MR. GUNNEMANN:  So, Judge, what we were trying to accomplish on that trade secret identification here, what we had done in the big paragraphs above the other paragraph, if you think of these as large maybe Venn diagrams is the word -- the wrong word, but there were -- there were kind of large

groups of functionality that we put together.  There was, right, the notification system, user management.

We looked at some of the others, company management, et cetera.  But then -- then we have some smaller ones, some smaller functionalities that don't -- that didn't lend themselves to as big a grouping, so rather than create another 12, you know, however many paragraphs are under other subparagraphs, we just put them under -- on other subparagraph.  But they're still organized by functionality, and they still list specific code that is claimed to be trade secret, and that is the product of our analysis together with our experts to make sure it's confidential and commercially valuable, and so it still fits the definition, and it fits within the claim.

It's not a catch-all category, like the defendants have said, by any means.  It's simply a way that we have tried to put some organization and structure in the trade secret ID to assist experts on both sides what their identification of what the trade secrets are, how they're listed, and how they're organized in our system so that someone skilled in the art can understand it and do an expert report.

THE COURT:  Right.  So why is this section, to the extent it describes source code, why is this not acceptable?

MR. LANDES:  So we're -- we're again back to the -- Your Honor's order from May 15th.  And I apologize, I don't

56

have the docket cite in front of me -- May 19th. The descriptions that we have in other are effectively the same level of generalization that Your Honor had before you before.

If you remember, there was a description before, like the way the website functions in order to make it optimal for a user. And what we have now -- and it would list a whole bunch of source code. And what we have now is essentially the same thing. I mean, I won't read this into the record because it's designated highly confidential source code.

But if we look at page 27 of the second amended supplemental trade secret identification, user settings, I mean, look -- what are we -- what is our expert supposed to do with that description? And we -- we have an unrebutted expert declaration that, no, this doesn't make sense. And this is the -- the same thing that you see everywhere, right?

THE COURT: Yeah.

MR. LANDES: So if we were -- if we were to look at that one user setting, and the other ones are similar even if they might have more jargon in them, what we would expect to see is here are the settings that are the trade secrets, or if there's something about the way that the settings are organized or implemented, you have to say what it is. You can't just say user settings and then point to a whole bunch of code because that doesn't tell us what the trade secret is, especially, you know, if we're -- in this world where we

57

have -- we have an admission from a 30(b)(6) witness that says, yeah, the other category is -- it is a catch-all. It's just -- it's all the code that wasn't included anywhere else.

THE COURT: I know. Y'all just did not really -- I think you -- the plaintiff might have spent two sentences on this.

MR. LANDES: I don't -- I don't think it's something rebutted at all.

THE COURT: The defendant put very little on there. There isn't -- I think the expert is unrebutted saying he doesn't know what it means; is that right?

MR. LANDES: Yes.

THE COURT: Okay.

MR. CHALLY: Your Honor, it's the source code. I mean, look, we think -- we were intending to use this trade secret identification to, even in the other category, cover features and functions that are not apparent or embedded in the source code itself. You have already indicated what you're going to do with that.

But as to the source code components, it's listed, so their expert need do nothing more than look at what is linked in this document to determine what it is we're claiming in these various categories to be a source code trade secret.

MR. LANDES: So, now, Your Honor, we are back to January 11th. We are absolutely back to January 11th. Just

58

had a list of all the source code, and they said, who cares what it does?  The source code is the trade secret.  We'll tell you what the trade secret is once we look at yours and see if we can find any matches.

If they wanted to -- and this, again, is the -- this is what we fought about at the beginning of this year.  It's what Your Honor put in your May 19th order.  It's what was memorialized very specifically in 141.  You have to describe with particularity to separate it from any other code in the whole world that does files or user settings.

THE COURT:  Are you saying that their reference that you -- they need to go beyond the spreadsheet and identify the code that is referenced in the Excel spreadsheet?

MR. LANDES:  No, because the -- the Excel spreadsheet is a reference tool.

THE COURT:  Okay.

MR. LANDES:  To take -- so, again -- so, again, I'll also --

THE COURT:  So for user settings.

MR. LANDES:  Yeah.  Can we just agree that we can read those three words into the open record?

THE COURT:  Controls user settings?

MR. LANDES:  Okay.  I guess you -- you broke the seal.

THE COURT:  Well, look, so how is that not a

reference to very specific -- or to source code that is just as good as it was for when they broke out the source code by other topic?

MR. LANDES:  Because I don't know what user setting, which user settings they're claiming are the trade secret, right?  There are any number of settings in this code that could be a trade secret or any group of them or any individual one.  And when our expert looks at that -- this is again going back to what is the code that makes the website easy to use.  Well, what user settings are they talking about?

THE COURT:  I think all of them.

MR. GUNNEMANN:  Your Honor, if -- if we were back in the features and functions claim, maybe this would be a good complaint because he's talking about the output of the system.

THE COURT:  Yeah, that's what it seems like to me what you're looking at is the code identifier.

MR. LANDES:  If what we're saying is that we had to steal these actual individual files, right, then that's one thing.

THE COURT:  That is what they're saying.

MR. LANDES:  Well, no, because it's getting a lot fuzzier now.

THE COURT:  No, not to my mind.

MR. GUNNEMANN:  Or ours, Your Honor.

THE COURT:  Not to my mind.

MR. LANDES:  So, again, I don't -- again, I don't know what this -- and this is, again, what our experts spelled out.  I don't know what the trade secret user setting is.  They would have to say that.  That's what 141 says.  You have to say what the trade secret is.

THE COURT:  Okay.

MR. LANDES:  So if the user setting is -- you know, the user setting is that people from --

THE COURT:  All right.  Well, let's go -- let's go to the next one.  You see the description of the other server down there?

MR. LANDES:  Yes.

THE COURT:  Why is that not adequate when you combine that with the data, with the code identified after?

MR. LANDES:  Give me one moment to read it, Your Honor.  Yeah, so this -- that paragraph is describing for functionality.  It doesn't describe what is the trade secret element that achieves that.

THE COURT:  It's the code below that.  It's the code.

MR. LANDES:  Is it all of it?  Is it one piece of it?

THE COURT:  Yes.  Right now they're saying all of it.  Because, again, I feel like you're trying to get -- you're trying to now go into they've got to break open the code and identify the portions of the code.

MR. LANDES:  It's not --

THE COURT:  And that may be later what they have to do, but right here they're -- they're merely alleging what they claim to be the trade secrets.

MR. LANDES:  It's not necessarily the portion but the thing that's the trade secret, the actual recipe for code.

THE COURT:  Okay.  I think this is enough.  Taking out any slip in the functionality, and given the way that it's been presented right now, I'm not going to strike the other section.

If there's something that you don't understand about what it is, for example, the user code, that is fairly generic, and you could ask them to provide you more information about that, and they ought to do it because you want to be honing things.  But I'm not going to try to now on this one break open the code and identity -- tie the code back to functionality or what it does, which is what you're fighting against on the front end.

MR. LANDES:  So I -- I hear you, Your Honor, but I think the issue is more widespread than it may seem.  So, for instance, our expert declaration spoke about reducers.

THE COURT:  Understand.

MR. LANDES:  Where the -- the language that they had is close to a quotation.  It's slightly paraphrased from if you just go and look on the open source project for reducers, this is what it describes reducers do.  This is -- this is --

any reducer in the world does what these three lines say, and so if there's something different in that code that they think is trade secret, they have to tell us what it is.

THE COURT:  Yeah.  I --

MR. LANDES:  And that's not in here.

THE COURT:  Okay.

MR. LANDES:  Right, so any code, right, has, you know, controls user settings, right, so any code in the world has user settings, and it controls them.  I don't -- and they say, well, here's our code, and we say --

THE COURT:  You can -- you can ask them for more clarity on that.

MR. LANDES:  But, I mean --

THE COURT:  If you think there's things that need clarity, you ask them.  I'm not going to strike it wholesale. I'm not going to do that.  And we're going to talk now about what the next step in this is, and it's going to get you more clarity than we have now.  I'm not going to let this case end with it -- just lists.  There's going to be more to it, okay? And I want to think about how to get to that, more to it, because I feel like what we've accomplished today is the clarity of thought that this is about stolen source code on these topics and how we go about identifying it.

And what you're talking about now is that, how we go about identifying in the world of what they've said is

protected what they now claim that you've used.  And that's what I want to get to next, okay?

MR. LANDES:  And so, Your Honor, I just -- if I could just put one thing here.

THE COURT:  Yes.

MR. LANDES:  I -- I respectfully don't want to go back and get a fourth, seventh, eighth amended trade secret identification.

THE COURT:  Okay.

MR. LANDES:  So what I would ask is hold them to this.  Hold them to --

THE COURT:  Oh, I will.

MR. LANDES:  Yeah.

THE COURT:  I will.

MR. LANDES:  This is it.  Controls user settings.

THE COURT:  Yeah, I --

MR. LANDES:  And they can't -- they can't come back in a month --

THE COURT:  Yeah.

MR. LANDES:  -- or in two months or six months and say, well, gee, with the benefit of hindsight, we sure wish we'd put another sentence in that trade secret ID, and now we're going to put it in our summary judgment opposition. That's where you'll see the real description --

THE COURT:  Okay.

MR. LANDES:  -- of what these -- so hold them to this.

THE COURT:  I think that is fair, and you've hit on something that is exactly in some communications we've had in my chambers, which is this, is that we will hold the plaintiff to this description of summary judgment if this is what you're traveling under.  And you could flesh out your positions and arguments at that stage, but it's not going to be a slippage for something more.  That -- I think that's fair.

So I appreciate you reminding me, but that -- I just read to you exactly what was one of our bullet points for the way this might go, okay?

MR. LANDES:  Sorry for interrupting you, Your Honor.

THE COURT:  No, I'm glad you did because I was ready to move on without mentioning that, and I think that is fair.  It is -- it is somewhat inconsistent with my -- I mean, it's somewhat more vague, particularly this one that we've been talking about, and you're going to be limited to that.  You're not going to be able to come in there and say it's really this very precise thing because you haven't done it now, and there's not going to be any aha later, okay?  All right.

The next thing to talk about is how we get to the next step.  And, Mr. Caplan, I think you have to go.

MR. CAPLAN:  Your Honor, I was able to get -- my class will begin at 6:15 now, so we're good.

THE COURT:  What?  I hate that for you.

MR. CAPLAN:  No.  No.

THE COURT:  I hate that for all those students.

MR. CAPLAN:  Well, I'll probably -- I'll probably -- it's an introductory day anyways.

THE COURT:  All right.

MR. CAPLAN:  So they'll be appreciative of letting out early.

THE COURT:  Leave my name out of it.

MR. CAPLAN:  I promise I will.

THE COURT:  Okay.  So the next thing I want to talk about is how do we end all of this, how do we get to where you-all have got really a pointed dispute about what occurred.

I have read the motion for production at the -- trying to get more of the defendant source code.  Is that what you-all are ready to talk about now?

MR. CHALLY:  Yes, sir.

THE COURT:  All right.  Page 2 of the defendants' filing, 215, says, "Nothing" -- at the bottom -- "Nothing about the way Relay has produced its source code prevents RoadSync from undertaking the straightforward task of source code comparison."  What they say is that -- what the defendants says is that they have produced all of the code that corresponds to the code that has been identified.  Is that essentially right?

66

MR. LANDES:  Yes, Your Honor.

THE COURT:  Why is that not true?

MR. CHALLY:  Primarily, Your Honor, because if you look at what they've produced, they have not only extracted certain code, they have in some mechanism that we don't know determined whether things, files and folders that are referenced in those components.  Some of them they included; some of them they excluded.

And our expert, to understand how that code works, needs all of the materials that are referenced in what it is they did produce.  We understood that's what they were doing.  But then after writing a -- because of the way they went about producing this material, our expert went about writing a script, effectively a program to evaluate the code.  Had they produced the code in the way the code is typically produced in a case like this, we would not have had to do that.

They produced it in a different way, requiring our expert to basically run a program against that code to determine where there are missing pieces, where there are references in the code that are not separately produced.  And there are hundreds of them.

Even if you exclude parking and the mocks, which is all they referenced in their filing from Friday, there are almost 300 of them, 300 references that they've excluded.  Don't know how they excluded them, don't know why they

excluded them.  I know based on the names of some of those files, they've looked pretty plain, to be irrelevant to the issues that are in dispute in this case, but they're not there, and our expert needs those.

Now, I certainly think that the method of production has complicated the ability of our experts to do this review, and I think that's why we asked you to order that they produce what we refer to as the Git repositories, which is the way that source code is typically produced in a case like this. That's the easiest fix to this.  But even short of that, if you just hold them to what they told us they were doing, there are hundreds of files referencing what they've produced that they've never given us.

THE COURT:  But isn't your request for everything?

MR. CHALLY:  No, sir, it's not.  I don't --

THE COURT:  Don't you want the entire repository?

MR. CHALLY:  I do want the repository.

THE COURT:  Front end, back end, and middle?

MR. CHALLY:  Because those are the components of the code that they say includes the functionality that the code we produced and identified in our trade secret identified -- identification references.

THE COURT:  And but why is that not everything?  Why is that not all of their source code?

MR. CHALLY:  Well, it's --

THE COURT:  For Relay.  You want all of the Relay source code?

MR. CHALLY:  If they have stuff that's in another repository that isn't -- that isn't requested, that isn't -- that isn't in any way relevant to the functionality that exists in our -- the source code that we produced, leave it to the side.

This is -- this is the method they decided, they advocated for, they've insisted on.  We want to see your trade secret identification, understand what functionality you're contemplating, and then we're going to go in our code, and we're going to determine what pieces of our code relates to that functionality, and then we're going to give it to you.

And those -- that code exists in repositories, and those repositories are the way the code should be produced.  It streamlines the review.  You're able to determine the -- the evolution of the code so as to best present expert testimony as to how the code is, in fact, a copy, and they decided to do it different.  So we do want those repositories.  It calls for those repositories because they've decided those are the repositories that relates to the functions that's covered in our trade secret ID.

MR. LANDES:  So a few points.  So the first point I want to make is we never agreed to produce --

THE COURT:  I don't care about that.

MR. LANDES:  Yeah.

THE COURT:  I'm not trying to -- I am well past the point in this case in which I'm trying to get y'all to agree.

MR. LANDES:  Right.

THE COURT:  I want to know whether or not you're entitled to keep things or whether they're entitled to compel things.

MR. LANDES:  To say you should be required to produce everything in the repository because that's where the relevant functionality --

THE COURT:  Yeah, but let's ignore that because I do think that's too broad.

MR. LANDES:  Okay.

THE COURT:  The question is:  Are there 300 gaps --

MR. LANDES:  Oh.

THE COURT:  -- that their expert has identified that can't be explained?

MR. LANDES:  Yeah, so let me get to the point.  This is the point about --

THE COURT:  Is maybe a way to resolve this to allow plaintiff to take a deposition as to what's been left out?

MR. LANDES:  Well, wait, Your Honor.  Wait, Your Honor.  Wait, Your Honor.  Can I respond to that first, please?

THE COURT:  Well, I'm just trying to advance this.

MR. LANDES:  I absolutely want to respond to that, Your Honor.

THE COURT:  Okay.

MR. LANDES:  We made our code available in June, in June.

THE COURT:  I understand.

MR. LANDES:  They deposed Ryan Droege for 14 hours, did not ask him a single question about source code.  They deposed our 30(b)(6) witness on source code, and the chief technology officer, it would be like for seven hours, and when they had the source code available to him did not ask him these questions.

THE COURT:  So who would you depose?

MR. CHALLY:  I don't believe if -- if --

THE COURT:  No, who would you depose?

MR. CHALLY:  Whoever --

THE COURT:  If I said what about having a deposition to see if you need it, and you said, yes, who would you depose?

MR. CHALLY:  Whoever looked at our trade secret ID and determined what functions that were recovered by our trade secret ID, and then looked at their code and said I'm going to give you this.

THE COURT:  Who -- who is that?

MR. LANDES:  It was counsel, Your Honor.  And I'll

tell you, Your Honor, this is -- he says he wants to take a deposition; tell me about all the stuff you didn't produce.

THE COURT:  Well, no, it's not that.  He's got an expert that says there's 300 holes --

MR. LANDES:  Well, I --

THE COURT:  Here's how I could decide this.

MR. LANDES:  Yeah.

THE COURT:  Here's how I could decide this -- here's how I think it is decided, I think that the defendant has made the point that this is way too broad, that if you get what you're wanting to get, you're going to get all of this parking; is that right?  Is that what you asked for?  Motion to compel would inquire parking, right?

MR. CHALLY:  We had -- to be clear, we identified in the code that was produced a series of files that were referenced in that code but not produced.  And, yes, some of those appear to relate to --

THE COURT:  Okay.

MR. CHALLY:  -- parking.  I don't know exactly what function that is, but they -- they have a descriptor of parking.

THE COURT:  Okay.  And that has no relevance, it seems, to this case.

MR. CHALLY:  Well, I don't know because I don't know what's there.  But I don't believe that -- that there are

72

components of our code that facilitate the identification of parking or, you know, it competes with LAZ parking, who we now pay when we park in the courthouse down here.

MR. LANDES:  So, Your Honor, here's -- here's the issue.  The issue is -- and I could speak to why references are not automatically relevant.  I think parking is an absolutely perfect example.  Parking is referenced in our parking code because there's a button that says parking, and so it references all the parking code.  And that's the case for everything else we've excluded, but what we're essentially hearing the plaintiff say --

THE COURT:  So your -- your client --

MR. LANDES:  Um-hmm.

THE COURT:  -- has some functionality of Relay --

MR. LANDES:  Um-hmm.

THE COURT:  -- that has -- that has to do with parking?

MR. LANDES:  Yes.

THE COURT:  Does the plaintiff's program that was allegedly stolen have anything to do with parking?

MR. LANDES:  No.

THE COURT:  No?

MR. CHALLY:  It doesn't.

THE COURT:  Okay.  So to the extent your motion to compel would require them to produce code that has to do with

parking functionality, it's overbroad, isn't it?

MR. CHALLY:  Well, again, I don't know what's there.  The problem is --

THE COURT:  Well, but that's what he's saying.  He's saying this stuff -- if we had to give you everything, one of the things we held back was parking, and this is why.

MR. CHALLY:  Not at -- so I want to be very clear, Your Honor.  We're not asking for everything.  We're beyond that.  The everything is the Git repositories, okay?  What we're asking for -- put aside the Git repositories because you've concluded that that's too far, understood.  We think that's the simplest way to address this issue, but we understood where you're going.

They have went through the system.  Again, somebody on the counsel team went through and said these are the components of the system that relates to what you're saying your system does.  And in that system, there are references to what is described as parking.  I don't know what that does, but for our expert to understand how the code works needs to see -- he needs to see what is in the code and what is referenced in that code.

THE COURT:  Why does he need to see that if it has nothing to do with the code that your client had?

MR. CHALLY:  And we are assuming that it has nothing to do --

THE COURT:  But you're assuming -- so there's an assumption there that when you're told things that have -- that these things that we've not included that say parking have to do with this functionality, you want to test to see whether that's true?

MR. CHALLY:  Because -- yeah, because I have reason to believe that it is not so distinct.  If it were so distinct, it wouldn't be referenced in the code that they did produce.  And I would add there are other components of what they've produced that does relate to parking, so I have no idea how they went through and tried to determine what was related or --

THE COURT:  Yeah, my point in focusing on parking is I have warned you-all for a long time that I'm not here to split babies, that my way of trying to encourage everybody to be reasonable is to decide the dispute that's brought to me as to who is likely to win that dispute.  And it would be hard-pressed for me to grant a motion to compel where the defendant makes such an obvious defense that this would all be parking, and parking is not part of this case.

Whatever the parking -- I mean, is it -- are we really talking about a way they can access things that can tell them where to park?

MR. LANDES:  We have the expert here.

MR. DROEGE:  Where to park, reserve parking, and pay

75

for parking, yes, Your Honor.

THE COURT:  Is this like for -- for trucks or for what?

MR. DROEGE:  Correct, for 18-wheelers, large scale Class A trucks.

THE COURT:  So they get someplace, and they don't know where to park, and they're not familiar with the area, and they can access software that somehow tells them where to park?

MR. DROEGE:  That is correct, Your Honor.

THE COURT:  Okay.  And that's not in the case.  It's not part of your software, so why is it part of -- would you talk to the young lady behind you.  She is about to have a coronary.

MS. KOLB:  I know --

THE COURT:  But she needs to talk to you.  I don't want to hear it.  You just talk to her because she believes very vehemently that I'm being told something wrong.

(Counsel are conferring.)

MR. CHALLY:  Your Honor, I think we -- we used this analogy in our brief, recipes and the ingredients.

THE COURT:  Yeah.

MR. CHALLY:  Right.  So the way our expert would describe it is that for the expert to do his work, he needs to understand not only the ingredients but the way in which those

things are put together.  And to do that, you need to understand the different pieces that are comprised within the code that they produced.  And when they exclude certain things, our expert is unable to determine how the whole thing works together.  It's just that simple.

THE COURT:  Well, maybe a better expert could.  I don't know.  I don't know.

MR. CHALLY:  Well, but it -- but it's the job of the expert.  The job of the expert is to, as you're indicating by narrowing us to the source code, absent a motion for -- a granted motion leave -- for leave to amend, you're requiring our expert to understand the code and find code specific references to how it is they copied what it is that we did.  And to do so, he needs to be able to understand the code that they've produced.  Understanding the code that they've produced requires that we identify all of that, which is in reference in what they produced.

And, Your Honor, if we can, I mean, we for sure filed a motion to compel that said you should compel them to produce the Git repositories that we referenced, but we said in addition, even if you hold them to what -- well, in addition, we should be entitled to all of the code components in what they've produced -- excuse me, referenced in what they've produced but not included in their production.  That's what we're after.

MR. LANDES:  Your Honor, if I could just briefly say one thing?

THE COURT:  Sure.

MR. LANDES:  I think the references point is an over -- it's -- I think it's obscuring that the request is still overbroad and seeking irrelevant material.  Even if we're talking about the references, you're still sweeping in the parking code.  This is one system.  And so just like the example that we used in our briefing and declaration was, you know, the ESPN website, and even if the case is only about Fantasy Football, that doesn't mean that you can also bring in, you know, Hockeybox statistics just because it's all referenced within the same system.

And so the request for, well, because everything that is referenced anywhere, it gets you back to almost exactly the same place because the code references itself, right?  And if because the parking system uses the same payment system that we've already produced, and it uses the same front end that we've already produced.  But the back end, the logic of the parking code, there's no trade secret that they need that code to understand.  I -- it's not in the briefing.  I haven't even heard it today.  And if we were to go --

THE COURT:  Well, they say that you can't -- they can't figure out how the other works unless they have that too.

MR. LANDES:  And I -- well, when we talk about --

THE COURT:  I don't know whether that's right or not.

MR. LANDES:  When we talk about the how it works, Your Honor, that's what you excluded 15 minutes ago.

THE COURT:  No, no, because what they're saying is it might -- maybe there's some part of the code that they're entitled to that depends on some part of the how.

MR. LANDES:  So that's a different argument, Your Honor.  That's the argument of, well, we don't know that it really isn't responsive unless you give us a lot more detail about what you didn't produce.

MR. CHALLY:  Your Honor, it's this --

MR. LANDES:  And that's -- again, that's the issue that Your Honor has spoken to several times.  You don't get discovery on stuff that isn't responsive.

THE COURT:  Yeah.  Let -- let me read.  The request was source code for the Relay Payment products and services, including PaySite application.  Has that been given?

MR. CHALLY:  Portions of it.

MR. LANDES:  Yes, portions that tie to the source code.  Or I'm sorry, that tie to the alleged trade secrets.

THE COURT:  That they've identified?

MR. LANDES:  Correct.

THE COURT:  Payment functionality?

MR. CHALLY:  Again, only portions, not all.

THE COURT:  Relay codes and fleet check process and functionality.

MR. CHALLY:  Portions.

THE COURT:  There's request there for anything having to do with parking.  And it is not fair -- it is not fair to say to a defendant that you've dragged into court that even though we don't claim any violation in regards to, for example, parking, that you have to give it to us, your source code, so that we can test the extent of our knowledge.

MR. CHALLY:  Can I give you an analogy?

THE COURT:  And I look at what your expert says, and your expert's specificity is not sufficient that I can say that that is necessary to do.  He has a lot of generality.

I don't -- I would love for somebody to tell me the most efficient way to do this.  I don't -- I cannot.  I've got -- I've got experts saying things.  I've got the two of you saying things.  You -- the plaintiff admits the parking functionality and the parking code is not relevant except if you have to know how it works with the other stuff.  Well, that's a great kind of strong argument to get something you're not entitled to.  I don't know.

But I would be hard-pressed to make them give up something that they know that we all agree is their trade secret in order to defend a claim because it might be helpful to our expert analyzing this without something a whole lot

80

more.

MR. CHALLY:  Your Honor, if I can?

THE COURT:  So tell me how can we all get into the weeds of this?  I'm open to depositions.  I'm open to a hearing here in court.  I'm open to whatever you want to try to resolve this because this seems to me to be -- it is an important next step at the end of this case that's going to lead to what I'm going to require to be the final step is for the defendant to take a step back and say right now what are the trade -- the plaintiff to take a step back and say right now what are -- having done the analysis we want to do, where is the alleged theft, and where does it manifest?

But I'm going to require that to be done before we end this, and this seems like maybe the last step to that process.  You've given them everything.  They've given you, they say, enough, and you've disclosed everything.  They say they've given you everything you need, how do we test that?  What's the best way?

MR. CHALLY:  I would love -- I would love -- I thought -- when we were here the last time I was in your courtroom, I thought that I was going to have an opportunity to depose an expert who made the determination as to what to include or exclude in what they produced.

THE COURT:  But counsel did it.

MR. CHALLY:  Counsel did it.  And I think that's a

great way to fix it. I think if you have questions as to the accuracy of our expert's statements as to the necessity of viewing these other referenced components, we'll bring them. You're -- you're welcome to -- we're welcome to have a hearing where those experts can testify and can describe to you in greater detail than they did in their affidavits exactly -- or declarations of why they need this information and why it's important.

And part of the reason I say that is -- this was the analogy I was trying to get to. Like any document that's ever been produced in any case, you can determine by that document. Let's say it's a PowerPoint presentation. Maybe only one page relates to what's going on in the case, but to be able to understand how that document is relevant, you have to see the entirety of the document. It's the same thing.

THE COURT: Yeah, but so the question, though, is going to be how is the defendant going to explain? Is counsel going to testify?

MR. CHALLY: Well, like I said, we're happy to have our experts testify and describe why it is they need what they need. If they want to -- if they --

THE COURT: But they're shooting in the dark. I mean, maybe -- maybe it's --

MR. CHALLY: I agree.

THE COURT: The part that I found uncompelling about

82

what I've had so far from you-all is that I don't find it specific enough.

MR. LANDES:  So, Your Honor, if I could respond briefly?

THE COURT:  As long as it is about a plan to move forward.

MR. LANDES:  Yeah, I have a perfect plan to move forward.  Your Honor has a motion that was presented to you. You should deny it.  You should deny it.  They have twice asked Your Honor to order the production of a broad range of code without --

THE COURT:  I'm not going to do that.  So you think I should just deny it as is and let them move for something more specific?

MR. LANDES:  Yes.  Yes.  And if that -- that motion, I think, would be untimely and improper, but, yes, I think -- you have been presented with a motion, and I think that motion asks for something that has already been denied twice and is not supported, and so I think it should be denied.

And if they want to reopen fact discovery to redepose the same people and try to get evidence about what is this parking module, let them move and satisfy their burden to get another seven hours after Mr. Droege has already been deposed three times in this case without a single question about source code.  Let them move and carry their burden for more

discovery to support this motion.  That's -- that's what I think, Your Honor.

Yeah, we -- again, the meet and confer record in this case going back to June was if you think there is something missing --

THE COURT:  I understand.

MR. LANDES:  -- something that you need, tell us what it is.

MR. CHALLY:  And we did that, Your Honor.  But the way that they've produced it required our experts to write a program to analyze it.

MR. LANDES:  The --

MR. CHALLY:  And that -- and that, if I may, that took us until the day we had to file a motion to compel to complete it.  That's how difficult that process was.  And through that process, our expert identified hundreds of files, even -- even removing what's parking and mocks, so 300 files that have not been included.

MR. LANDES:  So, Your Honor, I would ask Mr. Chally when that process started.

THE COURT:  So let me offer some other possibilities. I am troubled by the generality and the over-inclusiveness of the motion that's been filed.  Did not find the expert's affidavit compelling because he just says, in my own experience, sometimes you need this for that, and I can't tell

what the finished dish would be unless I have everything.  But that's really -- you know, I would think an expert with the amount of stuff he has could fill in those gaps.  None of this has gone smoothly going back a long time.  I'm not going to rush it now.

If I deny this motion, I'm likely to allow the plaintiff to file a much more focused one in part because I do find the expert's discussion of the difficulty he's had and what he's had to do to do the analysis to be a basis for the timing at least.

I'm thinking of a couple of different options.  I'm thinking of allowing the plaintiff to renew with identification of, he says, 300.  I bet it's less than 300.  I'm willing to allow -- I'm thinking about allowing the plaintiff to pick 15 and require production of 15 to the expert to test this allegation that he needs these missing pieces to do his analysis.

And the only reason I say this because this is not a question of what is the scope of the claim, or what does the law permit, or what have been the other orders.  I'm not -- I'm not going to require you to produce everything, the defendant.  I already said that.

I think it's hard-pressed to, for example, the parking stuff.  But I've got the plaintiff saying we can't do the analysis that we want to do on source code, the heart of

this case, until we get more code.  And I've got the defendant saying, no, you can do all of the analysis you need to do.

I guess we could have a hearing, and I could decide which expert is more believable.  Maybe that's the best way to do it.  I'll give you those options:  A hearing where the two experts can testify and, I guess, the defendants' expert will have to explain why certain things were omitted.

MR. LANDES:  So to be clear, our -- our expert, Mr. Fenn, he has access to exactly the same code that they --

THE COURT:  And he can say he says he could do it?

MR. LANDES:  Yeah.  And so if he does not have the knowledge to sit in a chair and say here's what's excluded because he's being given access to exactly the same --

THE COURT:  Maybe that's the way to resolve it.

MR. LANDES:  That's the case that's in his declaration.

THE COURT:  I know, but one guy says one thing, one guy says the other.  How do I decide it?

MR. LANDES:  It says -- it says -- I'm sorry, on which issue?

THE COURT:  On whether or not enough information has been presented to do the analysis.

MR. LANDES:  So I think part of the disconnect is what the plaintiff is describing as the analysis because throughout the brief and throughout the -- both expert

declarations is I can't understand the functionality.  I can't see what's working as opposed to what the source code is.

THE COURT:  Yeah, but I think what he's saying -- well, I think what he's saying now is that there could be source code that is required to run this that is in the missing files, right?  I think that's what he's saying.

MR. CHALLY:  Exactly.

THE COURT:  I'm not moving the functionality.  You could -- I don't know how to say that any clearer.

MR. LANDES:  I get it, but I'm saying it has ripple effects.

THE COURT:  But they're -- no, it doesn't because what they're saying this is merely where they can hunt for use of source code.  And you have made a decision to slice it in a certain way that they say they can't accept that.

MR. LANDES:  I get that, Your Honor.

THE COURT:  So I just have to decide that issue.  So why don't we set a hearing for that.  And we'll have their expert come in, and I'll listen to whether their expert is speaking specifically.  I mean, has the plaintiff's expert looked at it and said, I've tried to see if the source code that I've got can do these things or whether there is missing code for it?  I guess.  I don't know.

MR. LANDES:  Here's -- here's the issue, Your Honor.

THE COURT:  Well, I would love it.  I mean, this

is -- this is the problem in this case.  Both of you have a position of 100 percent victory.

MR. GUNNEMANN:  So what I -- what we want to do at the end of the day, right, is the analysis that we came in here to discuss, which is we've identified source code in a trade secret identification, and we'd like to look at their source code and see whether our expert can do an analysis to compare the two and say here's the evidence we have of misappropriation, and that's relevant evidence that should be presented to an ultimate trier of fact.  And our expert has said, just as you've identified, that we don't have the information necessary to do that analysis.

So, Your Honor, if -- I think you have many choices of how to proceed, but I think the most efficient one is the hearing that you've described because I think you will be convinced by our expert at that hearing.  And if we can't convince you, we can't convince you, so.  But that's a very fair way of proceeding.  And, Your Honor, we, at the end of the day, just need the evidence.  And if that's the path we need to go to get it, we will absolutely go that path.

MR. LANDES:  So can I just respond briefly, Your Honor?  So what we're presented with in this motion is two options, right?  Option 1 is everything.  Your Honor said, no, and Option 2 is everything that's referenced.  And we know that everything --

THE COURT:  Everything is what?

MR. LANDES:  Referenced.  Everything that's referenced in the code that you produced.  And we know that that's overbroad too because it captures parking, among many, many, many, many other irrelevant things, all right?  And I hear what Your Honor is saying is, well, how about something -- something less than -- certainly less than everything and less than whatever method you're using to -- that encompasses parking also.

If it's something less than that, if it's something less than that, right, something that they think is absolutely necessary that doesn't -- you know, the way you define it isn't so broad that it necessarily includes parking, tell us what that is so we can evaluate it.  But I don't think it's fair --

THE COURT:  Have they not told you the 300 files?

MR. LANDES:  The 300 files includes parking.

THE COURT:  I know.  But have they given you all 300?

MR. CHALLY:  No, the parking does not.  No, that's wrong.

MR. LANDES:  I'm sorry.

MR. CHALLY:  It's 288 files excluding mocks and parking.

MR. LANDES:  Okay.  That's new.  That's not in the motion.

MR. CHALLY:  Well --

MS. KOLB:  It's in the list you've got.

THE COURT:  Y'all --

MR. LANDES:  The list --

THE COURT:  I don't care about pegging people to misstatements and things of that nature.  I'm trying to get to where we're going.

MR. LANDES:  I just -- again, if there's a new request being made today that does not include parking and does not include mocks -- and one second.  Let me just go to this list.  So the list that we're looking at is 213-1, and then if you go to 213-1, page 23, you can see all of the parking code there.  That's not all of it.  It's in other places also, but you can see 213-1.

THE COURT:  They're telling me now that the 288 are not that.

MR. LANDES:  No.  You see?  Is it what --

THE COURT:  Parking is not in the 288.

MR. CHALLY:  We don't know how you determined that which is parking related, but --

MR. LANDES:  If the stuff that says parking --

MR. CHALLY:  If you'd let me finish.  If you would just take out from that list, which you say is parking related, and tell -- tell me how you decided this other stuff was not to be included.

MR. LANDES:  So -- okay.  So here's where we are, Your Honor, so the list that you have in front of you, is this the 288?

MR. CHALLY:  No.

MR. LANDES:  Is it 213-1?  What -- what is 288?  I don't know what that is.

MR. CHALLY:  400 -- two -- there's 411 missing modules.  That's --

THE COURT:  Which document are y'all looking at, 213-1, 213-1?

MR. LANDES:  So if 213-1 is what we're talking about -- I don't know how many are on here?

MR. CHALLY:  Four hundred and eleven.

MR. LANDES:  Okay.  And you're saying if you get rid of parking and mocks, it's 288?

MR. CHALLY:  Yes.

MR. LANDES:  Okay.  So now we have a new list.

THE COURT:  I understand.  I understand.

MR. LANDES:  A new request today.  And I will tell you that in those 288, we picked parking as an example, we can pick another one.  We can pick 50 more, right?  We can pick -- I'll give you another example, Your Honor.  There is a system that we have --

THE COURT:  Well, let's not do this right now.

MR. LANDES:  Yeah.

91

THE COURT:  Let's not -- let me -- let me look.  Let me look at something.  I'm going to -- I'm going to require the plaintiff to identify on this list the 288 that are now at issue.  That means excluding mocks and excluding parking.  Are there other big matters here that you think ought not to be included for the defense?

MR. LANDES:  Yes, Your Honor.

THE COURT:  What are they?

MR. LANDES:  So here's the issue, Your Honor.

THE COURT:  No, no, no, just answer the question.

MR. LANDES:  Okay.  Engineer fire emergencies.

THE COURT:  Okay.

MR. LANDES:  That's one.

THE COURT:  Is that one -- where's that?

MR. LANDES:  Fuel.  These are -- again, I don't -- I wasn't prepared to defend them on here.

THE COURT:  I understand.  We're making the sausage.

MR. LANDES:  Right.  Can I have 15 minutes to confer with my client?  I'll come back on 288 of these.

THE COURT:  So here's -- why don't you-all spend 15 minutes and talk right now and see if you guys can hone down 288 even further, okay?

MR. CHALLY:  Sure.

THE COURT:  Because then what I'm thinking of doing is having a meet and confer that includes both of your

experts, and after that having a hearing as to what the dispute might be.  I am very hesitant to make the defendant produce things that are not related.  And in the end, the practice of law has a -- has an element to it of integrity, which means when counsel says this has been withheld for this reason, that is typically accepted unless proven to be untrue.

And so I'm not willing to allow discovery to test whether -- whether things that are withheld are withheld for the reasons they say they are, particularly, in regards to a defendant who is -- we're now asking for his code in a case that he didn't want to be a part of.  But at the same time, we are now to the end where we are talking about a comparison of code.  The plaintiff wants to do it.  The defendant agrees that the plaintiff is entitled to do it, and we just have to make sure we have the data available for that, okay?

So I'm going to give you-all 15 minutes to talk and see if you can pare down 288 into a more finite list.  We have -- Mr. Droege is here; he can help, and that might be a good use of time, okay?  I'll be back in 15 minutes.

(There was a recess taken.)

MR. GUNNEMANN:  So, Judge, I want to briefly address the comment you made as you were leaving and then tell you that we did make progress.  You said this often comes down to an integrity issue, right, where -- where you accept the --

THE COURT:  No, I said integrity is not an issue that

93

can be tested in this way.

MR. GUNNEMANN:  Right.  And I want to point out that one difficulty we realized we're having as we were sitting here talking amongst ourselves, which is this is an expert issue, right, and we need the assistance of our experts in reaching a conclusion here.

THE COURT:  Okay.

MR. GUNNEMANN:  So what, though, we discussed was a process that we need to clear with our expert, which we couldn't do during this 15 minutes' conference, but assuming it's acceptable to our experts, what we would like to do is provide a refined list.  We had started with 400, right, and we got down to 288.  Provide a refined list to the defendants of what our expert says he needs to understand the software, really truly needs to understand the software, and we'll provide some specificity with that list about why.

We'll then allow the defendants -- or the defendants will look at that and respond and say we're willing to give you these things or not and here's why.  Maybe some of them are irrelevant, and we don't think you need them.

If it's useful, and the parties think it's useful during that process, we'll get on the phone with the experts in tow and try to have a conference to work that out, a meet and confer, if we think that's useful to do.  And then at the conclusion of that, we'll either have reached an agreement or

not.

We're going to try to do all of that within the next two to three weeks, subject to the holiday and our expert's availability, which we haven't been able to check during this 15 minutes.  And at the end of that, Your Honor, we'll come to you and say we have an agreement or we'll come to you and say we don't have an agreement.

And at that point, it's we'd like some guidance from you as to how you'd like to proceed.  The one thing that we've considered, though, is that that might be an appropriate time for Your Honor if there's still a disagreement between the experts to have the experts here and talk to you.

THE COURT:  Okay.  Here's -- all of that seems fine with some modification.  Do you want to say anything about that?

MR. LANDES:  Yeah, I mean, so I -- I want to get back to the -- just the issue of having finality and knowing that it will be done.  So I agree that we should be getting a better list than this with more support.  Depending what we see next, I just want to make sure we're reserving the argument this is untimely, it's already been decided and so forth.  But we've always said if there's something specific that they need that they think is missing, tell us what it is.  And so if this is a process to get that information, then we will look at what they tell us and go from there.

THE COURT:  Okay.  So I think that is a good way to proceed with this caveat.  If you-all cannot get to an agreement, then this is what I want you to do.  I want the plaintiff to refile their motion to compel and ask for a hearing, and the defense can respond to it.

But before that is filed, I'm requiring an in-person meet and confer that includes both parties' experts and whoever, on behalf of the defendant, made the decision to withhold certain files so that that decision can be discussed so that the expert can understand why this file or that file was excluded and can ask follow-up questions as to whether it would have had any -- to determine whether there is a chance that it could have had the source code that's at issue, or in other words, how the defendant ensured that it did not have the source code at issue, okay?

MR. LANDES:  Can I speak?

THE COURT:  Yes.

MR. LANDES:  I worry a little bit about that, Your Honor.

THE COURT:  I do too because as a lawyer.  But I don't have any other way of doing it.  We've got to get to the point of -- I accept people when they say it's not -- it doesn't have the source code, but it's fair to ask how do you know that.

MR. LANDES:  Yeah, and I understand that concern.  I

96

think it's along the lines -- my concern now is along the lines of their concern that has come up at prior hearings about, you know, discovery about what wasn't produced and what isn't responsive.

And I'll tell you my practical concern is that having that avenue to be able to question, you know, essentially depose someone on our side about responsiveness calls, encourages the list that they send us to discuss to be broader because they get free discovery on the things that are not relevant.

MR. GUNNEMANN:  Well, Judge, let me -- let me say two things.  We don't -- we don't want to come back to the Court on this, right?  I mean, we would love to work this out.  It's expensive.  The in-person meet and confer that you're ordering with experts flying in is expensive, right?  We want to reach a resolution, so we're not going to be encouraged to have a longer list.

THE COURT:  I'm not worried about that.  I'm not worried about that.  But, look, what I don't want to do is have you-all talk and then think, well, what we'll do is we'll just make all the hay in front of the judge.

MR. GUNNEMANN:  No, I'll --

THE COURT:  And so I want y'all to do that ahead of time.  It is fair to say why was something excluded.  I made a reasoned, knowing decision that this was excluded because it

can't contain the code at issue because it only contains code that has to do with parking or because it is this type of file that cannot contain that.

I am not requiring the defendant to produce all of his source code. I'm not doing it. I am -- I've said it before. I've said it now. I'm not altering that. It wasn't an unthoughtful decision before. I'm not ordering it. But what I am ordering to do is vary some way so that the plaintiff can say more than just I need it. It doesn't help for me for one person to say I need it and the other person to say, no, you don't need it.

If I'm going to judge who's right, I want them to say I need it because I have had a chance to ask these questions, and I've gotten this information, and on all of this, this is why, or they don't need it because of these reasons. The witness -- when the plaintiff's expert was talking with us, there was a meet and confer, and this is what was provided, and there's no way that that could be relevant.

It's not a deposition. There's not a court reporter present. I'm not going to hear a bunch of he said, no, he said this. We're not going to have that. But I'm going to have enough that the experts can give me a reason besides just generic in a case like this or in my experience, okay? I -- we're far enough into it that we are all in the weeds together, and I think the answer will be there, okay?

So how long do you-all want to do this process?

MR. CHALLY:  We were -- as Josh was just saying, we need to check with our expert.  We hope that we would be able to do something and -- before the Thanksgiving holiday where our expert provides a narrowed list with a description of why these things are important.  I would be happy to defer to how much time they feel like they need.  I would think that roughly the amount of time that we get, so if we're saying somewhere in the neighborhood of 10 days, which we can confirm shortly after this hearing, they get the same.  If you want us to then file a motion to compel, I would say set a 10-day deadline.

THE COURT:  Why don't you-all discuss it with your experts and give me a schedule that says this is when the parties will have their list revised.  If there is a dispute, this is when they will have the meet and confer in-person by, and this is when we would like to have a hearing, okay?

MR. CHALLY:  Okay.

THE COURT:  And I want you-all -- I want you-all thinking about what the next step is after that, okay?

MR. CHALLY:  Do you want us -- we were actually not contemplating filing another motion to compel, thinking that you didn't want the docket to be more clogged in this case.

THE COURT:  I would like it to be an amendment of the current motion to compel because I think it -- I do think I

could answer the current motion to compel by just saying I'm not splitting babies, but it appears as though you have already pared it down just in coming today, so I just want to get -- I just want to move it forward, okay?

MR. CHALLY:  Understood.  Thank you.

THE COURT:  All right.  Anything else?  I think -- I think that I have addressed everything other than, I believe, the Request for Production 93 and 94 was an outstanding issue, and I believe that's obviated by my rulings on the motion to strike.

MR. CHALLY:  Yes.

THE COURT:  Okay.  Anything else that's open?

MR. LANDES:  We had discussed setting an expert schedule, and I realize it will depend to some extent on this next process, but I would like to at least have a schedule that's set even if it's keyed off of dates in this process.

THE COURT:  Then you all -- have you-all talked about what that ought to look like?

MR. LANDES:  We did.  We had -- we had discussed opening expert reports due 30 days from today if -- if there was a ruling that all the source code is produced or if there's an order that no more needs to be produced.  So whenever Your Honor orders -- issues an order on this renewed motion, we should say 30 days from that day is opening expert reports.

MR. CHALLY:  I think if we're -- just a slight amendment to that; we need 30 days from whenever the final amount of source code --

THE COURT:  Understood.

MR. CHALLY:  That's all.

THE COURT:  Okay.  What other dates do you want to put on it?

MR. LANDES:  I think we could say depending if -- depending on how that works over the -- you know, there might need to be some movement by a week here or there based on when the end of the year holiday comes into this, but roughly 30 days for rebuttal reports, and then another two to three weeks for the close of expert discovery, all expert depositions completed.

THE COURT:  And then summary judgment after that?

MR. LANDES:  Summary judgment most likely after that. Well, certainly, we will be filing some motion for summary judgment after that.  We had -- we had discussed the possibility of an early motion for summary judgment.

THE COURT:  Yeah.

MR. LANDES:  And I'll let my colleague speak to that since he had spoken with opposing counsel this morning.

MR. CAPLAN:  Yes, Your Honor.  Good afternoon.  Yeah, I think that based upon conferral that I had with plaintiff's counsel, we probably don't need judicial decision on this

issue.  I might speak about what we discussed, but if -- if we're moving this case forward and we're on a relatively quick expert schedule, it may ultimately be more efficient for the Court to resolve a single motion for summary judgment at the end of expert discovery.

But we did want to reserve the right, which I think we have under the rules to move earlier on certain issues that we don't think would require expert discovery.  And I think the understanding is if Rule 56(f) was raised successfully in response to such a motion, we wouldn't forfeit our right to then raise that same issue following the conclusion of expert discovery.

And, of course, if you ruled on the merits of a motion that we filed, then obviously we would probably not be very well advised to file again, especially under the successive motion rules.  So I think we have a general understanding of that, but, you know, I don't want to burden the Court with, you know, seriatim motions.

THE COURT:  Yeah.

MR. CAPLAN:  And so if we're moving forward towards an efficient expert discovery conclusion, then we're more likely, I think, to wait until the conclusion.

THE COURT:  I think that's the right way to go.  I mean, obviously, there's rules that allow you to do other things, but I would prefer to have one motion for summary

judgment unless it is truly a discrete legal issue that you-all agree could be handled that way.  I can't stop you from doing that, but, you know, arguments that somebody needs to complete discovery are pretty compelling --

MR. CAPLAN:  Right.

THE COURT:  -- typically.  So if there is something that's purely legal, that's one thing at this point in the case.  But, otherwise, I prefer, but, obviously, I can't require you to do them at one time.

MR. CAPLAN:  Understood.

THE COURT:  Okay?

MR. CAPLAN:  That's -- that's very helpful guidance. Thank you, Your Honor.

THE COURT:  Okay.  Anything else?

MR. CHALLY:  No, sir.  Thank you.

THE COURT:  I do want to think about -- thinking about where we might be at the end.  I guess maybe you get the answers in expert discovery, but the plaintiff's allegations from the expert or from the -- from the trade secret disclosure are still very, very broad.  And if it's not significantly narrowed by experts, then I want to think about whether there is a way of requiring greater precision before summary judgment is -- comes up.

It seems to me as though the defendant has a right to move for summary judgment.  And as part of that, they have a

right to know some much more finite list of at the end of all of the discovery with all of the allegations we've made, and we've married that up with the evidence this is what we think the theft was.

But I don't know exactly whether that would be necessary or not. But if we're not at that point at the end of discovery, at the end of -- as y'all are moving through experts, I want somebody to raise that to me before we get to summary judgment briefing, okay?

MR. GUNNEMANN: So, Judge, I think that that's helpful guidance as we're contemplating doing expert reports, right, because that suggests to me, if I'm hearing you correctly, that our expert reports need to be focused on that issue.

THE COURT: Yeah.

MR. GUNNEMANN: And that's good guidance for us.

THE COURT: Okay. If not, maybe it comes in a different way. I don't know. You don't have to prove it through experts. You can prove it through direct evidence.

MR. GUNNEMANN: True.

THE COURT: All those kinds of things. But if there is any haziness on it -- or I shouldn't say it that way. If it's not sufficiently defined, I would like to know, okay?

MR. GUNNEMANN: Thank you, Your Honor.

MR. LANDES: Your Honor, just to go back to the point

we made earlier, I think the argument that I made is that we're at a point where they have to live or die by what they've defined, and they can't --

THE COURT:  Close to that point.  We are at the close of discovery from that point.

MR. LANDES:  Right.  And so what we don't want to see on summary judgment because we -- unless something truly shocking happens, we will be moving for summary judgment on -- on the entire trade secret claim.  And what we don't want to see in opposition to a motion for summary judgment is a new formulation of the trade secrets that wasn't disclosed in interrogatory responses or in the trade secret identification.  And, frankly, Your Honor, the same is true for an expert report.  We don't want to see an expert report that has a new formulation on what the trade secrets are.

I mean, these -- those are -- there are factual issues about what's the alleged trade secret, what is alleged to be misappropriated, and it's -- an expert can provide evidence to support that allegation, but an expert can't be the one who says, well, here's what the allegations are.  So I think they're -- they're bound by what they've put in, in their interrogatory responses, and they're bound by what they've put in their trade secret ID, and it's good enough or it isn't.

THE COURT:  Well, I don't disagree with that.  I

mean, they have alleged the theft of, for example, source code.

MR. LANDES:  Um-hmm.

THE COURT:  They're entitled to have experts that say I have looked at this evidence and that evidence, and here is evidence of that theft.  My only point is, and I think you are entitled to know what that is before the close of discovery.  You've asked it, and it has been -- the answer in the trade secret disclosure is very, very broad.  It is I don't know how many lines of code, a lot.  And so what I think that the defendant is entitled to is at the end of the day when the parties have had all the discovery that they're entitled to, I think that the defendant is then entitled to know what their target is for summary judgment.

MR. LANDES:  I completely agree we need to know what the target is.  And I -- maybe it's something that we could defer to in summary judgment briefing.  But I think the case law is quite clear that the place we're entitled to know what trade secrets are at issue is the trade secret ID, not some later expert declaration that says, well, we said source code, and we said invoicing, but what we really mean is this piece over here.

THE COURT:  No, that's -- you're saying that that's where they have to identify the trade secret.

MR. LANDES:  What's that?

THE COURT:  That's where they have to identify the trade secret.

MR. LANDES:  Right.  Exactly, yeah.

THE COURT:  No, what I'm talking about is were they not meant to go a step further and say, here's the theft -- here's the trade secret, and of all the trade secrets that we've identified, these are the ones that we say your client stole.

MR. LANDES:  Well, that's what the trade secret ID is supposed to be.

THE COURT:  Well, it doesn't.  It doesn't, and my concern would be that it identifies so many, and then which one are you targeting?

MR. LANDES:  Well, respectfully, Your Honor, that's the question we're trying to answer in fact discovery.

THE COURT:  I understand.

MR. LANDES:  So I -- look, I --

THE COURT:  They write in the -- I don't -- I think we're speaking past each other.  What I'm saying is that they have got to put it all together to tell, I think, where the evidence is of that theft.

MR. LANDES:  I understand that, Your Honor, and I just -- what I don't want to have happen is for the expert to be a conduit for information and evidence that is fact discovery that should have been provided in response to fact

discovery.

THE COURT:  Well, what does the expert get to say then?

MR. LANDES:  Well, he can say I understand, I look at this source code, and here's how this source code works, and I look at this source code, and here's how this source code works.  And based on how similarly these two are aligned, it's the equivalent of translating from English to German.

THE COURT:  That's fact.  That's evidence, so that's an expert providing evidence.

MR. LANDES:  That's his opinion, right.  That's --

THE COURT:  Right.

MR. LANDES:  -- his opinion providing evidence.

THE COURT:  Right.

MR. LANDES:  What I don't want to hear is the expert saying, well, what the trade secret really is, is it's not invoicing generally.  It's this very specific component of invoicing.  And the way that we know it was stolen is because we have this other log file that we never identified in any interrogatory response, but I'm going to bring it up now and tell you that this log file is really what seals the deal. That's what I don't want to see because we would have tested that log file at a fact deposition or a 30(b)(6) witness.

MR. CHALLY:  Your Honor, if I can, a couple of things.  First, totally advisory.  So if there's something

that we do and they want to challenge it, feel free to challenge it, and you can rule on it faced with some real -- something tangible that you can evaluate.  That's number one.

Number two, I think this is in part.  And, frankly, this is why we didn't think that amending our trade secret identification to reference features and functions divorced from source code would be such a big deal.  And I say that in part because Mr. Landes is complaining about us potentially identifying additional functions in an expert report that we believe to be trade secrets.

You've already ruled on that.  If -- if he's agreed on functions, then rest on what you rule as to that.  We're talking about source code that we really think we can move on.

THE COURT:  Well, what he's saying now is he doesn't want them to come in, that the evidence of the theft is from some log file that he's never been told about.  He said very clearly that there's no evidence that the defendants stole it.

MR. CHALLY:  Well, I think if we're -- if we're clear, evidence of theft is not something required to be disclosed in the trade secret ID.  The trade secret ID identifies those things that we believe to be a trade secret.  And discovery, including through depositions of their witnesses, is what reveals that which would constitute misappropriation, and they participated in all of that.

We have interrogatories that described the basis for

our conclusions in that regard.  And if they believe that summary judgment, if we -- we have responded to their motion with some evidence that they don't think was fairly disclosed in discovery, you can deal with it at that point.

MR. LANDES:  I'm fine with that, Your Honor.  I just wanted to make sure that as far as fact evidence goes, they are bound by their trade secret ID, their interrogatory responses, and their deposition testimony.  And the expert isn't someone who can come in and reinvent the case and fill gaps by -- I mean, fact testimony rather than opinion testimony.

But I will say this:  I agree with Mr. Chally that this is something that is best -- best dealt with in the context of whatever we see.

THE COURT:  I don't -- I didn't expect on this issue to feel like I'm being opposed by Mr. Landes because what I'm simply saying is the source code that has been identified is a large volume of source code.  It would not surprise me for the plaintiff to try to prove their case with specific instances of fact to say amongst the 33 pages of code that we've identified by bullets, here are the five that we are going to avoid summary judgment by showing how these items are not just source code, but here is our evidence that they were stolen.

Number one, we found it in their code in the -- in the other -- in the defendants' code.  Number two, here's an

110

email where he says I'm going to steal it.  Number three, our expert has done this analysis, and he thinks that this is evidence of use of it.

And my only point is that at this point in the case where we have such broad claim of what the trade secrets are, it seems to me as though the defendant should be entitled to know what some of those examples are at the end of the case.

Now, maybe it is you just file an initial motion that says we have -- they have nothing, and then they come back with the five examples.  Maybe that's the way to do it.  But in the light of I think there are requests for that type of information in discovery, it may be that you're entitled to some assessment at the end of discovery or you're entitled to demand an updated discovery response that says now having done everything we want to do, here is where we claim the theft was.  That's all I'm saying.

MR. LANDES:  So --

THE COURT:  And maybe it doesn't have to be in response to summary judgment.  Maybe summary judgment would be more helpful to the Court if there was that type of amended discovery response, provided that there has been a discovery request for that that would have to be updated.

But people have an obligation to supplement discovery responses, and it would not be unfair to say we asked you before which pieces were stolen, and now at the end of seeing

111

everything, we want you to tell us which pieces were stolen.

MR. LANDES:  So, Your Honor, just briefly, we did serve those discovery requests.  We have the responses that have been amended three, four times.  Your Honor evaluated in the context of the features and functions Rule 26(e), and the obligations that provide a prompt amendment.  That -- that exists all the way even past fact discovery obligation to amend for newly discovered evidence.  So if there's newly discovered evidence that supports it, then they can try to amend.  But, otherwise, the raw response, it's a binding admission on the company.

THE COURT:  That there isn't any?  You're saying they haven't identified --

MR. LANDES:  Well, whatever -- whatever is in there is what's in there.

THE COURT:  Right.

MR. LANDES:  And, you know, we have the deposition testimony, right, so I'm not saying they need to amend the interrogatory response to, you know, add a bunch of cites to deposition testimony.  But what's in -- what's in the discovery record is in the discovery record, and we will move based on that.

MR. CHALLY:  We appreciate your indulgence for the entire afternoon.  This is, from my perspective, premature. And I don't -- I don't want to show lack of appreciation for

the guidance that you're giving us because I think, as we've indicated, there are some real things that we need to make sure we focus on so that we're meeting your expectations, and we intend to do that.

We understand our obligations to supplement discovery responses if we believe they are appropriate, and we have every intention of doing so if that becomes necessary.

THE COURT:  I would just guess that some of those discovery responses have sort of a catch-all phraseology that might prevent the defendant from tying you to it --

MR. CHALLY:  And I --

THE COURT:  -- in terms of has it been disclosed.  I don't know; maybe it doesn't, but I don't know.

MR. CHALLY:  And all I would say is I think that the most efficient way to resolve this case is to address those things in summary judgment rather than continue litigation over whether the discovery response was appropriate.  In summary judgment, they can say, oh, you didn't disclose it in discovery, and so you're -- you're out of luck at this point.  That seems to me to be a lot more efficient of a way to address this than it is creating a new requirement outside -- extra rule requirement from the Court specifically.

THE COURT:  I'm not doing that.

MR. CHALLY:  Yeah.

THE COURT:  I'm not doing that.  What I'm trying to

suggest to you is that there might be an obligation.  And the way that some of the briefing in this case has gone so far is sleepy in the brief and strong in the response, which provides for a reply to which there's not much of a response, right?  I'm often digesting what you are filing and realizing that I'm just told part of the story because there's a weak opening; there's a fairly strong response, and then there's a reply that is more complete than the opening, and that's what I get, so I get two-thirds of the story or maybe -- yeah, two-thirds of the story.  I don't know.

I'm not going to tell you how to do it, but I would guess, I would guess that the discovery responses have wiggle room that you might not be able to tie something to.  I don't know.  But I see this, and I see the way y'all have briefed it before.  I'm not planning on giving you extra page limits.  I'm not planning on it.

I don't think this -- this case is about whether some code was stolen.  I'm not thinking extra page limits are needed for briefing.  It's a relatively simple case, but I want something that is clear to me that is fully fleshed out.  And if it's not, I guess the loser is the person who has the burden.  I don't know.

But I just have been -- I have not found the briefing that you-all think to be profound to be as profound.  I find them awfully often like two ships passing each other without

114

truly engaging each other, and this most recent briefing has been a good example of that.

MR. GUNNEMANN:  Judge, thank you for the guidance. You asked if we had anything else.

THE COURT:  Yes.

MR. GUNNEMANN:  And I'm just cognizant of the clock, so I just -- I was just reminded by my colleague of something. And I hope this is the easiest thing for all afternoon. There's an ominous motion to seal that's currently due on Monday.

THE COURT:  Yeah.

MR. GUNNEMANN:  I believe, although I wasn't here, it was reported to me that you said if we need a little more time, we could ask for it.

THE COURT:  If you want more time, I'll do it.

MR. GUNNEMANN:  Could we have two weeks to make the --

THE COURT:  That's fine.  Are you resolving some of these issues?

MR. GUNNEMANN:  We're going to keep trying, Your Honor.

THE COURT:  Am I going to be pleased with the level of detail?

MR. LANDES:  Absolutely.

MR. CHALLY:  Yes, we expect so.  In terms of

resolving them, we can engage in further discussion with the other side, but I think what -- what I understood from the transcript that I read because we -- neither of us were here is that there was confusion in the docket because some things looked like they were part of the motion at some point and some things weren't later.

THE COURT:  And then you're adopting other arguments --

MR. CHALLY:  Yes.

THE COURT:  -- in this?

MR. CHALLY:  We're getting all of that fixed, so it will be substantially narrow from what you currently see in addition to being streamlined.

THE COURT:  Okay.  I pity whoever is writing that motion.  All right.  Thank you all.

(The proceedings were adjourned at 5:00 p.m.)

116

REPORTERS CERTIFICATE

I, Keisha M. Crump, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate record of the proceedings.

This the 20TH day of NOVEMBER, 2023.

/S/ Keisha M. Crump, RCR, RMR, RPR
Official Court Reporter
United States District Court
Northern District of Georgia

UNITED STATES DISTRICT COURT
CERTIFIED OFFICIAL TRANSCRIPT