# Exhibit D

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 2 of 16
Paul Dopp                                         February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 1

```
1                IN THE UNITED STATES DISTRICT COURT
2                FOR THE NORTHERN DISTRICT OF GEORGIA
3                         ATLANTA DIVISION
4
5      ROADSYNC, INC.,              )
                                    )
6              Plaintiff,           )
                                    )
7      vs.                          ) CASE NO. 1:21-cv-03420-MLB
                                    )
8      RELAY PAYMENTS, INC.,        )
       SPENCER BARKOFF, JAMES       )
9      RYAN DROEGE,                 )
                                    )
10             Defendants.          )
                                    )
11
12                         - - - - -
13
14           VIDEOTAPED DEPOSITION OF PAUL DOPP
15           Taken by Counsel for the Defendants
16             Before Richard Bursky, RMR, CRR
17                Certified Court Reporter
18                  At Caplan Cobb LLC
19      75 Fourteenth Street NE, Atlanta, Georgia
20
21      On February 13, 2024, commencing at 9:41 a.m.
22
23
24
25                         - - - - -
```

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 3 of 16

Paul Dopp                                            February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 26

1  Q  Got it. And then were you getting more
2  documents over the course of August, September of
3  2023?
4  A  That's fair, yes.
5  Q  Who, was it you that was leading this
6  process of interacting with Plaintiff's counsel
7  regarding which documents to obtain?
8  A  Yes.
9  Q  Did you ask for any documents from
10 Plaintiff's counsel that Plaintiff's counsel
11 declined to provide to you?
12      MR. CHALLY: I object to the form.
13 A  No, not that I recall. There was nothing
14 that we asked for that they didn't produce. I
15 understand there were things we asked for that was
16 not in the production, weren't available to us, but
17 that was more from the Relay side.
18 BY MR. CAPLAN:
19 Q  What are you referring to there?
20 A  Financial statements, income statements,
21 balance sheet, projections, customer lists, sales by
22 -- to customers by product line.
23 Q  So let's, I just want to break this down for
24 a second.
25     You asked for financial statements of Relay,

Page 27

1  you said?
2  A  Yes.
3  Q  And you said that that was something that
4  you asked for but you were told was not there?
5  A  No. We asked for it and they produced some
6  information that was only through, I think, October
7  of 2021 and here we are in late 2023. And I said, I
8  would like the more recent information; this appears
9  to be outdated.
10     And my understanding was that that had been
11 requested and that Relay did not produce it. And
12 ultimately we delayed working on our analysis and
13 report until I was informed that this is all we are
14 going to get in production and we had to get moving
15 on doing our analysis and a report to meet the
16 deadlines.
17 Q  Who informed you this was all you were going
18 to get?
19 A  Counsel.
20 Q  Counsel for RoadSync?
21 A  I understood there was a hearing, they went
22 to it. And that was one of the, they wanted to get
23 that additional information that covered the most
24 recent period.
25     And when they came back they said, that's

Page 28

1  all you are going to get. They didn't tell me what
2  happened in the hearing, but what you have requested
3  is not going to be produced, so.
4  Q  So you were made aware that there was
5  essentially a discovery dispute between RoadSync and
6  Relay that involved the production of financial
7  information?
8  A  I don't know how -- if you would categorize
9  it as a discovery dispute. I think it was Relay
10 produced what they did and said, this is what we are
11 going to produce, that we had to rely on. They were
12 representing to the Court this was the data that
13 Relay had.
14 Q  Do you recall approximately what timeframe
15 that was?
16 A  We had been asking for it for a while,
17 and...
18 Q  When you say a while, like what timeframe?
19 A  Probably starting in August.
20 Q  Of 2023?
21 A  Yes.
22 Q  And that was when you began asking for it or
23 that's when you had been asking for it for a while?
24 A  That's when I had asked for it, received
25 what we saw was information through to October of

Page 29

1  2021, with projections, with no customer sales.
2  Q  So by August of 2023, you had this document
3  that contained financial information, actual
4  financial performance information through mid-2021;
5  is that right?
6  A  Well, it was an Excel worksheet that had it
7  monthly going through October of 2021, and then
8  starting November through to the end of '23, so
9  starting November of 2021 on a monthly basis through
10 the end of 2023 were projections by management.
11 Q  Got it. And this is the document, this is
12 actually listed in your Appendix 2, correct?
13 A  It should be. I don't know where it is. I
14 could tell you or figure it out by looking at the,
15 my schedules and getting the Bates numbers.
16 Q  I will refer you to Nos. 107 through 109,
17 Relay 187163 through 165.
18 A  Which number, are you on the number that I
19 have on the left-hand side?
20 Q  Correct.
21 A  Starting with No. 7?
22 Q  Starting with No. 107 through 109 of your
23 Appendix 2.
24 A  Yes, that looks like it.
25 Q  So that's what you were just describing,

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 4 of 16

Paul Dopp                                             February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 30

1  correct?
2    A  Correct.
3    Q  And you had that as of August of 2023 or so,
4  correct?
5    A  Yes, we had it early on.
6    Q  And there were interactions with you and
7  counsel and you asked for more updated financial
8  information; is that right?
9    A  Well, I asked, is there additional
10 information that postdates the information that we
11 have here that is more current and --
12   Q  Because you are sitting in approximately
13 August --
14       MR. CHALLY:  Let him finish.
15 BY MR. CAPLAN:
16   Q  Sorry, please finish.
17   A  So we were, we said we got this information,
18 is there any more information that is more current.
19 And counsel said, we will look.  And they sent us an
20 additional thing, does this look like it is it?  No.
21 And eventually came back and said, no, that's all
22 that was produced.  We are going to go and have a
23 hearing at the Court to see if we can compel or
24 obtain, I don't know what the legal word is, how the
25 lawyers do, but I had a request in to counsel if

Page 31

1  they could get more current information in
2  discovery.
3    Q  Understood.  Why did you want more current
4  information?
5    A  Everyone is doing, every accountant wants as
6  much information as they can get.
7    Q  And you are sitting in approximately August
8  of 2023 and in your mind all you have is actual
9  financial information through October 31 of 2021,
10 right?
11   A  August, September, October, November, that's
12 all I have.
13   Q  Sorry.  Okay.  But the P&L, at least as
14 reflected on Appendix 2, Item No. 108, reflects that
15 it is through October 31, 2021; is that right?
16   A  Well, that was a separate historic P&L.  It
17 is a stand-alone, looks like it was a Quick --
18   Q  Got it.
19   A  -- a QuickBooks report, a one or two-pager.
20   Q  It is the first document that is No. 107
21 which has actuals through October, you said, October
22 31 of 2021?
23   A  Yes, from inception through actuals through
24 October of 2021 and thereafter projections.  So at
25 least it identifies it as heading projections.

Page 32

1    Q  And you wanted to see, because you were now
2  sitting in August 2023, you wanted to obtain the
3  actual financial information for the years between,
4  or time between October 31, 2021 to as present as
5  you could get, correct?
6        MR. CHALLY:  I object to the form.
7    A  I wanted whatever Relay had that was the
8  most current information.
9  BY MR. CAPLAN:
10   Q  And most accurate information about its
11 actual financial performance?
12       MR. CHALLY:  I object to the form.
13   A  I don't speak to the accuracy of it.  If it
14 was audited, I might place more weight on audited
15 financial statements over management, but I don't
16 know what it is.
17   Q  Sure, but in general, what I am asking is,
18 in general you would prefer actual financial
19 performance data to projections, correct?
20   A  Well, no, not necessarily.  If you are
21 looking forward, you would definitely want
22 projections.
23   Q  But if you are looking past and you are
24 making a statement about what the revenues or
25 expenses of a company were, wouldn't you prefer to

Page 33

1  have the actual information rather than some
2  projection?
3    A  That's why I asked for it.  And I would like
4  both the actuals and the projections --
5    Q  Understood.
6    A  -- as of the most recent period, so most --
7    Q  But you would agree with me that --
8        MR. CHALLY:  Mike, you interrupted him
9  again.  Just let him finish.
10 BY MR. CAPLAN:
11   Q  Fair enough.
12   A  If the most recent period was 2022, then
13 that what's we have to work with.  I was realizing
14 that it was towards the tail end of 2023, maybe they
15 hadn't finalized their books and records, but they
16 appeared to generate monthly data.
17       So simply, I asked for the most recent.  I
18 wasn't asking for the most accurate or the most
19 reliable, I was just asking what's available that is
20 the most current.
21   Q  Understood.  But you would agree with me
22 that when evaluating historically the financial
23 performance of a company, it is more accurate and
24 reliable to rely upon the company's actual financial
25 performance data rather than some projection

Case 1:21-cv-03420-MLB Document 262-6 Filed 03/22/24 Page 5 of 16

Paul Dopp February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 34

1 regarding that data, correct?
2     MR. CHALLY: I object to the form.
3   A  To the extent you have actuals, you would
4 rely on that for historical, and to the extent you
5 have projections, you would rely on that for
6 projections. Again, it was the information that I
7 took to mean this was all that Relay had in terms of
8 the most current information that they wanted to
9 represent to the Court and to me as being the
10 information I needed to rely on for my report, for
11 my analysis.
12   Q  And I think I understood, if I understood
13 you correctly, had you had the actual information,
14 your report at least with respect to the historical
15 years including 2022, for example, would have relied
16 upon the actual information rather than some
17 projection, correct?
18     MR. CHALLY: I object to the form.
19   A  Generally, yes, that would be correct. That
20 would rely on whatever data was produced.
21 BY MR. CAPLAN:
22   Q  And the only reason you didn't do that,
23 because your understanding was that it was not
24 available for whatever reason or had not been
25 provided?

Page 35

1     MR. CHALLY: I object to the form.
2   A  I don't know the reason for it. I
3 understand that, as you said, there was some
4 discovery dispute. If that's the case, I don't know
5 whether it existed or not. I was just informed that
6 this is all you are going to get from Relay.
7   Q  Do you recall whether after that discussion
8 in or around August of 2021 -- excuse me, strike
9 that.
10     Do you recall after that discussion in or
11 around August of 2023 with counsel about requesting
12 more financial information, was there any additional
13 financial information ever given to you?
14   A  Relating to Relay?
15   Q  Yes.
16   A  That I don't know off the top of my head,
17 the timing of when we received financial
18 information. So, for example, when I learned there
19 were valuations done, I asked for that.
20     So we as a practice oftentimes will set up a
21 folder with the date we received production so we
22 could narrow it down, when did we receive it. And
23 within that folder, it will have those documents.
24     So I would just be guessing as to the
25 timing. We were receiving documents throughout the

Page 36

1 period. As I was reviewing and requesting
2 additional information, I would receive it.
3   Q  And had you found it material or just --
4 earlier you testified whenever you received, you
5 list on Appendix 2, right?
6   A  Correct.
7   Q  So had you received some additional
8 financial information regarding Relay after August
9 of 2023, that would have been listed under the Relay
10 documents financial data category in Appendix 2,
11 correct?
12   A  If that's where it fit, yes, that's where it
13 would go.
14   Q  So if you had been provided any additional
15 profit and loss information, for example, it would
16 be in that category listed, correct?
17   A  Yes.
18   Q  So since you had already had Numbers 107,
19 108 and 109, is it fair to conclude that after you
20 had this conversation asking for more information,
21 you did not receive any additional Relay financial
22 information?
23   A  Ultimately, that's the short version. There
24 was months and months of us saying, can you request
25 it, can you get it; yes, we are going to make those

Page 37

1 efforts, we will get that for you; up to the point
2 where I understood they were going to a hearing
3 where they were presumably trying to get the Court
4 to compel production.
5     I don't know if that's the right term or
6 not, but I've been involved in those types of things
7 before many times. When there is information we
8 need from the other side, there is a process I
9 understand called going to to the Court and
10 compelling production.
11   Q  And you were aware of that process being
12 undertaken in this case, correct?
13   A  I am aware that there were efforts tried to
14 get what I requested. I don't know if there was a
15 hearing to compel production. I am just saying that
16 is the typical scenario.
17   Q  Understood. I am not asking to you detail
18 that. The Court is well aware of what happened in
19 regards to all of that.
20     But what I am asking is what your level of
21 knowledge and participation is or was, and to the
22 best of your recollection, were you involved in any
23 of the efforts to prepare for any Court action by
24 counsel for RoadSync to obtain additional financial
25 information in or around August of 2023?

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 6 of 16

Paul Dopp                                                February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 86

1  believe it was four-year; it really depends on what
2  they decide after having heard all the evidence.
3  BY MR. CAPLAN:
4    Q   Do you think that three years is more
5  reasonable than two years or do you not have an
6  opinion on that?
7    A   I think that the three years is supported by
8  the financial data.
9    Q   But I am not asking that question.  I am
10 asking, is three years in your opinion better than
11 or the more accurate measure of the delayed start
12 time -- strike that.  That is a bad question.
13       Are you offering an opinion in this case
14 that three years rather than two years is the
15 appropriate head-start calculation?
16      MR. CHALLY:  I object to the form.
17   A   Basically, yes, I am saying that based on
18 the evidence, it appears to me that three years
19 looks like it is supportable and consistent with the
20 data and consistent with management.
21   Q   And in your report I believe you state that
22 you assumed three years but then conduct a
23 reasonableness check and provided five reasons why
24 you thought it was reasonable; is that right?
25   A   Basically, yes.

Page 87

1    Q   And are those all of the reasons that you
2  considered in making your reasonableness opinion?
3    A   Generally, yes.
4    Q   You didn't leave any additional reasons out,
5  correct?
6    A   I may have.  I don't recall any that I left
7  out.
8    Q   We will go into that in a little bit.
9        The lost profits calculation that you make
10 with respect to the six customers essentially yields
11 a --
12      MR. CHALLY:  Hold on.  Be careful about what
13 you are offering in light of who is sitting in
14 the room, okay?
15      MR. CAPLAN:  I am just staying at a high
16 level.
17      MR. CHALLY:  I think if you were to identify
18 the amount, that would be something that would be
19 designated as AEO.  I have to doublecheck, but I
20 think that's true.
21      And I am not trying to get in your way, but
22 Mr. Droege is sitting in here and I don't want to
23 waive or be criticized of waiving any
24 confidentiality designation we might make or have
25 made.

Page 88

1      MR. CAPLAN:  How is the amount of damages
2  you are seeking in the case even confidential,
3  much less how can you conceal that from a party
4  Defendant?
5      MR. CHALLY:  You haven't shared with him the
6  precise amount of damages that we are seeking
7  because we have, I think, designated it as
8  confidential.  And I think it would be
9  inappropriate to disclose to him the damages that
10 we think flow from lost profits from customers
11 that we think that they improperly interfered
12 with in large part because it is a reflection of
13 what RoadSync's financial information could
14 suggest.
15      MR. CAPLAN:  We can that take that up
16 separately.
17      THE VIDEOGRAPHER:  I think somebody is
18 trying to get on Zoom, if you would just hit
19 admit.
20      MR. CHALLY:  There is no space to hit admit.
21 I think I see Elisabeth Miller who is on.
22      I am sorry, I see it.  There you go.
23      MR. CAPLAN:  I do want to ask about the
24 number, so is it your instruction that my client
25 leave the room?

Page 89

1      MR. CHALLY:  We will get the redactions that
2  we propose to report and try to confirm.
3      MR. CAPLAN:  We can go off the record.
4      THE VIDEOGRAPHER:  The time is 11:52 a.m.,
5  we are off video record.
6      (Discussion ensued off the record.)
7      THE VIDEOGRAPHER:  The time is 11:53 a.m.,
8  we are back on video record.
9  BY MR. CAPLAN:
10   Q   All right, so to summarize, your opinion is
11 that RoadSync suffered lost profit damages of
12 ███████████████████████
13   A   That sounds correct, yes.
14 ███████████████████████
15 ███████████████████████
16 ███████████████████████
17   Q   Is it your opinion that those damages are
18 additive or mutually exclusive and in the
19 alternative?
20   A   They would be additive.
21 ███████████████████████
22 ███████████████████████
23 ███████████████████████
24 ███████████████████████
25 ███████████████████████

23 (Pages 86 - 89)

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 7 of 16

Paul Dopp                                                                February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 90

1  ▉▉▉▉▉▉▉▉▉▉
2  BY MR. CAPLAN:
3     Q   Is there any duplication between your lost
4  profit damages calculation and your unjust
5  enrichment that would require offset from one to the
6  other?
7     A   No, the unjust enrichment says you could
8  have the stolen customers or the allegedly taken
9  customers; you can have the taking trade secrets;
10 you can benefit from all that.  So we are not saying
11 you can't have those profits, you are entitled to
12 them, but you just get them at a later period.
13        So the difference here is the, essentially
14 the time value of money.  They accelerated the time
15 they would have received that, but it is not like we
16 are duplicating anything here.
17    Q   Is there any inconsistency between the
18 assumptions that you made to support your lost
19 profit damages calculations and the assumptions that
20 you made to support your unjust enrichment damages
21 calculations?
22        MR. CHALLY:  I object to the form.
23    A   They are two different approaches, so unless
24 you have some specific question -- but the
25 assumptions would be different because they are

Page 91

1  different models.
2  BY MR. CAPLAN:
3     Q   Did you analyze carefully whether it is
4  possible for the jury to award both of those
5  methodologies based upon the differing assumptions
6  that are used to support each?
7     A   I don't follow the question.
8     Q   Did you conduct any analysis to determine
9  whether there is inconsistency between the
10 assumptions you used to support your lost profit
11 damages calculation and the assumptions that you
12 used to support your unjust enrichment calculation
13 such that it would not be possible for the jury to
14 award both sets of damages?
15        MR. CHALLY: Object to the form.
16    A   Again, I don't understand the assumptions on
17 a lost profit.  Assume that but for the alleged
18 actions, RoadSync would have continued to enjoy
19 receiving profits from those customers.  They
20 wouldn't have been lost.
21        The assumption in the accelerated approach
22 under the head-start doesn't assume that.  It
23 assumes that you actually got those customers and
24 you used the technology.  So it uses a completely
25 different set of assumptions because it is a

Page 92

1  different damage model that does a different thing.
2        The first one provides damages that were
3  sustained by the Plaintiff in this case, whereas the
4  second one is like a disgorgement remedy.  It says
5  you can't enjoy, because sometimes the benefit they
6  receive is greater than the losses of the Plaintiff.
7     Q   I don't think you answered my question.  I
8  am going to ask it again.
9        I understand your point, that these are
10 different calculations.  That wasn't my question.
11       My question is:  Did you conduct an analysis
12 to determine whether the assumptions that underlie
13 your lost profit damages calculation are consistent
14 or inconsistent with the assumptions underlying your
15 unjust enrichment damages calculation such that it
16 would not be possible for the jury to award both?
17    A   Again, I don't know how to answer the
18 question.  I know that the assumptions are different
19 under both damage methodologies.  They do different
20 things.
21    Q   But despite that, you believe the jury could
22 award both?
23    A   Certainly.  One of them is a remedy to take
24 away the unjust benefit received by the infringer in
25 this case, the alleged infringer; where the other

Page 93

1  one provides a monetary award for the losses that
2  they sustained, that the Plaintiff sustained as a
3  result of the Defendants' alleged actions.  They do
4  two different things.
5     Q   So let me ask you this:  Is it your opinion
6  in this case that if the jury awards lost profits to
7  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
8  would compensate RoadSync for its economic losses?
9     A   Yes.
10    Q   And it would not be entitled to recover any
11 other form of compensatory damage, correct?
12    A   Correct.
13 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
14 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
15 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
16 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
17 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
18    Q   And that is notwithstanding that they have
19 been given a full remedy in the form of a full
20 compensation award?
21    A   Right, for the lost profits.  If the unjust
22 enrichment were disgorgement of their profits, then
23 you can't get it on the same sales.  You wouldn't
24 get the, the Plaintiff would not get double dipping.
25 You could only get it on the unjust

Page 130

1  A   Only what's in here in terms of when, what
2  was her initial introduction to RoadSync.  She said
3  it was as a consultant and that later was brought on
4  as an employee, as an officer.
5  Q   Besides what you have described in that
6  answer and in these three paragraphs, did you obtain
7  any other information about RoadSync's history
8  between 2015 and 2017?
9  A   No.
10 Q   You would agree with me, as reflected on
11 Paragraph 38, that from -- well, withdrawn.
12     MR. CAPLAN:  Let's go off the record.
13     THE VIDEOGRAPHER:  The time is 1:44 p.m.  We
14 are off the record.
15     (Mr. Droege leaves the room.)
16     (Discussion ensued off the record.)
17     THE VIDEOGRAPHER:  The time is 1:45 p.m.  We
18 are back on the video record.
19 BY MR. CAPLAN:
20 Q   Mr. Dopp, is it true that as you state in
21
22
23
24 A   It is true that that's what my report
25 states.

Page 131

1  Q   And is that the best of your understanding?
2  A   Yes, it is my observation based on my review
3  of the historical income statements.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 132

14 BY MR. CAPLAN:
15 Q   Would you also characterize RoadSync during
16 the relevant time period of this case as a
17 relatively new business?
18 A   Yes.
19 Q   Let's spend a little bit of time talking
20 about the lost profits analysis.  Prior to Relay
21 being formed in early 2018, did you -- strike that.
22     In your work preparing this report and
23 offering these opinions, did you make any
24 observations with respect to whether RoadSync had
25 competitors between 2018 to present?

Page 133

1      MR. CHALLY:  I object to the form.
2  A   My understanding is their competitor now is
3  Relay in covering that period to present.
4  BY MR. CAPLAN:
5  Q   Prior to 2018, did RoadSync have any
6  competitors?
7  A   My understanding is they believed they did
8  not, that they were developing a unique product.
9  Q   Did you, besides sort of asking for their
10 perceptions of that, did you conduct any independent
11 analysis to determine whether RoadSync had
12 competitors prior to the formation of Relay?
13 A   No.
14 Q   Did you conduct any analysis to determine
15 whether, since the formation of Relay, RoadSync has
16 competitors other than Relay?
17 A   No.
18 Q   Did you review the investor materials that
19 RoadSync provided to investors when raising capital?
20 A   I don't know if I reviewed that or not.  I
21 just can't recall.
22
23
24
25

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 9 of 16

Paul Dopp                                                                                       February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 194

1  customer?
2      MR. CHALLY: I object to the form.
3   A   In what -- can you give me an example?
4   Q   An example would be if you had projected
5   ████████████████████████████████████
6   ████████████████████████████████████
7   from Relay, wouldn't that potentially impact your
8   projections of lost profits?
9   A   I'd have to think about it. It may not, it
10  may have been that they were on that trajectory to
11  stay with them and continue to build revenues; then
12  when they lost them, they went over to Relay, they
13  may have bought less from Relay than what they would
14  have otherwise bought or at a lower price than what
15  they otherwise would have paid RoadSync.
16  Q   So how would you evaluate that then, if you
17  had both sets of information?
18  A   If I had both sets of information, I would
19  have to assess that, other questions, the pricing,
20  so are they additive. Is that the amount that would
21  have been purchased otherwise or sold otherwise at
22  that same price by RoadSync.
23      If Relay solicited those customers by
24  undercutting the price, then the dollars aren't
25  additive, because if it wasn't there to undercut the

Page 195

1   price by whatever are the numbers, to make it easier
2   on me, say 50 percent reduction, then I might take
3   that 50 percent, that dollar amount and then double
4   it and add it to, if that's what we learned was
5   going to be the only amount that that customer would
6   have bought from RoadSync as a stand-alone company.
7   Q   So did you ask for pricing information from
8   Relay in addition to, for customer purchase history?
9   A   I didn't at the time because I didn't have
10  the customer information so I didn't -- it wasn't
11  relevant for me to ask for the pricing if I didn't
12  have the sales.
13  Q   With respect to your calculation of unjust
14  enrichment damages, fair to say that having the
15  actual revenues and profits of Relay at least
16  historically would have informed or changed your
17  analysis?
18      MR. CHALLY: I object to form.
19  A   It definitely would have been different
20  numbers. I don't know how, what impact it would
21  have on the ultimate opinion.
22  BY MR. CAPLAN:
23  Q   Again, with respect to your calculation of
24  unjust enrichment damages, you depended only on
25  Relay actual financial information through October

Page 196

1   of 2021 and projections afterward, even though you
2   rendered your opinion in January of 2024, correct?
3   A   That's the only data that was available, the
4   actual and projections. So since they were produced
5   in response to whatever the request was, that was
6   the information that I relied on.
7   Q   When you say, that was the only data
8   available, you mean that was the only data that was
9   given to you by RoadSync's counsel, correct?
10      MR. CHALLY: Object to the form.
11  A   It is my understanding that that's what was,
12  the only information that was relevant for that time
13  period produced by RoadSync -- sorry, produced by
14  Relay.
15  BY MR. CAPLAN:
16  Q   I am going to introduce as Exhibit a
17  document that I've labeled Exhibit 5 and ask you to
18  refresh it and pull it up on your screen.
19      (Dopp Deposition Exhibit 5 was marked for
20      identification.)
21  A   Exhibit 5, okay.
22  Q   Feel free to take a moment to review this
23  document. The document is Bates labeled 264007.
24  And it is two pages and it goes to 264008. Let me
25  know once you have had a chance to review it.

Page 197

1      (Witness reviewing document.)
2   A   Okay, I have reviewed it.
3   Q   Have you ever seen this document before?
4   A   Not that I recall, no.
5   Q   This document was not provided to you by
6   counsel for RoadSync, correct?
7      MR. CHALLY: I object to form.
8   A   No, if it is not on my list, I didn't get
9   it.
10  BY MR. CAPLAN:
11  Q   Does this appear to be a profit and loss
12  statement for Relay from January 2019 to December
13  2022?
14  A   Yes.
15  Q   Had you received this document, would this
16  document have impacted your calculation of unjust
17  enrichment damages?
18      MR. CHALLY: I object to the form.
19  A   It would have, I would have used different
20  numbers, yes.
21  ████████████████████████████████████
22  ████████████████████████████████████
23  ████████████████████████████████████
24  ████████████████████████████████████
25  ████████████████████████████████████

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 10 of 16
Paul Dopp                                               February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 198

1  Q  According to Exhibit 5, what were Relay's
2  actual revenues in 2023?
3  A  They are not there.
12  Q  Do you have any reason to doubt that this is
13  the accurate, an accurate profit and loss statement
14  reflecting Relay's revenues during the time period
15  listed?
16  A  No.

Page 199

1  Q  And you took that representation and you
2  calculated damages upon that representation,
3  correct?
4  A  Yes.
5  Q  Do you have an opinion whether those
6  representations were reasonable or not?
7  A  I thought that they were probably a bit
8  aggressive.  That's why I had a higher discount
9  rate.
10  Q  What analysis did you undertake to evaluate
11  whether they were a bit aggressive or reasonable or
12  not?
13  A  When I looked at the individual product
14  sales, those were, looked to be new products.
15  Q  Most of the new revenue that Relay was
16  projecting had nothing to do with its credit card or
17  check processing, correct?
18  A  It was different line items, yes.
19  Q  In any event, its performance in 2022 is far
20  different from what you had projected its revenues
21  would be as a part of your unjust enrichment damages
22  claims, correct?
23      MR. CHALLY:  I object to the form.
24  A  It is different than what management
25  projected, not what I projected.

Page 200

1  BY MR. CAPLAN:
2  Q  Do you have any basis to dispute that this
3  document was fully available to you as of September
4  15, 2023?
5      MR. CHALLY:  I object to the form.
6  A  I don't know one way or another.
7  BY MR. CAPLAN:
8  Q  You see the Bates number on Exhibit 5?  I
9  think I read it into the record as 264007.
10  A  Yes.
11      MR. CAPLAN:  I am going to mark as Exhibit
12  6, a letter.
13      (Dopp Deposition Exhibit 6 was marked for
14  identification.)
15  Q  Mr. Dopp, you were not a recipient to this
16  letter, so I recognize you cannot authenticate it,
17  but I am putting it in the record to reflect that on
18  September 15, 2023 Relay produced documents that
19  were labeled Relay 206554 through 264008.  Do you
20  see that?  It is the last sentence of the first
21  paragraph.
22  A  It is Exhibit 6 now?  There it is.
23      (Witness reviewing.)
24  A  Yes, I see it now.
25  Q  Again, any reason to dispute that this

Page 201

1  document, that the profit and loss statement that
2  went through year end 2022 was produced to RoadSync
3  on September 15, 2023?
4  A  I have no reason to dispute that.
5  Q  And earlier you were testifying that you
6  were repeatedly asking counsel to RoadSync for this
7  profit and loss statement; is that correct?
8      MR. CHALLY:  I object to form.
9  A  Among other things.
10  BY MR. CAPLAN:
11  Q  This profit and loss statement that was
12  Exhibit 5 would have been very important and
13  ultimately caused you to have different opinions in
14  this case, correct?
15      MR. CHALLY:  I object to the form.

51 (Pages 198 - 201)

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 11 of 16
Paul Dopp                                          February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 202

9   Q   And you said you would need projections, but
10  we also have -- I mean, now it is 2024, right?
11  A   Yes.
12  Q   And as of September of 2023, obviously Relay
13  did not have full-year financial information for
14  2023, right?
15  A   That's true.
16  Q   And it is your experience it usually takes a
17  little bit of time for companies to sort of finalize
18  their year and submit their financials, right?
19  A   Typically.
20  Q   And on Friday, which was Friday, February
21  9th, Relay provided to counsel to RoadSync the 2023
22  P&L statement, correct, at least as far as you know?
23      MR. CHALLY: I object to the form.
24  BY MR. CAPLAN:
25  Q   You received a copy of it yesterday,

Page 203

1   correct?
2   A   Yes.
3       MR. CAPLAN: Let's put in that exhibit. I
4   am going to mark as Exhibit 7 the profit and loss
5   statement for Relay for 2023 which is Bates
6   stamped Relay 268198.
7       (Dopp Deposition Exhibit 7 was marked for
8   identification.)
9   BY MR. CAPLAN:
18  Q   And that you adopted for purposes of your
19  unjust enrichment calculation, correct?
20  A   I relied on it, yes.
21  Q   Did you also form an opinion as to the
22  reasonableness of that projection?
23  A   Of which one, the 62?
24  Q   Yes, sir.
25  A   Not really. I had seen that there were four

Page 204

1   new categories of revenue and management had
2   prepared a projection. I am assuming that the
3   projection was used to present to -- for a purpose,
4   whether that is investors or the board, and they
5   were representing, at the time they did that, this
6   is the target we are aiming for, this is what we
7   anticipate our revenues to be, so that, you know, I
8   didn't assess management's capabilities in terms of
9   projections. I accepted it to be a good-faith
10  projection.
23  Q   But you didn't undertake to evaluate whether
24  those projections were realistic or not?
25  A   No. They are realistic to the extent

Page 205

1   management believes they are realistic. I've
2   accepted that. I just noted that, wow, that's a big
3   increase.
17  BY MR. CAPLAN:
18  Q   And then to conduct your unjust enrichment
19  analysis, would you make those two corrections and
20  then essentially take the, you would have to
21  calculate a proper profit margin, which we will talk
22  about separately, and then determine the present
23  value of having earned those revenues three years
24  earlier than they should have per your theory,
25  correct?

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 12 of 16

Paul Dopp                                           February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 206



13  Q   Projections at this point and as of the date
14  of your report, which is January 3rd of 2024, would
15  be for revenue in 2024 or beyond, correct?
16  A   For any projections past this would be in
17  2024 and beyond, yes.
18  Q   But your expert opinion in this case and
19  your 88-plus page report and calculation of unjust
20  enrichment damages looks only at revenue in the
21  years 2019 through 2023 after you, with lengthy
22  explanation, explained the rationale behind your
23  head-start theory, correct?
24  A   Yes.  That was the information that was
25  available.

Page 207

1   Q   Now that you have seen the real numbers for
2   2021, 2022 and '23, you are saying, well, I might
3   want to look at what's management projecting for
4   2024 and '25?
5   A   Yes, that's going to be part of the
6   head-start, all that, all that.  You know, they
7   would be also reduced by a discount rate to reflect
8   the time value of money.
9       But that would be part of the revenue stream
10  that would be part of the head-start.  It is
11  relevant --
12  Q   But you have opined that the relevant time
13  period for calculating head-start damages is 2019 --
14  is the five-year period following its formation,
15  right?
16  A   No, it is not my opinion that that's the
17  damage period.  There is a secrecy period that we
18  are talking about here, the two- and the three-year
19  period with the damages, period is what is
20  appropriate for the head-start.
21      The only data I had was through 2023.  If I
22  went beyond that, I would have to come up with my
23  own projections which I didn't want to do.  So
24  now --
25  Q   So head-start damages last forever, in other

Page 208

1   words?
2   A   Essentially, but it gets to a point where it
3   is so far in the future that with the discount rate
4   it doesn't give you much in the way of incremental
5   value.  It is more in the near term.
6       So that's why to properly calculate what the
7   head-start benefit would be, I would want to get
8   what management thinks they are going to get over
9   the next couple of years and tack on here.  And if I
10  had that data and plugged it in, I would do the same
11  thing.  If I had the data correct through of 2023
12  and then management's projections, I would have
13  included that.
14  Q   Where do you say all that in your report?
15      MR. CHALLY:  I object to the form.
16  BY MR. CAPLAN:
17  Q   Is there anywhere in your report that you
18  indicate that you requested or wished to have
19  management projections for 2024 and beyond?
20      MR. CHALLY:  Are we seriously going to
21  dispute the fact that we requested that
22  information?  That is a silly question.  So I
23  will object to form.  I will object to you
24  arguing with this witness.
25      MR. CAPLAN:  That is a speaking objection.

Page 209

1       MR. CHALLY:  You are right, it is, because
2   it is absurd in light of the discussions that we
3   had, the order that you all are under.
4       MR. CAPLAN:  This is a speaking objection.
5       MR. CHALLY:  You are correct, because you
6   were ordered to produce supplemental information
7   and you decided not to do so.  So we are here
8   today --
9       MR. CAPLAN:  We did so.  You just didn't
10  give it to your expert.
11      MR. CHALLY:  Incorrect, incorrect.
12      MR. CAPLAN:  I am not going to debate you,
13  Chally, I am just not.  This is useless.
14      MR. CHALLY:  Okay, so don't ask.
15      MR. CAPLAN:  Let's go off the record.
16      THE VIDEOGRAPHER:  The time is 4:02 p.m.  We
17  are off video record.
18      (Discussion ensued off the record.)
19      THE VIDEOGRAPHER:  The time is 4:02 p.m.  We
20  are back on video record.
21  BY MR. CAPLAN:
22  Q   Mr. Dopp, you have submitted a 59-page
23  report.  And my question is -- and that's without
24  exhibits -- my question is:  If you believed that it
25  was necessary to obtain management projections for

Page 242

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted]
7  [redacted]
8     Q   Doesn't their status as a startup make them
9  more vulnerable to competition by larger companies?
10    A   It depends.  If you are a startup in a new
11 area with a new product that has a competitive
12 advantage, that no one else has, I don't think so.
13 I think it, again --
14    Q   Did you evaluate -- what competitive
15 advantage does RoadSync have?
16        MR. CHALLY:  I object to the form.
17    A   They developed a product that apparently the
18 market wanted and needed.  And they beta tested it
19 and they started to monetize that.
20 BY MR. CAPLAN:
21    Q   Going back to your answer before, would you
22 agree with me that your comment about the
23 possibility that some of these customers would have
24 contracts that would make them stickier is
25 speculative?

Page 243

1         MR. CHALLY:  I object to the form.
2     A   It is not just the contracts, I agree that
3  whether there's going to be a contract for a long
4  term, that may be somewhat speculative.  But as a
5  general rule, the longer you have a customer, it is
6  a little bit more difficult for a new market entrant
7  to take them, take them away.
8  BY MR. CAPLAN:
9     Q   You have assumed that these customers would
10 remain with RoadSync for six years, correct?
11    A   Yes.
12    Q   And each of these, the four customers that
13 were former RoadSync customers, had been with
14 RoadSync for approximately two to three years before
15 leaving RoadSync, correct?
16    A   I don't know how long they were there during
17 the beta testing period, but at least in terms of
18 generating revenues from them, that sounds about
19 right.
20    Q   So in other words, you in total are
21 projecting that these four customers would have a
22 customer life with RoadSync of approximately nine,
23 eight to nine years; isn't that right?
24    A   About eight, eight years.
25    Q   RoadSync has not been in existence for that

Page 244

1  long, correct?
2     A   RoadSync, no.
3     Q   There is no track record whatsoever to
4  establish that RoadSync has kept a single customer
5  for that long of a period of time, correct?
6     A   They had a track record of keeping that
7  customer until Relay allegedly took those customers
8  because of the alleged bad acts.
9     Q   That's not my question.  My question is:
10 Can you give me an example of a single customer that
11 has stuck with RoadSync for eight to nine years?
12        MR. CHALLY:  Object to the form.
13    A   That hasn't happened yet.  This is a
14 forward-looking process.
15 BY MR. CAPLAN:
16    Q   And you would agree with me that there is no
17 track record from which to predicate an opinion that
18 a customer would stay with RoadSync for eight to
19 nine years, correct?
20        MR. CHALLY:  I object to the form.
21    A   There is a track record that the customer
22 existed and was with Road Track (sic) for the period
23 of time until which they were taken by or solicited
24 away by Relay.
25    Q   And that period was two to three years,

Page 245

1  correct?
2     A   Correct, plus the beta time period.  So that
3  is a basis that I've used as a reasonable basis to
4  say, but for, in the but-for world, had RoadSync not
5  been in the market, they would have had them another
6  three years.  Then when they came to compete, they
7  would have stayed with them another year or two.
8     Q   Did you conduct an analysis of the -- strike
9  that.
10        MR. CHALLY:  Can we take a comfort break,
11    please?
12        MR. CAPLAN:  Okay.
13        THE VIDEOGRAPHER:  The time is 4:56 p.m.  We
14    are off video record.
15        (Recess.)
16        THE VIDEOGRAPHER:  The time is 5:17 p.m.  We
17    are back on video record.
18 BY MR. CAPLAN:
19    Q   Mr. Dopp, for a little while we were talking
20 about management projections that you relied upon
21 for purposes of calculating your unjust enrichment
22 damages opinion.  Did you review any testimony from
23 Mr. Droege concerning those management projections?
24    A   Not that I recall.
25    Q   You are not aware one way or the other

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 14 of 16
Paul Dopp                                                                February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 246

1  whether there was testimony elicited in this case
2  regarding the accuracy of those projections?
3      MR. CHALLY: I object to the form.
4   A   I am not aware one way or the other.
5  BY MR. CAPLAN:
6   Q   So you did not consider such testimony or
7  you could not have considered such testimony in
8  forming your opinions in this matter, correct?
9   A   Since I don't know what the testimony is.
10  Q   You did not, correct?
11  A   Yes, I don't know. So it really depends on
12 if they were reliable later or they were reliable at
13 the time they were prepared. I don't know what the
14 testimony is one way or another.
15  Q   You chose to rely on those projections as of
16 your report dated January 3rd of 2024, correct?
17  A   Yes.
18  Q   And the deposition transcripts of Mr. Droege
19 that are listed in your report obviously occurred
20 long before that, correct?
21  A   Yes.
22  Q   But you didn't review, you do not recall
23 reviewing any testimony regarding those projections
24 as a part of any analysis of those projections,
25 correct?

Page 247

1   A   Correct.
2   Q   I want to ask you a few questions about the
3  way you calculated variable costs. Can you quickly
4  -- not quickly. Strike that.
5      How did you calculate variable costs for
6  purposes of calculating lost profits from the six
7  allegedly lost customers?
8   A   A combination of reviewing the historical
9  data at a total revenue level, and then also at a,
10 where it was available, at a customer level.
11  Q   Where is that reflected in your report?
12  A   That is reflected in Table 7-3.
13  Q   So I note that there are -- that Table 7-3
14 does not calculate avoided costs on a
15 customer-specific basis.
16  A   Correct.
17  Q   So did you use the same avoided costs for
18 all customers?
19
20
21
22
23
24
25

Page 248

1
2
3
4
5
6   A   Correct. So absent any other information on
7  what it would be, I assumed it was the average for
8  the company on those sales except for where I had
9  evidence on specific customer sales where it was
10 different.
11  Q   And for those particular customers, you
12 actually lessened the costs associated with
13 servicing those customers, correct?
14  A   I didn't do that. The data showed that they
15 made higher profit margins because they had lower
16 cost of sales.
17  Q   So when you evaluate cost of goods sold, was
18 that just looking at the top line of RoadSync's
19 financial statements?
20  A   Well, no.
21  Q   Income statements?
22  A   I looked at all the lines.
23  Q   Okay. But the cost of goods sold number is
24 the number reflected underneath essentially revenue
25 to calculate gross profit; is that right?

Page 249

1   A   Yes.
2   Q   Do you know what that number reflects in
3  RoadSync as, what that expense is associated with?
4
5
6
7
8
9
10
11
12
13
14  Q   And then the only other costs that you, or
15 variable costs that you considered in calculating
16 lost profits was as it related to the new -- excuse
17
18
19
20  A   Yes.
21  Q   You did not include as variable costs any
22 sales expenses or other expenses in RoadSync's
23 financial or income statement, correct?
24  A   Yes, to the extent they were not variable, I
25 did not include.

Case 1:21-cv-03420-MLB   Document 262-6   Filed 03/22/24   Page 15 of 16

Paul Dopp                                                                February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 278

1  Q  Having seen these two exhibits, Exhibit 5
2  and 7, do you feel the need to make any changes to
3  the conclusions that you reached in your report?
4  A  Not until such time as I see the
5  projections.
6  Q  Now, I also want you to look at Exhibits 8
7  and 9. We will just do this, a line of questions as
8  to both 8 and 9, I will just have you look at 8. Do
9  you know what this is?
10  A  I don't know specifically. I did ask
11  counsel and he reminded me it was not his
12  deposition, it was mine.
13  Q  Right. So let's assume that, as I think
14  counsel was trying to imply to you, that this is
15  customer-specific revenue numbers from Relay for
16  some particular time period. Does that then,
17  customer-specific revenue information for Relay,
18  relate at all to your lost profit calculation as
19  reflected in your report?
20  A  No.
21  Q  Right. Now, let's assume again that this is
22  customer-specific revenue information from Relay.
23  Do you need customer-specific revenue information to
24  reflect all revenue associated with these customers
25  to appropriately consider unjust enrichment for

Page 279

1  purposes of your analysis?
2  A  Yes.
3  Q  Why?
4  A  Because the theory of the case that the
5  Plaintiff has is that none of these revenues would
6  have been available to Relay but for the theft, the
7  alleged theft of the trade secrets and confidential
8  information. So in other words, because of that, I
9  was able to take, it went from zero to whatever
10  financial performance it has plus the projected
11  financial performance because of the benefit it
12  received from those trade secrets.
13  Q  Now, I want a to put you on the spot a
14  little bit, but only a little bit: Can you identify
15  what else you would want to know about
16  customer-specific information at Relay before you
17  determined how that might impact your conclusions in
18  your report?
19  A  I would want to know which of those
20  revenues, which portion of it relates to the
21  products that infringe on the RoadSync operations
22  and those which apparently they are alleging are a
23  separate line of business or a separate line of
24  income.
25  Q  Anything else that you can think of?

Page 280

1  A  I would want to get, I need to get the
2  amounts that reconcile and tie to the financial
3  statements -- to the income statements, rather.
4  Q  You want to know whether or not there was
5  some off-market discount --
6  A  Yes.
7  Q  -- associated with these revenue numbers?
8  A  Yes, that's true. I already discussed that
9  earlier in my testimony, that I would want to know
10  is the pricing different or is there a discount on
11  these prices from what RoadSync sold those products
12  to those customers.
13  Q  Would you want to know any cost-related
14  information in connection with these numbers?
15  A  It would be interesting to have, but if it
16  was information -- rather, if it was revenues that
17  would be otherwise generated by Relay -- sorry --
18  otherwise generated by RoadSync, then their cost
19  structure would typically apply. But to the extent
20  there was additional costs incurred for those
21  particular revenues, I would want to at least assess
22  them.
23  Q  Let's look at Exhibit 9. Same question for
24  this exhibit, do you know what this is?
25  A  It appears to be the customer-specific sales

Page 281

1  of Relay for their customers but not for their total
2  revenues.
3  Q  That's what Mr. Caplan represented to you.
4  Do you know whether that that is in fact what it is?
5  A  I don't know in fact what it is, no.
6  Q  Let's assume Mr. Caplan is right and this is
7  in fact customer-specific revenue numbers for Relay.
8  Does this relate in any way to your lost profit
9  calculation?
10  A  No.
11  Q  Again, assume this is, as Mr. Caplan
12  implied, customer-specific revenue information from
13  Relay. Do you need this document to reflect all
14  revenue associated with these customers so as to
15  appropriately evaluate this information, as you
16  have, for purposes of your report? Excuse me.
17  A  For purposes of the unjust enrichment, yes.
18  Q  Why is that?
19  A  Because that's, again, part of the theory of
20  the case. It is all the revenues that they -- it is
21  alleged that all the revenues that were obtained by
22  Relay were on account of the trade secrets that they
23  allegedly misappropriated.
24  Q  And as to the additional information that
25  you said you would want to know about Exhibit 8,

71 (Pages 278 - 281)

Case 1:21-cv-03420-MLB  Document 262-6  Filed 03/22/24  Page 16 of 16

Paul Dopp February 13, 2024
Roadsync, Inc. v. Relay Payments, Inc., et al.

Page 298

1  DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Page No._____Line No._____Change to:_____
17 _____
18
19           _____
              PAUL DOPP
20
              _____
21            Date
22
   SUBSCRIBED AND SWORN To before me
23 this _____ day of _____, 2024.
24
   _____
25 NOTARY PUBLIC

Page 299

1         D I S C L O S U R E
2    I, Richard Bursky, RMR, CRR, CCR, do hereby disclose
3  pursuant to Article 10.B. of the Rules and Regulations
4  of the Board of Court Reporting of the Judicial Council
5  of Georgia that I am a Georgia CCR; Veritext Legal
6  Solutions was contacted by the party taking the
7  deposition to provide court reporting services for this
8  deposition; this deposition will not be taken under any
9  contract that is prohibited by O.C.G.A. 15-14-37(a) and
10 (b); and I am not disqualified for a relationship of
11 interest under O.C.G.A. 9-11-28(c).
12     There is no contract to provide reporting
13 services between myself, Veritext Legal Solutions, or
14 any person with whom I have a principal and agency
15 relationship and any party to the case, any counsel in
16 the case, anyone having a financial interest in the
17 case, or agents to any party to the case, any counsel
18 in the case, or anyone having a financial interest in
19 the case. There is no agreement in place prohibited by
20 O.C.G.A. 15-14-37(a) and (b). Any case-specific
21 discounts are automatically applied to all parties at
22 such time as any party receives a discount.
23
24           [signature]
              Richard Bursky, RMR, CRR, CCR 2509
25            Veritext Legal Solutions

Page 300

1  CERTIFICATE OF COURT REPORTER
2
3  STATE OF GEORGIA    )
4  COUNTY OF HENRY     )
5
6
7     I hereby certify that the foregoing deposition
8  was reported as stated in the caption, by the method of
9  machine shorthand, and the questions and answers
10 thereto were reduced to typewriting by me; that the
11 foregoing pages represent a true, correct, and complete
12 transcript of the evidence given on February 13, 2024,
13 by the witness, Paul Dopp, who was first duly sworn by
14 me.
15
16    This the 14th of February, 2024.
17
18
19
20
21
22
23           [signature]
              Richard Bursky, RMR, CRR, CRC
24            Certified Court Reporter 2509
25

Page 301

1  JONATHAN CHALLY, ESQUIRE
2  jchally@cgc-law.com
3         February 14, 2024
4  RE:   Roadsync, Inc. v. Relay Payments, Inc., Et Al.
5        2/13/2024, Paul Dopp (#6461939)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 litsup-ga@veritext.com
16   Return completed errata within 30 days from
17 receipt of testimony.
18   If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22         Yours,
23         Veritext Legal Solutions
24
25